**In The**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **ARCHITECTS & ENGINEERS FOR 9/11 TRUTH,** *et al.,* | ) ) ) |
| *Plaintiffs-Appellants,* | ) ) |
| v. | ) Case No.: 22-5267 ) ) |
| **GINA RAIMONDO, in her official capacity as Secretary         of Commerce,** *et al.,* | ) ) ) ) |
| *Defendants-Appellees.* | ) |

**APPENDIX**

Mick G. Harrison, Attorney at Law (#55038)
520 S. Walnut Street, #1147
Bloomington, IN 47402
Tel. 812-361-6220
Fax 812-233-3135
Eml. mickharrisonesq@gmail.com

**Page A1**

# APPENDIX TABLE OF CONTENTS

**Page**

DISTRICT COURT DOCKET ENTRIES                                    A3

NOTICE OF APPEAL     .     .     .     .     .     .     .     .     A12

AUGUST 2, 2022 ORDER OF DISTRICT COURT          .     .     .     A14

AUGUST 2, 2022 MEMORANDUM OPINION OF DISTRICT COURT     A15

FIRST AMENDED COMPLAINT     .     .     .     .     .     .     A29

ANGLE DECLARATION, COMPLAINT EXHIBIT 1     .     .     .     A116

MCILVAINE DECLARATION, COMPLAINT EXHIBIT 2     .     .     A121

BROOKMAN DECLARATION, COMPLAINT EXHIBIT 3     .     .     A123

EXHIBIT A TO DEFENDANTS' MOTION TO DISMISS     .     .     A127

APPEAL,CLOSED,TYPE−E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:21−cv−02365−TNM

| | |
|---|---|
| ARCHITECTS & ENGINEERS FOR 9/11 TRUTH et al v. RAIMONDO et al | Date Filed: 09/07/2021 |
| | Date Terminated: 08/02/2022 |
| Assigned to: Judge Trevor N. McFadden | Jury Demand: None |
| Cause: 05:702 Administrative Procedure Act | Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**ARCHITECTS & ENGINEERS FOR 9/11 TRUTH**　　represented by　**Mick G. Harrison**
Mick G. Harrison, ESQ.
520 S. Walnut Street
520 S. Walnut Street
Suite 1147
Bloomington, IN 47402
812−361−6220
Fax: 812−233−3135
Email: mickharrisonesq@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
CLIFFORD & GARDE LLP
815 Black Lives Matter Plaza, N.W.
Suite 4082
Washington, DC 20006
202−280−6115
Fax: 202−789−0101
Email: jclifford@cliffordgarde.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MATT CAMPBELL**　　represented by　**Mick G. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Page A3**

1

**DIANA HETZEL**                          represented by   **Mick G. Harrison**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **John M. Clifford**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT MCILVAINE**                      represented by   **Mick G. Harrison**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **John M. Clifford**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**HELEN MCILVAINE**                       represented by   **Mick G. Harrison**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **John M. Clifford**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DREW DEPALMA**                          represented by   **Mick G. Harrison**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **John M. Clifford**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BARBARA
KRUKOWSKI−RASTELLI**                      represented by   **Mick G. Harrison**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

**Page A4**

2

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

KATHLEEN PAPA                            represented by    **Mick G. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

FRANCINE SCOCOZZO                        represented by    **Mick G. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

LYNN AFFLECK                             represented by    **Mick G. Harrison**
*PE*                                                      (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

WILLIAM BRINNIER                         represented by    **Mick G. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

RONALD H. BROOKMAN                       represented by

**Page A5**

**Mick G. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLES MICHAEL HENRY**               represented by   **Mick G. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PETER KOSMOSKI**                       represented by   **Mick G. Harrison**
*PE*                                                     (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SETH MCVEY**                           represented by   **Mick G. Harrison**
*PE*                                                     (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JUSTIN MYERS**                         represented by   **Mick G. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Page A6**

**John M. Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KAMAL OBEID**                    represented by    **Mick G. Harrison**
*SE*                                                (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **John M. Clifford**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAVID A. PARKER**               represented by    **Mick G. Harrison**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **John M. Clifford**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**WILLIAM PREVATEL**              represented by    **Mick G. Harrison**
*AIA*                                               (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **John M. Clifford**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALL PLAINTIFFS**                represented by    **John M. Clifford**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Mick G. Harrison**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

**Page A7**

V.

**Defendant**

| | |
|---|---|
| **GINA M. RAIMONDO**<br>*in her official capacity as Secretary of Commerce* | represented by **Kathryn L. Wyer**<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch<br>1100 L Street, NW<br>Washington, DC 20005<br>(202) 616−8475<br>Fax: (202) 616−8470<br>Email: kathryn.wyer@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | |
|---|---|
| **JAMES OLTHOFF**<br>*Dr.; in his official capacity as Director of the National Institute for Standards and Technology* | represented by **Kathryn L. Wyer**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | |
|---|---|
| **NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY** | represented by **Kathryn L. Wyer**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/07/2021 | 1 | | COMPLAINT against NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO ( Filing fee $ 402 receipt number ADCDC−8715119) filed by ALL PLAINTIFFS. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Secretary of Commerce Gina Raimondo, # 3 Summons to NIST Director Olthoff, # 4 Summons to NIST)(Clifford, John) Modified on 9/10/2021 to edit docket text (znmg). (Entered: 09/07/2021) |
| 09/07/2021 | 2 | | ENTERED IN ERROR..... MOTION for Leave to Appear Pro Hac Vice : Attorney Name− Mick G. Harrison, Filing fee $ 100, receipt number ADCDC−8715628. Fee Status: Fee Paid. by ALL PLAINTIFFS. (Attachments: # 1 Declaration of Attorney Mick Harrison)(Harrison, Mick) Modified on 9/10/2021 to edit docket text (znmg). Modified on 9/13/2021 (znmw). (Entered: 09/07/2021) |
| 09/08/2021 | | | NOTICE OF ERROR re 1 Complaint; emailed to jclifford@cliffordgarde.com, cc'd 1 associated attorneys —− The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & full residence address of each party using the event Errata., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (znmg, ) (Entered: 09/08/2021) |

**Page A8**

| 09/08/2021 | 3 | ERRATA *Corrected Complaint with Plaintiffs' addresses* by ALL PLAINTIFFS re 1 Complaint, filed by ALL PLAINTIFFS. (Clifford, John) Modified on 9/10/2021 to edit docket text (znmg). (Entered: 09/08/2021) |
|---|---|---|
| 09/10/2021 | | Case Assigned to Judge Trevor N. McFadden. (znmg) (Entered: 09/10/2021) |
| 09/10/2021 | 4 | STANDING ORDER Establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 9/10/2021. (lctnm2) (Entered: 09/10/2021) |
| 09/13/2021 | | NOTICE OF CORRECTED DOCKET ENTRY: Docket Entry 2 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mick G. Harrison was entered in error (invalid login/signature); motion must be filed by sponsoring attorney.(znmw) (Entered: 09/13/2021) |
| 09/13/2021 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mick Harrison, Filing fee $ 100, receipt number ADCDC−8727350. Fee Status: Fee Paid. by ALL PLAINTIFFS. (Attachments: # 1 Affidavit)(Clifford, John) (Entered: 09/13/2021) |
| 09/13/2021 | 6 | SUMMONS (3) Issued Electronically as to All Defendants. (Attachment: # 1 Notice and Consent)(znmg) (Entered: 09/13/2021) |
| 09/13/2021 | | MINUTE ORDER granting 5 Motion for Leave to Appear *Pro Hac Vice*. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click here for instructions. Signed by Judge Trevor N. McFadden on 9/13/2021. (lctnm2) (Entered: 09/13/2021) |
| 09/13/2021 | 7 | NOTICE of Appearance by Mick G. Harrison on behalf of All Plaintiffs (Harrison, Mick) (Entered: 09/13/2021) |
| 11/08/2021 | | MINUTE ORDER. Plaintiffs filed the Complaint in this action on September 7, 2021. As of the date of this Order, the public docket reflects that Plaintiffs have yet to file proof of service of each Defendant. The Court directs Plaintiffs' attention to Federal Rule of Civil Procedure 4(m) and Local Civil Rule 5.3. It is hereby ORDERED that, by no later than December 6, 2021, Plaintiffs must either cause process to be served upon each Defendant and file proof of service with the Court or establish good cause for the failure to do so. Failure to make such filings will result in dismissal of this case. SO ORDERED. Signed by Judge Trevor N. McFadden on 11/8/2021. (lctnm2) (Entered: 11/08/2021) |
| 11/10/2021 | | Set/Reset Deadlines: Plaintiffs' proof of service due by 12/6/2021. (hmc) (Entered: 11/10/2021) |
| 11/18/2021 | 8 | NOTICE of Appearance by Kathryn L. Wyer on behalf of NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO (Wyer, Kathryn) (Entered: 11/18/2021) |
| 11/18/2021 | 9 | Consent MOTION for Extension of Time to File Answer re 3 Errata *or Otherwise Respond*, Consent MOTION for Briefing Schedule by NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) (Entered: 11/18/2021) |
| 11/18/2021 | | |

**Page A9**

|  |  |  |
|---|---|---|
|  |  | MINUTE ORDER granting 9 Consent Motion for Extension of Time and for Briefing Schedule. Defendants' Motion to Dismiss the 3 Complaint will be due by December 23, 2021; Plaintiffs' opposition will be due by January 31, 2022; and Defendants' Reply will be due by February 17, 2022. SO ORDERED. Signed by Judge Trevor N. McFadden on 11/18/21. (lctnm2) (Entered: 11/18/2021) |
| 11/19/2021 |  | Set/Reset Deadlines: Defendants' Motion to Dismiss due by 12/23/2021. Plaintiffs' opposition due by 1/31/2022. Defendants' reply due by 2/17/2022. (hmc) (Entered: 11/19/2021) |
| 12/06/2021 | 10 | DECLARATION *of Counsel for Proof of Service* by ALL PLAINTIFFS re Order,,. (Attachments: # 1 Exhibit 1 Postal Service Proof of Delivery and Tracking for Service of Summons, # 2 Exhibit 2 Summons served)(Harrison, Mick) (Entered: 12/06/2021) |
| 12/23/2021 | 11 | MOTION to Dismiss by NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A − NIST IQA Guidelines, # 3 Text of Proposed Order)(Wyer, Kathryn) (Entered: 12/23/2021) |
| 12/23/2021 | 12 | Consent MOTION To Excuse Compliance with Local Rule 7(n) by NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) (Entered: 12/23/2021) |
| 12/23/2021 |  | MINUTE ORDER grants 12 Consent Motion to Excuse Compliance with LCvR 7(n). Defendants need not file a certified list of the contents of the administrative record. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/23/21. (lctnm2) (Entered: 12/23/2021) |
| 01/12/2022 | 13 | Consent MOTION for Briefing Schedule *on Motion to Dismiss First Amended Complaint* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Harrison, Mick) (Entered: 01/12/2022) |
| 01/12/2022 |  | MINUTE ORDER granting in part 13 Consent Motion for Briefing Schedule. Plaintiffs shall file their amended complaint by January 31, 2022. Defendants shall file by March 11, 2022 their motion to dismiss that complaint. Plaintiffs' opposition will be due by April 11, 2022, and Defendants' reply will be due by April 25, 2022. Given this new schedule, the Court denies as moot Defendants' 11 Motion to Dismiss. SO ORDERED. Signed by Judge Trevor N. McFadden on 1/12/22. (lctnm2) (Entered: 01/12/2022) |
| 01/13/2022 |  | Set/Reset Deadlines: Amended Complaint due by 1/31/2022. Motion to dismiss due by 3/11/2022. Opposition due by 4/11/2022. Reply due by 4/25/2022. (hmc) (Entered: 01/13/2022) |
| 01/31/2022 | 14 | AMENDED COMPLAINT against All Defendants filed by ALL PLAINTIFFS. (Attachments: # 1 Exhibit 1 Declaration of Roland Angle, # 2 Exhibit 2 Declaration of Robert McILvaine, # 3 Exhibit 3 Declaration of Ronald Brookman)(Harrison, Mick) (Entered: 01/31/2022) |
| 01/31/2022 | 15 | Supplement re 14 AMENDED COMPLAINT *Standing Order Redline Version* against All Defendants filed by ALL PLAINTIFFS.(Harrison, Mick) Modified docket event/text on 2/4/2022 (zeg). (Entered: 01/31/2022) |

| | | |
|---|---|---|
| 02/08/2022 | 16 | LEAVE TO FILE DENIED− This document is unavailable as the Court denied its filing. "Leave to file DENIED". Signed by Judge Trevor N. McFadden on 2/8/2022. (zeg) (Entered: 02/08/2022) |
| 03/11/2022 | 17 | MOTION to Dismiss by NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A − NIST IQA Guidelines, # 3 Text of Proposed Order)(Wyer, Kathryn) (Entered: 03/11/2022) |
| 03/11/2022 | 18 | Consent MOTION To Excuse Compliance with Local Rule 7(n) by NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) (Entered: 03/11/2022) |
| 03/11/2022 | | MINUTE ORDER granting 18 Consent Motion to Excuse Compliance with LCvR 7(n). Defendants need not file a certified list of the contents of the administrative record unless later ordered by the Court. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/11/22. (lctnm2) (Entered: 03/11/2022) |
| 04/11/2022 | 19 | Memorandum in opposition to re 17 MOTION to Dismiss filed by ALL PLAINTIFFS. (Harrison, Mick) (Entered: 04/11/2022) |
| 04/15/2022 | 20 | Consent MOTION for Extension of Time to File Response/Reply as to 17 MOTION to Dismiss by NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) (Entered: 04/15/2022) |
| 04/15/2022 | | MINUTE ORDER granting 20 Consent Motion for Extension of Time. Defendants reply is due by May 2, 2022. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/15/22. (lctnm2) (Entered: 04/15/2022) |
| 04/15/2022 | | Set/Reset Deadlines: Reply due by 5/2/2022. (hmc) (Entered: 04/15/2022) |
| 05/02/2022 | 21 | REPLY to opposition to motion re 17 MOTION to Dismiss filed by NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, JAMES OLTHOFF, GINA M. RAIMONDO. (Wyer, Kathryn) (Entered: 05/02/2022) |
| 08/02/2022 | 22 | MEMORANDUM OPINION re Defendants' 17 Motion to Dismiss. Signed by Judge Trevor N. McFadden on 8/2/22. (lctnm2) (Entered: 08/02/2022) |
| 08/02/2022 | 23 | ORDER granting Defendants' 17 Motion to Dismiss. See attached Order for details. Signed by Judge Trevor N. McFadden on 8/2/22. (lctnm2) (Entered: 08/02/2022) |
| 10/03/2022 | 24 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 23 Order on Motion to Dismiss, 22 Memorandum & Opinion by LYNN AFFLECK, ARCHITECTS & ENGINEERS FOR 9/11 TRUTH, WILLIAM BRINNIER, RONALD H. BROOKMAN, MATT CAMPBELL, DREW DEPALMA, CHARLES MICHAEL HENRY, DIANA HETZEL, PETER KOSMOSKI, HELEN MCILVAINE, ROBERT MCILVAINE, SETH MCVEY, JUSTIN MYERS, KAMAL OBEID, KATHLEEN PAPA, DAVID A. PARKER, FRANCINE SCOCOZZO. Filing fee $ 505, receipt number ADCDC−9573206. Fee Status: Fee Paid. Parties have been notified. (Harrison, Mick) (Entered: 10/03/2022) |

**Page A11**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
ARCHITECTS & ENGINEERS FOR 9/11 TRUTH, et al.,  )
                                                )
        Plaintiffs,                             )
                                                )
        v.                                      )   No. 1:21-cv-2365-TNM
                                                )
GINA M. RAIMONDO, in her official capacity as   )
Secretary of Commerce, et al.                   )
                                                )
        Defendants.                             )
_____ )

## **NOTICE OF APPEAL**

Notice is hereby given this 3rd day of October, 2022, that Plaintiffs Architects &

Engineers for 9/11 Truth, Robert McILvaine, Helen McILvaine, Matt Campbell, Diana Hetzel,

Kacee Papa, Drew DePalma, Francine Scocozzo, Justin Myers, Bill Brinnier, Ron Brookman,

Seth McVey, Mike Henry, Dave Parker, Peter Kosmoski, Kamal Obeid, and Lynn Affleck

hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from:

1) The final appealable Order of this Court entered on the 2nd day of August, 2022 (Doc.

23), in its entirety, which granted the Motion to Dismiss filed by (all) Defendants GINA M.

RAIMONDO, in her official capacity as Secretary of Commerce, DR. JAMES OLTHOFF, in his

official capacity as Director of the National Institute for Standards and Technology, and THE

NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY; and

2) The related Memorandum Opinion of this Court that accompanied the above

referenced Order, also entered on the 2nd day of August, 2022 (Doc. 22), in its entirety, which

concluded *inter alia* that Plaintiffs lack standing.

1

**Page A12**

Respectfully submitted,


/s/ Mick G. Harrison
Mick G. Harrison, Attorney at Law
D.C. Circuit Bar No. 55038
520 S. Walnut Street, #1147
Bloomington, IN 47402
Tel. 812-361-6220
Eml. mickharrisonesq@gmail.com

Attorney for Plaintiffs-Appellants

2

**Page A13**

11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ARCHITECTS & ENGINEERS FOR 9/11 TRUTH,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **GINA M. RAIMONDO**, *in her official capacity as Secretary of Commerce*, *et al.*, <br><br> Defendants. | Case No. 1:21-cv-02365 (TNM) |

## ORDER

Upon consideration of the pleadings, relevant law, related legal memoranda in opposition and support, and the entire record, for the reasons set forth in the accompanying Memorandum Opinion it is hereby

ORDERED that Defendants' [17] Motion to Dismiss is GRANTED.

**SO ORDERED**.

This is a final, appealable Order.  The Clerk of Court is directed to close the case.

2022.08.02
07:48:51 -04'00'

Dated: August 2, 2022                          TREVOR N. McFADDEN, U.S.D.J.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARCHITECTS & ENGINEERS FOR 9/11 TRUTH**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **GINA M. RAIMONDO**, *in her official capacity as Secretary of Commerce*, *et al.*, <br><br> Defendants. | Case No. 1:21-cv-02365 (TNM) |

### MEMORANDUM OPINION

Eighteen individuals and one organization claim that a government agency has incorrectly reported why a World Trade Center (WTC) building collapsed on 9/11. These claims echo their similar allegations that this Court dismissed two years ago for lack of standing. And one year ago, the Southern District of New York likewise dismissed similar claims from some of these Plaintiffs for lack of standing.

Not much changes here. Although Plaintiffs' claims look different, they suffer from the same infirmities as before. The Court will dismiss their claims for lack of standing.

### I.

Everyone knows that the Twin Towers collapsed on September 11, 2001. Less known is that a nearby 47-story building, known as WTC 7, collapsed later that day "without having been struck by an aircraft." Am. Compl. (Compl.) ¶ 93, ECF No. 14. In November 2008, an agency in the Department of Commerce (the Department) called the National Institutes of Standards and Technology (NIST) released three reports about the collapse of WTC 7 (collectively, the WTC 7

**Page A15**

Report or the Report).[1]  NIST concluded that debris from the collapse of one Tower ignited fires

in WTC 7, generating so much heat that a structural support inside the building collapsed.  *See*

Compl. ¶ 126.  Plaintiffs disagree.  They believe that WTC 7 collapsed not from fire but from a

"controlled demolition[,]" *id.* ¶ 94, involving "pre-placed explosives and/or incendiaries" in the

building, *id.* ¶ 12.

> One Plaintiff is Architects & Engineers for 9/11 Truth (Architects), a California nonprofit

whose mission is "to establish the full truth surrounding the events of [9/11]."  *Id.* ¶ 10.

Architects seeks to educate the public about the causes of the collapse and "has made hundreds

of public presentations" to show that "pre-placed explosives and/or incendiaries" destroyed the

WTC buildings.  *Id.* ¶ 12.  Eight Plaintiffs are relatives of those who died on 9/11, *see id.* ¶ 27–

52, though the collapse of WTC 7 "is not known to have directly caused the death of any"

Plaintiff's family member, *id.* ¶ 123.  The other ten Plaintiffs are engineers and architects who

have studied the 9/11 collapses.  *See id.* ¶¶ 54–67.

> The legal background for this dispute begins with the Information Quality Act (IQA), *see*

44 U.S.C. § 3516 note, and then trickles downward into several agency regulations.  Passed in

2001, the IQA directed the Office of Management and Budget (OMB) to issue guidelines to

federal agencies "for ensuring and maximizing the quality, objectivity, utility, and integrity of

information" published by each agency.  *Id.*  Congress imposed some requirements for these

guidelines.  As relevant here, OMB must require each agency to issue its own guidelines about

information it publishes.  *See id.*  Each agency must also "establish administrative mechanisms

---

[1]  Links to these reports are available at https://www.nist.gov/world-trade-center-
investigation/study-faqs/wtc-7-investigation.

**Page A16**

allowing affected persons to seek and obtain correction" of any agency-published information that did not comply with the agency's own guidelines. *Id.*

OMB dutifully promulgated its guidelines in 2002. *See* Guidelines, 67 Fed. Reg. 8452 (Feb. 22, 2002). The Department followed suit later that year and delegated to its agencies the establishment of administrative mechanisms for IQA corrections. *See* Guidelines, 67 Fed. Reg. 62,685, 62,687 (Oct. 8, 2002).

NIST complied and issued guidelines of its own. *See* Mot. to Dismiss (MTD), Ex. A, ECF No. 17-2. These guidelines set forth an internal procedure for the review of NIST-published information, including peer reviews and stricter quality controls for information considered "influential." *Id.* at 13.[2] The guidelines also included a process for corrections to published information. An affected person "may request, where appropriate, timely correction of disseminated information that does not comply" with NIST's guidelines. *Id.* at 15. The requester bears the burden to show "the necessity and type of correction sought," *id.*, and to overcome a presumption that "influential" information is correct, *see id.* Properly submitted requests go to the Chief of the NIST unit responsible for the information. *See id.* at 16. The Chief will investigate and respond within 120 days. *See id.* at 18. A dissatisfied requester may appeal that ruling to NIST's Associate Director for Laboratory Programs, who decides whether to correct the information at issue. *See id.* at 19. His decision is final. *See id.*

Plaintiffs invoked this procedure. In April 2020, they filed a request for correction of NIST's WTC 7 Report and some FAQs about the investigation that NIST had published on its website. *See* Compl. ¶ 111. They challenged NIST's conclusion that fires caused the collapse and argued that "dispositive evidence" showed "the use of explosives and incendiaries" in the

---

[2] All page numbers refer to the pagination generated by the Court's CM/ECF filing system.

3

**Page A17**

building. *Id.* ¶ 113.  The relevant NIST Chief denied the request, *see id.* ¶ 114, as did the Associate Director on appeal, *see id.* ¶ 117.

Plaintiffs then sued NIST, its Director, and the Secretary of Commerce (collectively, the Secretary), arguing that NIST violated the Administrative Procedure Act and other federal laws when it denied the request for correction.  *See generally* Compl.  Across ten claims, Plaintiffs mainly assert that NIST failed in the Report to consider certain evidence or to make correct scientific and methodological judgments.  *See generally id.*  Plaintiffs also allege that these deficiencies violated the "spirit and purpose" of another federal law, *id.* ¶ 355, and that NIST failed to conform to its own procedural regulations, *see id.* ¶¶ 362–70.

The Secretary moves to dismiss the Complaint on various grounds, including under Rule 12(b)(1) for lack of standing.  *See* MTD, ECF No. 17-1.  That motion is now ripe for decision.

## II.

"[T]here is no justiciable case or controversy unless the plaintiff has standing."  *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017).  As the parties seeking federal jurisdiction, Plaintiffs bear the burden to show standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  They "must show (1) [they have] suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant[s] and (3) that is likely" redressable by a favorable decision from the Court.  *EPIC v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (cleaned up).

When ruling on a motion to dismiss under Rule 12(b)(1), the Court "assume[s] the truth of all material factual allegations in the complaint and construe[s] the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).  The Court "may

**Page A18**

consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Cal. Cattlemen's Ass'n v. U.S. Fish and Wildlife Serv.*, 315 F. Supp. 3d 282, 285 (D.D.C. 2018) (cleaned up). And the Court treats any documents attached to the Complaint—like Plaintiffs' three declarations attached to this Complaint—"as if they are part of the complaint." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005).

### III.

Plaintiffs allege that they have informational standing. *See* Opp'n to MTD at 16, ECF No. 19 (Opp'n). To have informational standing, Plaintiffs must suffer an informational injury. For that, they must allege (1) that they "[have] been deprived of information" that a statute requires NIST to disclose; and (2) that they suffer, "by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Any informational injury still must meet the traceability and redressability prongs of the traditional standing analysis. *See FEC v. Akins*, 524 U.S. 11, 25 (1998).

Architects also alleges that it has organizational standing. Organizations must meet the same three requirements as individuals—injury, traceability, and redressability. *See ASPCA v. Feld Ent'mt*, 659 F.3d 13, 24 (D.C. Cir. 2011).

### A.

Before applying those principles, however, consider the caselaw previewed above. Suffice it to say, Plaintiffs are familiar with dismissals for lack of standing.

In *Lawyers Committee for 9/11 Inquiry v. Wray*, a provision in an appropriations bill directed the FBI to review recommendations proposed by the 9/11 Commission. *See* 424 F. Supp. 3d 26, 28 (D.D.C. 2020) (*Lawyers' Comm. I*). Represented by the same attorneys as here,

5

**Page A19**

the plaintiffs there included Architects and one of this case's individual Plaintiffs.  *See id.*  They alleged that the Bureau broke the law when it failed to report to Congress about evidence that pre-placed explosives had collapsed the Twin Towers.  *See id.* at 29.  The plaintiffs alleged that they had informational standing from the FBI's failure to report and that Architects had organizational standing.  *See id.* at 30.

This Court held that the plaintiffs lacked informational standing because the appropriations provision did not "mandate the disclosure of any information." *Id.* at 31 (cleaned up).  They therefore failed the first requirement for an informational injury.  *See id.*  The Court also found no organizational standing.  Architects suggested multiple injuries, including a financial interest in a State Department award, expenses for studies and presentations to rebut the Bureau's report, and expenses to fight defamation of the group by agencies.  *See id.* at 33.  The Court found that these harms stemmed from the deprivation of information, meaning their viability "depend[ed] on the existence of an informational harm," which Architects had not shown.  *Id.* at 34.  And their resource expenditures were for litigation and advocacy not cognizable for organizational standing.  *See id.* at 35.  The Court thus dismissed the complaint. *See id.*

Plaintiffs appealed and the D.C. Circuit affirmed.  *See Lawyers' Comm. for 9/11 Inquiry v. Wray*, 848 F. App'x 428, 431 (2021) (per curiam) (*Lawyers' Comm. II*).  The Circuit held that the appropriations provision said "nothing about disclosure," and thus did not confer a right to information.  *Id.* at 430.  The Circuit also affirmed this Court's holding that the theories of organizational standing were "part and parcel of the alleged informational injury and thus fail with it." *Id.* at 431 (cleaned up).  But in any event, those theories failed the standing analysis. *See id.*

**Page A20**

Finally, Architects and two of this case's individual Plaintiffs sued in *Lawyers'*

*Committee for 9/11 Inquiry v. Barr*, No. 19 Civ. 8312, 2021 WL 1143618, at *1 (S.D.N.Y. Mar.

24, 2021), objecting to the U.S. Attorney's Office's inaction to a petition they filed about alleged

federal crimes on 9/11. *See id.* at *1. The plaintiffs asked the court to order the Office to present

the evidence in the petition to a grand jury. *See id.* at *3. Of relevance here, the court dismissed

three claims because the relevant statute did not grant a private right sufficient for standing nor

did the other asserted injuries—including a reward from the State Department and efforts to

combat alleged defamation—meet the requirements for standing. *See id.* at *6–*8.

## B.

Plaintiffs' arguments fare no better here and indeed repackage unsuccessful arguments

from those earlier cases.

For starters, they again rely on assertions of informational injury. For instance, the

relatives of 9/11 victims say that they might reach "closure" if they had "a more complete picture

of what happened on 9/11." Compl. ¶ 46. This case will allow that closure, they say, "[i]f NIST

is required to correct its WTC 7 Report." *Id.* ¶ 53. In other words, NIST's allegedly incorrect

information keeps them from emotional closure. Likewise for the individual architects and

engineers, who "have suffered a special information injury," Opp'n at 22, because NIST's

alleged mistakes in the Report have "significantly eroded" their "trust in the research and

publishing institutions involved," Compl. ¶ 67. That alleged injury stems, as for the 9/11

relatives, from the information published by NIST. Architects is clearest of all Plaintiffs on its

informational injury—the Report "was more harmful to AE's mission than would have been the

case if NIST [had] issued no report at all." Compl. ¶ 22; *see also* Opp'n at 21 (asserting that the

Report "denied [Architects] and the other plaintiffs critically important information affecting

their individual and organizational interests"). So Plaintiffs come again to this Court with informational injuries.

And yet again, they identify no statute that requires the proposed disclosures. Consider first the IQA. By its terms, that statute required OMB to issue guidance and then other agencies to do likewise. *See* 44 U.S.C. § 3516 note. Nowhere does it require disclosure of information, so Plaintiffs fail the first prong for informational standing. Other courts agree. *See Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006); *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307, 316 (D.D.C. 2009), *aff'd in relevant part on other grounds sub nom. Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010).

To Plaintiffs' credit, they do not argue otherwise. They instead point to the National Construction Safety Act (NCST Act), 15 U.S.C. §§ 7301–7313, arguing that it "supplies the basis" for their standing "[w]hether or not" the IQA does. Opp'n at 21.

Passed in 2002, the NCST Act authorizes deployment of a NIST team after a building collapse "that has resulted in substantial loss of life." 15 U.S.C. § 7301(a). After an investigation, the team must issue a public report including "an analysis of the likely technical cause" of the collapse. *Id.* § 7307(1). The report also must contain the team's recommendations for (1) improvements to building standards, (2) changes to evacuation procedures; and (3) areas of further research. *See id.* § 7307(2)-(4). Any information submitted or received by the team "shall be made available to the public on request," but with some restrictions. *Id.* § 7306(a). The Act shields from disclosure any information exempt under FOIA. *See id.* § 7306(b)(1). More, the agency may withhold information when the NIST Director finds that disclosure "might jeopardize public safety." *Id.* § 7306(d).

8

**Page A22**

Plaintiffs' theory is that NIST violated the NCST Act not because it failed to release a report, but because the WTC 7 Report was "at best an unscientific sham[ ] and likely fraudulent." Opp'n at 21.  That is not enough.  To assert an informational injury, Plaintiffs must be "deprived of information" required to be disclosed under the Act.  *Jewell*, 828 F.3d at 992.  Under its plain terms, the NCST Act requires disclosure only of a report on the technical cause of the collapse, among other things.  *See* 15 U.S.C. § 7307.  Plaintiffs admit that NIST complied with that requirement when it released the WTC 7 Report.  *See* Compl. ¶ 89.  That admission means that regardless of the Report's accuracy, NIST has disclosed all information required by the statute.  As to the Report itself, then, Plaintiffs fail the first requirement for an informational injury.

So too for any information examined by NIST but not included in the final Report.  At various points, Plaintiffs allege that NIST should "make public all of its WTC 7 computer modeling(s)," *id.* ¶ 370(D), and other "withheld evidence" that the team apparently examined, Opp'n at 25.  To be sure, the NCST Act requires this information to be available to the public "on request."  *See* 15 U.S.C. § 7306(a).  Based on that requirement, Plaintiffs say that the NCST Act requires disclosure of the computer models and other evidence used by NIST.[3]

The problem is that under the Act NIST may disclose only information not otherwise exempt under FOIA.  *See id.* § 7306(b)(1).  Thus, Plaintiffs must use FOIA requests to obtain any investigation information not in the public Report, including the computer models.  The NCST Act includes no other request procedure.  *See Cole v. Copan*, No. 19-cv-1182, 2020 WL 7042814 (D.D.C. Nov. 30, 2020); *see also Cole v. Copan*, 485 F. Supp. 3d 243, 253 (D.D.C. 2020) (upholding under FOIA the nondisclosure of WTC investigation information that the NIST

---

[3]  Plaintiffs never explicitly make this argument, but the Court infers it from Plaintiffs' focus on the NCST Act as "the basis" for their standing, Opp'n at 21, and multiple statements in their brief objecting to the withholding of NIST's modelling data.

**Page A23**

Director determined would jeopardize public safety if disclosed). Indeed, at least one Plaintiff has filed such requests. *See* Compl. ¶¶ 58–60.

Plaintiffs fail the first prong as to this information if FOIA is their only recourse. FOIA "does not require the disclosure of any specific information to anyone," *Pub. Citizen Health Rsch. Grp. v. Pizzella*, 513 F. Supp. 3d 10, 20 (D.D.C. 2021), and therefore FOIA alone does not help Plaintiffs clear the first hurdle for informational standing, *see EPIC v. USPS*, No. 21-cv-2156, 2022 WL 888183, at *3 (D.D.C. Mar. 25, 2022). The NCST Act neither references nor incorporates any other disclosure regime or requirement.

Plaintiffs counter that the Court must "adopt Plaintiffs' interpretation" of the relevant statutes. Opp'n at 17. True enough, the Circuit says that a plaintiff must merely allege that "it has been deprived of information that, *on its interpretation*, a statute requires the government" to disclose. *Jewell*, 828 F.3d at 992 (emphasis added). But Plaintiffs disregard their prior appeal where the Circuit clarified that a "plaintiff's reading of a statute for informational standing purposes must at least be plausible." *Lawyers Comm. II*, 848 F. App'x at 430. Plaintiffs cannot avoid the first step by merely "asserting that a statute creates a cognizable interest in information." *Id.* (cleaned up). And as the Court has described, the text of the NCST Act makes Plaintiffs' reading here implausible.

In sum, Plaintiffs have not shown an informational injury.[4] NIST issued the report required by the NCST Act, and any other disclosure requirement in that Act runs through FOIA, which does not meet the first step for an informational injury.

---

[4] One claim might not be informational, but it still fails. Count X alleges that NIST's denial of the request for correction violated NIST guidelines for those corrections. *See* Compl. ¶¶ 362–69. Even so, that procedural error cannot confer standing absent some underlying concrete harm. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Plaintiffs identify no injury beyond the deficient informational one.

10

**Page A24**

## C.

Now for organizational standing. Architects puts forward similar theories of organizational standing as in *Lawyers' Committee I*. *First,* it claims to have a "financial interest at stake" because it applied for an award under the State Department's Rewards for Justice Program. Opp'n at 32. That program provides rewards to individuals who provide information that leads to the arrest or conviction of terrorists. *See* 22 U.S.C. § 2708(a)(3). Architects believes that its application "would likely be successful" if NIST publishes a corrected report. *Id. Second*, Architects asserts that, because of the inaccuracies in the Report, it spent its own resources on a study about the collapse of WTC 7. *See id.* at 30–31.

As before, these theories "are part and parcel of the alleged informational injury and thus fail with it." *Lawyers' Comm. II*, 848 F. App'x at 431 (cleaned up). Each alleged harm stems from NIST's failure to disclose the correct information. Indeed, Architects admits that "had NIST issued a report" with the right information, the engineering study "would have been unnecessary." Compl. ¶ 19. And any successful application to the State Department hinges on "a correction to [NIST's] WTC 7 Report." Opp'n at 32. So Architects yet again claims to have suffered harm "because [NIST] deprived [it] of information[.]" *Lawyers Comm. I*, 424 F. Supp. 3d at 34. "The viability of these other alleged harms thus depends on the existence of an informational harm[,]" which Architects has not shown. *Id.*

In any event, these theories fail even if they do not depend on the informational injury. The D.C. Circuit has already rejected the argument that the State Department program provides standing. Such a claim "rests on layers of speculation—that [NIST's] disclosure of additional evidence would lead to the prosecution of terrorists, which in turn would cause the State Department to exercise its discretion to provide [Architects] an award." *Lawyers' Comm. II*, 848

11

**Page A25**

F. App'x at 431. This theory of standing "fails at the redressability prong."[5] *Lawyers' Comm. I*, 424 F. Supp. 3d at 34.

The engineering study theory is likewise recycled. Architects made the same argument before this Court in *Lawyers' Comm. I. See id.* at 35. The response there holds here. Use of resources for "advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). The point of the study here "seems to be advocacy—shedding light on what [Architects] believe[s] were the true causes of the September 11 attacks." *Lawyers' Comm. I*, 424 F. Supp. 3d at 35. Indeed, the CEO of Architects affirms that the study intended to "publicly critique" NIST's report, Decl. of Ronald Angle ¶ 11, ECF No. 14-1, and to "educate the public regarding the errors in NIST's findings," *id.* ¶ 12. Those are classic descriptions of advocacy activities.

The Court need not rely, however, on its own reasoning. The D.C. Circuit also rejected this argument on appeal, saying the study expenses "cannot plausibly be said to flow from the claimed unlawful conduct; they were instead a self-inflicted budgetary choice that cannot qualify as an injury in fact." *Lawyers' Comm. II*, 848 F. App'x at 431 (cleaned up). So too here.

Architects responds by pointing to *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015). There, the D.C. Circuit held that PETA, an animal-welfare organization, had standing to sue USDA over its failure to issue guidelines about treatment of birds. *See id.* at 1091. Under the applicable statute and regulations, the lack of guidelines meant (1) that PETA could not file complaints with USDA about bird mistreatment and (2) that USDA "was not creating bird-

---

[5] Architects cites dicta from *Sargent v. Dixon*, 130 F.3d 1067, 1070 (D.C. Cir. 1997), to suggest that the possibility of reward gives them standing. *See* Opp'n at 32–33. The Court rejected this argument in the earlier case and does so again here for the same reasons. *See Lawyers' Comm. I*, 424 F. Supp. 3d at 34–35; *see also Barr*, 2021 WL 1143618, at *8 (rejecting the same argument).

**Page A26**

related inspection reports that PETA could use to raise public awareness." *Id.* The Circuit held that those two consequences were concrete enough to create an injury in fact. *See id.* at 1095.

Architects says that this case and *PETA* are "analogous." Opp'n at 24. The Court disagrees. As stated, Architects has not shown that the Secretary's actions caused a "denial of access" to information to which Plaintiffs were entitled. *PETA*, 797 F.3d at 1095. Indeed, NIST has released all information required by the statutes at issue. And Architects never alleges that NIST or the Department have closed off an avenue of redress the way that USDA did in *PETA*. The two cases are not analogous. *See Food & Water Watch*, 808 F.3d at 921 (distinguishing *PETA* on the same bases).

Architects fares no better when it says that this case, like *PETA*, involves "withholding information vital to a non-profit organization's mission." Opp'n at 23. Recall that the agency in *PETA* did withhold information, unlike the Secretary here. At bottom, then, Architects says only that it could not pursue its mission thanks to the Secretary's conduct. That is not enough for injury in fact. *See CREW v. U.S. Off. of Special Counsel*, 480 F. Supp. 3d 118, 129 (D.D.C. 2020).

More, the Court sees no conflict or impairment. The mission of Architects is "to establish the full truth surrounding the events of [9/11]," Compl. ¶ 10, by presenting evidence that "pre-placed explosives" destroyed the buildings on that day, *see id.* ¶ 12. Architects has pursued that mission since its founding in 2006, before the WTC 7 Report. *See id.* ¶ 9. Any attempt to re-examine or critique that report—which does not blame explosives—thus falls into what Architects must do to promote its self-proclaimed mission. Indeed, if education of the public about 9/11 includes technical evidence that explosives caused the collapses, Architects would flout that mission if it let the WTC 7 Report pass without critique. So, based on

13

**Page A27**

Architects' own admission, its challenge of the Report *advances* the organization's mission rather than hinders it.

## IV.

Plaintiffs have shown no reason for this Court to contradict the three decisions that have come before. As in those cases, Plaintiffs lack standing for their claims. The Court will therefore grant the Secretary's motion to dismiss. A separate order will issue.

2022.08.02
07:47:09 -04'00'

Dated: August 2, 2022                    TREVOR N. McFADDEN, U.S.D.J.

14

**Page A28**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ARCHITECTS & ENGINEERS FOR 9/11 TRUTH** | ) |
| 2342 Shattuck Ave., | ) |
| Suite 189 Berkeley, CA 94704 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **MATT CAMPBELL** | ) |
| 97a High Street | ) |
| West Sussex, BN6 9RE | ) |
| United Kingdom | ) |
| | ) |
| **AND** | ) |
| | ) |
| **DIANA HETZEL** | ) |
| 134 Boulson Road | ) |
| Rockville Centre, NY 11570 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **ROBERT MCILVAINE** | ) |
| 322 Twining Rd | ) |
| Oreland, Pa. 19075 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **HELEN MCILVAINE** | ) |
| 322 Twining Rd | ) |
| Oreland, Pa. 19075 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **DREW DEPALMA** | ) |
| 6 Rolling Hills Way | ) |
| Port Murray, NJ 07865 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **BARBARA KRUKOWSKI-RASTELLI** | ) |
| 16227 79th Terrace North | ) |
| Palm Beach Gardens, FL 33481 | ) |
| | ) |
| **AND** | ) |

1

**Page A29**

**KATHLEEN PAPA**                                    )
1103 Morse Brook Road                               )
Putney, VT 05346                                    )
                                                    )
**AND**                                             )
                                                    )
**FRANCINE SCOCOZZO**                               )
Towne Centre Dr., Apt. 1022                         )
Cliffside Park, NJ 07010                            )
                                                    )
**AND**                                             )
                                                    )
**LYNN AFFLECK, PE**                                )
2833 S. US Hwy 89                                   )
Wellsville, UT 84339                                )
                                                    )
**AND**                                             )
                                                    )
**WILLIAM BRINNIER**                                )
P.O. Box 160                                        )
Hurley, NY 12443                                    )
                                                    )
**AND**                                             )
                                                    )
**RONALD H. BROOKMAN**                              )
775 Storybook Court                                 )
Novato, CA 94947                                    )
                                                    )
**AND**                                             )
                                                    )
**CHARLES MICHAEL HENRY**                           )
181 Herman Melville Ave.                            )
Newport News, VA 23606                              )
                                                    )
**AND**                                             )
                                                    )
**PETER KOSMOSKI, PE**                              )
24414 Glen Loch Dr.                                 )
Spring, TX 77380                                    )
                                                    )
**AND**                                             )
                                                    )

2

**SETH MCVEY, PE**                                   )
7300 Parkwood Dr. NW                                 )
Abequerque, NM 87120                                 )
                                                     )
**AND**                                              )
                                                     )
**JUSTIN MYERS**                                     )
900 Rockmead Dr. Suite 250                           )
Houston, TX 77339                                    )
                                                     )
**AND**                                              )
                                                     )
**KAMAL OBEID, SE**                                  )
39863 San Moreno Ct.                                 )
Fremont, CA 94539                                    )
                                                     )
**AND**                                              )
                                                     )
**DAVID A. PARKER**                                  )
804 Centennial Ave.                                  )
Sewickley, PA 15143                                  )
                                                     )
**AND**                                              )
                                                     )
**WILLIAM PREVATEL, AIA**                            )
11950 N. Bayshore Dr. #25                            )
North Miami, FL 33181                                )
                                                     )
                Plaintiffs,                          )
                                                     )
v.                                                   ) **Civil No. 1:21-cv-2365-TNM**
                                                     )
**GINA M. RAIMONDO, in her official capacity as**    )
**Secretary of Commerce,**                           )
Office of the Secretary                              )
U.S. Department of Commerce                          )
1401 Constitution Ave NW                             )
Washington, DC 20230                                 )
                                                     )
**AND**                                              )
                                                     )

| | |
|---|---|
| **DR. JAMES OLTHOFF, in his official capacity** | ) |
| **as Director of the National Institute for Standards and** | ) |
| **Technology,** | ) |
| 100 Bureau Drive, Stop 1000 | ) |
| Gaithersburg, MD 20899-1000 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **THE NATIONAL INSTITUTE OF STANDARDS** | ) |
| **AND TECHNOLOGY** | ) |
| 100 Bureau Drive, Stop 1000 | ) |
| Gaithersburg, MD 20899-1000 | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

1.     This is an action for declaratory and injunctive relief under the Administrative

Procedures Act.

2.     This Complaint concerns actions contrary to law, and arbitrary and capricious

actions, taken by the federal agency National Institute of Standards and Technology (NIST)

during the conduct of and reporting of results from a study of the collapse of World Trade Center

Building 7 (WTC 7) on the day of the September 11, 2001, terrorist attacks in New York City.

3.     NIST's Final Report on the Collapse of the World Trade Center Building 7

("NCSTAR 1A") and NIST's Fire Response and Probable Collapse Sequence of World Trade

Center Building 7 ("NCSTAR 1-9"), are collectively referred to herein as the "WTC 7 Report."

4.     This Complaint is submitted by eight family members of people killed on

September 11, 2001, by ten architects and structural engineers, and by the nonprofit organization

Architects & Engineers for 9/11 Truth, Inc. ("Plaintiffs").

## JURISDICTION

5.     This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331. This

**Page A32**

action involves claims under a federal statute, the Administrative Procedures Act.

6.      The Plaintiffs each have standing to bring this action as reflected by the facts alleged herein and in the attached declarations which are incorporated herein by reference.

## VENUE

7.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) as one of the Defendants, Secretary of Commerce Raimondo, is a public official who resides, and performs her official duties, in Washington, D.C.

## PLAINTIFFS

8.      All the Plaintiffs were Requestors in the Request for Correction (RFC) submitted to NIST under the Information Quality Act and were parties to the subsequent appeal of NIST's denial of that RFC, which NIST actions are the focus of this Complaint.

9.      Plaintiff Architects & Engineers for 9/11 Truth (AE) is a non-profit organization, incorporated in California. Since its founding in 2006, AE has conducted an independent, multi-year scientific investigation into the causes of the destruction of World Trade Center Building 7 (WTC 7) as well as the destruction of the World Trade Center Twin Towers (WTC 1 and 2). See attached Declaration of Roland Angle, President and Chief Executive Officer of AE, Exhibit 1.

10.      AE's mission is to establish the full truth surrounding the events of September 11, 2001. AE pursues this mission by conducting research and educating the public about the scientific evidence related to the destruction of the three World Trade Center towers and by working with victims' families and other stakeholders to advocate for a new investigation. At the heart of AE's work is the deeply held conviction that establishing the truth is essential to achieving justice for the nearly 3,000 people murdered on 9/11 and their families.

**Page A33**

11.   AE has submitted a petition to the U.S. Congress, signed by more than 3,500 verified architects and engineers, calling upon the U.S. Congress to open a new investigation of the causes of the collapse of WTC 1, WTC 2, and WTC 7 on 9/11.

12.   AE has made hundreds of public presentations over the years after the 9/11 Commission Report was issued in 2004 regarding various aspects of the technical evidence that supports the conclusion that pre-placed explosives and/or incendiaries, including nano-thermite or nano-thermate, were used to destroy WTC1, WTC2, and WTC7 on 9/11.

13.   From the moment that the National Institute of Standards and Technology (NIST) issued its draft report for public comment on the destruction of WTC 7 on August 21, 2008, AE has been involved in costly examination of the NIST WTC 7 report. This NIST report purports to describe the likely technical cause of the destruction of WTC 7 but, in fact, fails to provide a complete, coherent, and evidentially supported technical cause of the building's destruction.

14.   NIST's demonstrable failure to establish and report the likely technical cause of the destruction of WTC 7 has severely impeded for 13 years AE's mission of establishing the full truth surrounding the events of 9/11, leading AE to devote substantial resources to scrutinizing the NIST WTC 7 report and publicly critiquing its findings.

15.   As part of AE's now-13-year effort to scrutinize the NIST WTC 7 report and publicly critique its findings, AE commissioned and funded a computer modeling study by researchers at the University of Alaska Fairbanks (UAF), expending $316,153 that it paid to UAF from 2015 to 2020. The UAF researchers, led by Professor Leroy Hulsey, concluded that "fire did not cause the collapse of WTC 7 on 9/11, contrary to the conclusions of NIST and private engineering firms that studied the collapse," and that "the collapse of WTC 7 was a

**Page A34**

global failure involving the near-simultaneous failure of every column in the building" (see

https://ine.uaf.edu/wtc7).

16.     Further, as part of AE's 13-year effort to scrutinize the NIST WTC 7 report and

educate the public regarding the errors in NIST's findings, AE in 2019 and 2020 expended

$38,304 to print and mail postcards to approximately 100,000 engineers in the U.S. informing

them about the release and findings of the UAF study. In addition, AE expended $54,044 to

produce a 45-minute documentary film titled "SEVEN" that followed the four-year process of

the UAF study and explained the study's findings to both technical and lay audiences, and AE

expended $9,000 to have a 5-minute version of SEVEN air on PBS to approximately 3 million

viewers across the U.S. In addition, AE expended $16,860 on sending teams of engineers to

three American Society of Civil Engineers (ASCE) conferences in 2018 and 2019 for the

purpose of educating other engineers about AE's findings relative to the NIST WTC 7 report and

the findings of the UAF WTC 7 study. (These outreach efforts to major conferences largely

ceased in 2020 and 2021 due to the Covid-19 pandemic.)

17.     Further, as part of AE's 13-year effort to scrutinize and educate the public

regarding the NIST WTC 7 report , AE expended $4,000 on attorney fees and devoted an

estimated 300 hours of staff time at a cost of approximately $37.50 per hour to research and draft

the Request for Correction to the WTC 7 Report submitted to NIST on April 20, 2020, the

administrative Appeal of NIST's Initial Decision submitted on September 28, 2020, and the

Supplement to this appeal submitted on December 7, 2020.

18.     AE has also devoted substantial staff and volunteer resources over the years to

publishing booklets and articles scrutinizing the NIST WTC 7 report. These booklets and articles

include:

* Beyond Misinformation: What Science Says About the Destruction of World Trade Center Buildings 1, 2, and 7 (50-page booklet),

* The NIST Analyses: A Close Look at WTC 7 (article),

* Free Fall and Building 7 on 9/11 (article),

* 25 Areas of Specific Concern in the NIST WTC Report (article),

* NIST's WTC 7 Reports: Filled with Fantasy, Fiction, and Fraud (article series), and

* 15 years later: on the physics of high-rise building collapses (article published in *Europhysics News*, of which the primary author was an AE staff member).

19.     All of the activities and expenditures described above would have been unnecessary, and AE's mission would not have been severely impeded, had NIST issued a report that provided a complete, coherent, and evidentially supported technical cause for the destruction of WTC 7.

20.     Should NIST be ordered by this court to respond in a substantive, meaningful, and non-erroneous way to the Request for Correction, which would necessarily entail conducting new analyses and revising the NIST WTC 7 report to address the information quality violations contained therein, the harm caused to AE's mission would be remedied, and AE's expenditures of its resources over the past 13 years will have contributed significantly to serving the public interest and AE's mission.

21.     The National Construction Safety Team Act required NIST to make its WTC 7 Report available to the public including to AE.

22.     The WTC 7 Report prepared and publicly released by NIST in 2008 was so technically erroneous and incomplete in its description of the alleged probable collapse sequence, so opaque in regard to its computer modelling (still kept secret), and so misleading

**Page A36**

from a factual, technical, and engineering standpoint that not only did it not serve the goal of Congress in making such reports public (to inform the public and relevant professions regarding the causes of significant building collapses), it was more harmful to AE's mission than would have been the case had NIST issued no report at all.

23.     Had NIST issued no WTC 7 report, AE could have provided the public transparent engineering, architectural, and scientific analyses explaining the technical causes of the WTC 7 building collapse on 9/11 that could have simply been objectively and independently evaluated by the public and other engineers, architects, and scientists. Instead, AE has, in addition, had to expend considerable time and resources to rebut the erroneous and misleading NIST WTC 7 Report, which many in the public assume to be credible because it was issued by a government agency.

24.     AE's mission has also been made more difficult than necessary by NIST's conscious decision to use "black box" (secret) computer modelling which prevents independent engineers, architects, and scientists from determining whether NIST's technical findings as to the cause of WTC 7's collapse can be independently replicated, and if NIST's findings cannot be replicated, where NIST's computer modelling work was in error (or intentionally misleading).

25.     AE as an organization also supports the Petition submitted by the Lawyers' Committee for 9/11 Inquiry, Inc. ("Lawyers' Committee") to the United States Attorney for the Southern District of New York (see *infra*) and AE has authorized the Lawyers' Committee to add its name as an organization to the list of Petition signers submitted to the United States Attorney.

26.     AE also joined in the Lawyers' Committee's August 30, 2019, application to the State Department's Rewards for Justice Program which involved submission to the State

**Page A37**

Department of the Lawyers' Committee's Petition to the U.S. Attorney and federal grand jury and the evidentiary exhibits thereto related to the as-of-yet unprosecuted terrorist and other federal crimes related to the use of explosives and incendiaries to destroy WTC 1, WTC 2, and WTC 7 on 9/11.

27.     Plaintiff Matt Campbell, a British national, is the brother of Geoffrey Thomas Campbell. Geoffrey Campbell was attending a Risk Waters conference on the 106th floor of WTC 1 (also known at the North Tower) when the building was struck by an aircraft at 8:46 AM on September 11, 2001. He died in the destruction of WTC 1 at 10:28 AM. His fragmented remains were identified by DNA analysis in 2002, 2004, 2008, and 2013.

28.     An inquest into Geoffrey Campbell's death was held at West London Coroner's Court before Her Majesty's Coroner Alison Mary Thompson on January 29, 2013. In the same hearing the coroner also heard and concluded inquests into the deaths of nine other British victims who perished in the destruction of the Twin Towers and whose remains had been repatriated to the UK. This coroner concluded that Geoffrey's death was due to an aircraft being flown into the building by the terrorist organization Al Qaeda which this coroner concluded caused the building to collapse.

29.     On the basis of substantial evidence not considered at the first inquest, the Campbell family, including Matt Campbell, disputes the coroner's finding that the impact of the aircraft into WTC 1 caused the building's subsequent total destruction.

30.     Matt Campbell, and the Campbell family, on August 26, 2021, applied for a new inquest pursuant to the UK Coroners Act 1988, citing significant evidence not heard by the coroner at Mr. Campbell's first inquest in 2013. The family contends that the unheard evidence contradicts the coroner's official finding that the impact of the aircraft into World Trade Center 1

**Page A38**

at 8:46 AM and the ensuing fires are what caused the building's total destruction at 10:28 AM, taking Geoffrey Campbell's life. They allege that the unheard evidence overwhelmingly supports the conclusion that the destruction of WTC 1 — as well as the destruction of WTC 2 and WTC 7 — was caused by the use of explosives and incendiaries.

31.     The Campbell family has suffered for twenty years from Geoffrey being taken from them long before it was his time. Their grief was compounded by the gradual realization that they did not have the full truth about his murder. They need the truth in order to heal.

32.     The Campbell family's application for a new inquest includes witness statements from six scientific experts and from five eyewitnesses to the World Trade Center's destruction, four of whom were first responders that day. The application contains around 2,500 pages of evidence as well as select volumes of the official reports issued by NIST.

33.     The Campbell family submitted their application for a new inquest to the attorney general for England and Wales whose authority is sought for the family to apply to the High Court for an order granting a fresh inquest. For the attorney general's authority to be granted and a new inquest to be ordered, the Campbell family only needs to demonstrate that evidence not considered at the first inquest may lead to a different verdict. The family does not have the burden of proving to the attorney general or the High Court that a different verdict is likely.

34.     The Campbell family also submitted their application for a new inquest to the senior coroner at the West London Coroner's Court, inviting him to consent to a fresh inquest. If he consents, the High Court can order a fresh inquest without the need for the attorney general's authority or a court hearing. The Acting Senior Coroner has recently notified the Campbell family that she will not object to a new inquest.

35.     Should a new inquest be held, the Campbell family will pursue the verdict that

their son was killed in the explosive demolition of WTC 1.

36.     The Campbell family is represented in their application for a new inquest by Nick Stanage, a barrister at Doughty Street Chambers in London. Mr. Stanage specializes in actions and complaints against the police and in inquests, public inquiries, human rights, and judicial review. He sits as an Assistant Coroner and as a Legally Qualified Chair of Police Misconduct Hearings.

37.     Plaintiff Diana Hetzel is the widow of Fire Fighter Thomas J. Hetzel, Ladder #13. They were married over 5 years. Their daughter, Amanda, was 2.5 years old at the time of 9/11. Tom was a wonderful loving husband who adored his daughter Amanda. He was a positive person and lover of life who always helped his family, friends, and neighbors. He dreamed of becoming a firefighter since he was a boy, and at 18, joined the local volunteer fire department. His dream of becoming a New York City fireman came true in October 1995 when he was inducted into the NYC Fire Service Academy. After graduation, Tom went to his dream firehouse, the one located on 85th Street between 3rd Avenue and Lexington Avenue in Manhattan. He liked being where the action was.

38.     Tom Hetzel was working his 24-hour shift from the evening of September 10 through the days shift on September 11, 2001. He was called to duty downtown at the World Trade Center site right after the second plane hit the South Tower at approximately 9:04am. They were assigned to the South Tower but ended up operating in the North Tower. Tom's position that day was the outside vent man (OV), at the Trade Center his job entailed operating the elevator, bringing firemen up to certain floors and others back down. After the South Tower fell, Tom was bringing another fire man down when their elevator shook, and it got trapped between floors. Tom and the other firefighter managed to escape the elevator and found a

12

**Page A40**

staircase to descend. The other firefighter managed to escape, but Tom met up with someone from his company and went down with them and went missing when Tower One collapsed at 10:29am.

39.      Ms. Hetzel was not notified of Tom being missing until after 10pm on September11, 2001. Throughout that day she believed that he was working rescuing and saving people and had no opportunity to reach out to her because the cell phone towers were out. She eventually reached out to another Fire Department wife. She believed at that time that the other wife she contacted knew that Ms. Hetzel's husband and the 9 other men from his truck company were all unaccounted for, but she didn't want to say so.

40.      Eventually a Lieutenant from Ladder #13/Engine#22 called her to say Tom was missing. She asked how could a 6'4' guy be missing. She was in shock, not knowing what to say or how to react. The Lieutenant said he would keep in touch throughout the night and let her know if they found her husband. Tom was found three weeks after September 11th in a stairwell during the recovery operation. Ms. Hetzel and her daughter, Amanda, will forever have a huge void in their hearts and home without Tom. They each still seek counseling and do the best they can to deal with their new "normal" life.

41.      Plaintiffs Robert and Helen McILvaine are the parents of Bobby McILvaine. Bobby McILvaine was killed at the World Trade Center on 9/11. *See* Declaration of Robert McILvaine, Exhibit 2, incorporated herein by reference. Before entering Princeton, Bobby McILvaine was an honor student who played basketball and soccer at Upper Dublin High School in Fort Washington, Pa. After excelling in his studies at Princeton, Bobby entered the New York publishing world, working for Random House and Henry Holt & Co. He eventually moved to Merrill Lynch, where he was assistant vice president for Media Relations. At the time of his

13

**Page A41**

death on 9/11, he had been applying to graduate programs at Penn and Harvard.

42.     When the McILvaines received word of the Twin Towers being attacked, they weren't overly concerned because Bobby did not work at the Towers. He had an office in the World Financial Centre, just across the street. They later learned, much to their dismay, that Bobby had been in charge of setting up a banking conference at the Towers that morning. Their worry had become acute by nightfall when Bobby hadn't telephoned, which was so unlike him, since he called every day.

43.     The next morning the McILvaines felt compelled to drive to New York and search for him. They went from hospital to hospital searching for any information on Bobby but found nothing. On Thursday, they received word that a body identified possibly as Bobby had been brought to the morgue. Their hearts fell as they headed there to identify their beloved son. Bobby's body was identified by dental records.

44.     The coroner disclosed that Bobby suffered massive trauma to his upper body and face. Bobby had a number of injuries consistent with having been the victim of an explosion and Mr. McILvaine received preliminary concurrence from a forensic pathologist that Bobby's injuries were caused by an explosion. Based on the injuries that Bobby sustained, Mr. McILvaine has concluded that Bobby was killed by a massive explosion as he was entering the WTC North Tower. He was one of the first bodies to be found and identified.

45.     Because of the circumstances of Bobby's death and because government officials were not giving direct and complete answers to 9/11 family members regarding what happened on that day, Mr. McILvaine has felt an on-going need to investigate what really happened at the WTC on 9/11, an investigation he has pursued to this day for his son, Bobby.

**Page A42**

46.     Mr. McILvaine, his wife, and his son Jeff were requesters on the request for

correction submitted to NIST on April 15, 2020. They joined the request for correction because

they believed that establishing the true cause of World Trade Center Building 7's destruction

would provide a more complete picture of what happened on 9/11 and would undoubtedly lead

to further investigation of the Twin Towers' destruction, as the Twin Towers were destroyed in a

manner similar to Building 7 and were operated by the same companies. If the Defendants are

ordered to comply with the requested information quality corrections, it will assist them and

other family members of the 9/11 victims in reaching closure regarding this tragedy and may

result in disclosure of criminal conduct related to 9/11.

47.     Robert McILvaine, Bobby's father, also supports the Petition submitted by the

Lawyers' Committee to the United States Attorney for the Southern District of New York and the

federal grand jury and has authorized the Lawyers' Committee to add his name to the list of

Petition signers submitted to the United States Attorney.

48.     Mr. McILvaine has been requesting, since 9/11, federal government agencies and

Congress to provide a true and complete explanation of how and why his son Bobby died at the

WTC on 9/11.

49.     In the above referenced Petition, Mr. McIlvaine and the other petitioners

requested that the United States Attorney present the information in the Petition concerning

alleged federal crimes to a federal special grand jury pursuant to the United States Attorney's

duty to do so under 18 U.S.C. § 3332(a). On July 30, 2018, Mr. McILvaine and the other

petitioners delivered to the Office of the United States Attorney for the Southern District of New

York their fifty-eight page "First Amended Petition to Report Federal Crimes Concerning 9/11 to

Special Grand Jury or in the Alternative to Grand Jury Pursuant to the United States Constitution

**Page A43**

and 18 U.S.C. § 3332(A)" (hereafter "Amended Petition"). The Petition and the Amended

Petition presented extensive scientific evidence demonstrating the use of explosives and

incendiaries to destroy WTC 1, WTC 2, and WTC 7.

50.     Plaintiffs Drew DePalma and Francine Scocozzo are family members of Jean

DePalma who was killed at the World Trade Center on 9/11. Drew DePalma is the son of Jean

DePalma. He signed the Lawyers' Committee's Petition and joined in the aforementioned

Lawyers' Committee's request to the United States Attorney. Francine Scocozzo is the sister of

Jean DePalma.

51.     Plaintiff Barbara Krukowski-Rastelli is the mother of William E. Krukowski who

was killed at the World Trade Center on 9/11. Ms. Krukowski-Rastelli signed the Lawyers'

Committee's Petition and joined in the aforementioned Lawyers' Committee's request to the

United States Attorney.

52.     Kathleen Papa is the daughter of Edward Papa, who was killed at the World Trade

Center on 9/11.

53.     If NIST is required to correct its WTC 7 Report as requested by Plaintiffs, such

corrected report, which is required to be made available to the Public under the NCST Act, is

reasonably expected to result in a better public understanding of the events of 9/11 and a more

complete picture of the truth of what happened on 9/11, assisting the family members of the 9/11

victims, including those named above as plaintiffs herein, in coming to closure regarding this

tragedy. This information has been sought by Plaintiffs who are family members of 9/11 victims

for twenty years.

54.     Plaintiffs Lynn Affleck, PE, a structural engineer, William Brinnier, an architect,

Ronald H. Brookman, a structural engineer, Charles Michael Henry, an architect, Peter

**Page A44**

Kosmoski, PE, a structural engineer, Seth McVey, PE, a structural engineer, Justin Myers, an

architect, Kamal Obeid, SE, a structural engineer, David A. Parker, an architect, and William

Prevatel, AIA, an architect, were each Requestors in the Request for Correction (RFC) submitted

to NIST under the Information Quality Act, and were parties to the subsequent appeal of NIST's

denial of that RFC, which NIST actions are the focus of this Complaint.

55.     Plaintiff Ronald H. Brookman is a licensed Structural Engineer in the state of

California. His education includes Bachelor of Science and Master of Science degrees in

Civil/Structural Engineering from the University of California at Davis. His professional

experience includes over 35 years of analysis, design, evaluation and rehabilitation of

commercial buildings, including numerous steel structures. See attached Declaration of Ronald

H. Brookman, Exhibit 3, which is incorporated herein by reference.

56.     Mr. Brookman has studied the World Trade Center (WTC) tragedy extensively

since 2007, with a primary focus on the structural aspects of WTC 7 since the final NIST reports

NCSTAR 1A, 1-9 and 1-9A were released in 2008.

57.     Mr. Brookman, as a licensed professional engineer, is charged with safeguarding

life, health, property and public welfare. He takes this obligation seriously and has dedicated

countless hours to understanding the failure of WTC 7. His study is strictly research-oriented and

not speculative.

58.     Mr. Brookman has made numerous attempts to communicate with NIST

regarding his technical questions and concerns. His inquiries include Freedom of Information

Act (FOIA) requests 09-49, 09-50, 10-037, 11-209, 12-009, and 2014-001436 as well as

correspondence with NIST Director Patrick Gallagher and Senior Communications Officer

Michael Newman in 2010.

59.     Several of Mr. Brookman's FOIA requests resulted in the release of original design and construction drawings of WTC 7. These drawings enabled him and others to independently review critical framing members and connections in the undamaged, pre-fire state. Independent verification is an integral part of science and is required to validate the complex NIST analysis.

60.     FOIA request DOC-NIST-2014-001436 (see attached Declaration of Ronald Brookman) was submitted on 7/21/2014. Mr. Brookman's request for information regarding the omission of stiffeners in the NIST analysis was denied on 9/22/2014. He appealed on 10/1/2014. The appeal was denied on 6/25/2015. He has never received a statement from NIST regarding the omission of stiffeners.

61.     Ethical standards require professional engineers to be objective and truthful in reports, statements and testimony, and require that all relevant information be included in reports, statements, and testimony by professional engineers. Significant omissions constitute a violation of these ethical standards.

62.     Through his investigation, Mr. Brookman has concluded that relevant information was omitted from NIST's NCSTAR 1-9 report. This includes the bearing stiffeners shown on Frankel Steel drawing 9114 that were typical at floors eight through 21. These stiffeners were omitted from the NIST analytical models of the seated-beam connection at floor 13 that was allegedly responsible for collapse initiation.

63.     The most recent explanation received by Mr. Brookman from NIST for omitting the stiffeners was in NIST's 8/28/2020 response, signed by Catherine Fletcher, to the 4/15/2020 request for correction, which Mr. Brookman joined as a requester. Her letter to Mr. Ted Walter states "Girder A2001 did not experience any deformation of its web or flange elements at the

**Page A46**

seated connection to Column 79 in the absence of web stiffeners [in NIST's preliminary analysis of the northeast corner floor system]. Therefore, the web stiffener was not needed to prevent web or flange buckling or bending in the 16-story ANSYS model." Although Mr. Brookman agrees that web and flange buckling were not failure modes, he has concluded from his own review of NIST's reports that Flange bending provided NIST's asserted justification for the loss of vertical support for girder A2001 at column 79 (see NCSTAR 1-9 on page 488).

64.    Mr. Brookman has concluded from his investigation that NIST's omission of stiffeners has not been justified, and the preceding statement by Ms. Fletcher is inconsistent with NCSTAR 1-9.

65.    Mr. Brookman has concluded that the NIST authors cannot justify the assumption that collapse initiation resulted from the flange bending and lateral walk-off failure of girder A2001 at column 79, and that NIST has provided incomplete and misleading responses — or no responses — to serious technical inquiries regarding this failure mechanism.

66.    It is Mr. Brookman's professional opinion that detailed independent analyses conducted and reported by researchers at the University of Alaska Fairbanks clarified many questions that NIST has refused to address. These comprehensive studies (Hulsey 2020) arrived at different conclusions from the NIST studies regarding the WTC 7 collapse initiation and the global collapse, including that the stiffeners would indeed prevent flange bending and lateral walk-off failure of girder A2001 at column 79.

67.    Mr. Brookman's trust in the research and publishing institutions involved (NIST and ASCE) has significantly eroded as a result of what he considers unethical conduct surrounding obvious errors and omissions in the NIST WTC 7 reports in question.

**Page A47**

**DEFENDANTS**

68.     Gina M. Raimondo is Secretary of Commerce, head of the Department of

Commerce (DOC), the federal agency of which NIST is a part. Officials of the DOC participated

in and/or consulted with NIST officials regarding NIST's decisions on Plaintiffs' RFC and

Plaintiffs' administrative appeal to NIST of NIST's denial of the RFC.

69.     Dr. James Olthoff serves as the Director of NIST, and Defendant NIST is the

federal agency whose actions are the subject of this Complaint.

**STATUTORY AND REGULATORY FRAMEWORK**

70.     Section 515 of Public Law 106-554 is commonly known as the Data Quality Act

or Information Quality Act (herein referred to as the "IQA").

71.     The IQA, enacted in 2000, provides that the Director of the Office of

Management and Budget ("OMB") shall, with public and federal agency involvement, issue

guidelines under sections 3504(d)(1) and 3516 of title 44, United States Code, that provide

policy and procedural guidance to federal agencies for ensuring and maximizing the quality,

objectivity, utility, and integrity of information disseminated by federal agencies in fulfillment of

the purposes and provisions of the Paperwork Reduction Act. 44 U.S.C. § 3516, note.

72.     The IQA required OMB's Guidelines to direct each Federal agency to which the

guidelines apply to issue agency specific guidelines ensuring and maximizing the quality,

objectivity, utility, and integrity of information disseminated by such agency.

73.     The IQA also required OMB's Guidelines to direct each Federal agency to

establish administrative mechanisms allowing affected persons to seek and obtain correction of

information maintained and disseminated by the agency that does not comply with the OMB and

agency information quality guidelines.

74.     The OMB, pursuant to the IQS, issued government-wide Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies ("OMB Guidelines"). On June 28, 2001, the OMB issued its proposed guidelines implementing the IQA and requesting public comment. 66 Fed.Reg. 34489. OMB issued its updated final guidelines on February 22, 2002. 67 Fed.Reg. 8452.

75.     The OMB guidelines require agencies to "adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal," including "specific standards of quality that are appropriate for the various categories of information they disseminate." 67 Fed.Reg. 8458–59. "Quality is to be ensured and established at levels appropriate to the nature and timeliness of the information to be disseminated." *Id*. at 8458.

76.     The OMB Guidelines state that "'Objectivity' includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner." *Id*. at 8460.

77.     The OMB Guidelines also require that agencies provide "administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines." *Id*. at 8459.

78.     The OMB commentary provided when the OMB Guidelines were published states, in regard to an agency's administrative mechanism allowing affected persons to seek and obtain timely correction of information, that "an objective process will ensure that the office that originally disseminates the information does not have responsibility for both the initial response and resolution of a disagreement." *Id*. at 8458.

79.     NIST in turn, pursuant to the IQA and the OMB Guidelines, issued its own "Guidelines, Information Quality Standards, and Administrative Mechanism" ("NIST IQS").

80.     The NIST IQS define information as follows:

> Information means any communication or representation of knowledge
> such as facts or data, in any medium or form, including textual, numerical,
> graphic, cartographic, narrative, or audiovisual forms. This definition
> includes information that an agency disseminates from a Web page but
> does not include the provision of hyperlinks to information that others
> disseminate. This definition does not include opinions, where the agency's
> presentation makes it clear that what is being offered is someone's opinion
> rather than fact or the agency's views.

81.     The NIST IQS defines dissemination as follows:

> Dissemination means agency initiated or sponsored distribution of
> information to the public. Dissemination does not include distribution
> limited to government employees or agency contractors or grantees; intra-
> or inter-agency use or sharing of government information; and responses
> to requests for agency records under the Freedom of Information Act, the
> Privacy Act, the Federal Advisory Committee Act or other similar law.
> This definition also does not include distribution limited to
> correspondence with individuals or persons, press releases, archival
> records, public filings, subpoenas or adjudicative processes.

82.     Under the OMB Guidelines and the NIST IQS, information quality comprises

three elements: utility, integrity, and objectivity.

83.     "Utility" under the NIST IQS means that the information is "useful to its intended

users." The term "useful," in turn, means that the information is "helpful, beneficial, or

serviceable to its intended users." The NIST IQS further provides that "Where the usefulness of

information will be enhanced by greater transparency, care is taken that sufficient background

and detail are available, either with the disseminated information or through other means, to

maximize the usefulness of the information. The level of such background and detail is

commensurate with the importance of the particular information, balanced against the resources

required, and is appropriate to the nature and timeliness of the information to be disseminated."

84.     "Integrity" under the NIST IQS means that before information is disseminated by

NIST, it is "safeguarded from improper access, modification, or destruction." Furthermore, the integrity of information is protected "to a degree commensurate with the risk and magnitude of harm that could result from the loss, misuse, or unauthorized access to or modification of such information."

85.     "Objectivity" under the NIST IQS means that the information is "accurate, reliable, and unbiased." Moreover, "objective" information is "presented in an accurate, clear, complete, and unbiased manner." In the case of scientific information, "the original and supporting data are generated, and the analytic results are developed, using sound statistical and research methods."

86.     The OMB Guidelines and the NIST IQS apply stricter quality standards to the dissemination of information that is considered "influential." The OMB Guidelines define as "influential" information that "will have or does have a clear and substantial impact on important public policies or important private sector decisions." The NIST IQS defines "influential" similarly.

87.     Regarding influential scientific information and analytic results related thereto, the OMB Guidelines dictate that "agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis could be undertaken by a qualified member of the public." (See 67 F.R. 8460.) Citing OMB Guidelines, the NIST IQS states that "agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties."

88.     "Reproducibility" under the NIST IQS means that the information is "capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is

**Page A51**

reduced (increased)." The NIST IQS states that "With respect to analytic results, 'capable of being substantially reproduced' means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error." (See id.) In other words, if independent analysis of the original or supporting data using identical methods does not generate similar analytic results, the disseminated information does not meet the reproducibility standard imposed on "influential" information.

89.     NIST was required by law to generate the NIST WTC 7 Report under the National Construction Safety Team Act ("NCST Act") (Pub. Law 107-231, 15 U.S.C. § 7301 et seq.), and did so generate the NIST WTC 7 Report in November 2008.

90.     The NCST Act, 15 U.S.C. § 7307, mandates the issuance of a final public report following a NIST investigation of a building collapse subject to the Act.

### FACTS COMMON TO ALL COUNTS

91.     The preceding paragraphs are incorporated herein by reference.

92.     The horrendous attacks of September 11, 2001 (9/11) were the worst attacks on American soil since Pearl Harbor, and perhaps the worst such attacks in the history of the United States.

93.     It is well known that on 9/11, on the morning of the terrorist attacks in New York City, the two World Trade Center (WTC) towers (WTC 1 and WTC 2) completely and rapidly collapsed, resulting in the tragic deaths of over two thousand people, including first responders and citizens working in and visiting the WTC, and exacerbating the already tragic loss of the passengers and crews on the hijacked aircraft. What is less well known is that also on 9/11 a

third WTC building, WTC 7, completely collapsed, much later in the day, without having been struck by an aircraft.

94.    WTC 7's collapse was rapid, symmetrical, and in every respect appeared to be a controlled demolition.

95.    There were also reports on 9/11 from witnesses that there were explosions at the WTC and in WTC 7 prior to and at the time of the collapses of WTC 1, WTC 2, and WTC 7.

96.    Many more people have died after 9/11 as a result of exposure to the toxic and corrosive materials that contaminated the air following the collapse on 9/11 of WTC 7, WTC 1, and WTC 2.

97.    The National Institute of Standards and Technology (NIST) was charged with investigating and reporting the cause of WTC 7's collapse.

98.    NIST in November 2008 issued its findings and conclusions regarding the collapse of WTC 7 in its WTC 7 Report.

99.    NIST, through the NIST WTC 7 Report and the NIST WTC 7 FAQs, has disseminated inaccurate, unreliable, or biased information about the collapse of the WTC 7.

100.    As alleged *infra* in more detail, the NIST WTC 7 Report and the NIST WTC 7 FAQs contain information that violates the IQA, the OMB Guidelines, and the NIST IQS.

101.    As alleged *supra* and *infra* in more detail, NIST's violations of the IQA, the OMB Guidelines, and the NIST IQS significantly and adversely affect Plaintiffs, some of whom are family members of those who died in the 9/11 attacks at the WTC, and some of whom are professional architects and engineers.

102.    The dissemination by NIST of inaccurate, unreliable, or biased information concerning the collapse of WTC 7 may lead to (and may have already led to) the adoption of

25

**Page A53**

unnecessary and improper changes to building codes, standards, and practices. These changes to building codes, standards, and practices could, in turn, lead to needless deaths and injuries if such codes and standards are too lenient or to unnecessary expenses if they are too strict.

103.    The NIST WTC 7 Report is "influential" information under the IQA.

104.    The correction of the WTC 7 Report would serve a useful purpose.

105.    Should the correction of the NIST WTC 7 Report render a finding that the collapse of WTC 7 was caused not by fires but by a controlled demolition, it would instantly cast extreme doubt on NIST's separate findings that the total destruction of two other WTC buildings on 9/11, the WTC Towers, was caused by the airplane impacts and ensuing fires alone, and would most likely lead to congressional and criminal investigations to identify those responsible for the destruction of all three buildings.

106.    Should the correction of the NIST WTC 7 Report render a finding that the collapse of WTC 7 was caused not by fires but by a controlled demolition, government efforts and efforts by architects and engineers and building owners could and would, of necessity, change focus from being concerned with illusory design defects thought to create vulnerability to fire induced collapse in steel framed high-rise buildings to the real threat that steel framed high-rise buildings are (only) vulnerable to collapse if terrorists (whether foreign or domestic) breach security and can access the weight bearing structures of the building to plant explosives and incendiaries. This real threat is an imminently preventable threat by implementation of security measures once this threat is recognized.

107.    Information contained in the NIST WTC 7 Report and the NIST WTC 7 FAQs is a communication of facts and data. The NIST WTC 7 Report was disseminated by NIST via the

**Page A54**

following webpage: https://www.nist.gov/el/final-reports-nist-world-trade-center-disaster-investigation.

108.    Information contained in the NIST WTC 7 FAQs is information disseminated from a webpage. The NIST WTC 7 FAQs were disseminated by NIST via the following webpage: https://www.nist.gov/topics/disaster-failure-studies/faqs-nist-wtc-7-investigation.

109.    Nowhere within the NIST WTC 7 Report or the NIST WTC 7 FAQs does NIST make it clear that what is being offered is someone's opinion rather than fact or the agency's views.

110.    NIST has publicly stated that, although it consulted an outside advisory committee, the content of NIST's WTC 7 Report and recommendations are solely the responsibility of NIST.

111.    Plaintiffs submitted their Request for Correction (RFC) under the IQA to NIST on April 15, 2020.

112.    Plaintiffs filed their RFC with NIST because NIST's conclusion that fires initiated by debris damage from the collapse of one of the towers, WTC 1, caused the collapse of WTC 7 was simply incompatible with the then-available scientific and witness evidence.

113.    Plaintiffs' RFC presented a scientifically and logically irrefutable case based on careful documentation of dispositive evidence clearly showing that the NIST WTC 7 Report's conclusion and rationale that the collapse of WTC 7 on 9/11 was due to fires and not the use of explosives and incendiaries was more than just wrong, it was also so factually inaccurate, methodologically unreliable, scientifically unsound, illogical, and biased that it blatantly violated NIST's IQS requirements of objectivity, utility, transparency, and reproducibility.

27

**Page A55**

114.    The Initial Decision by NIST denying Plaintiffs' RFC was issued on August 28, 2020.

115.    Plaintiffs' administrative Appeal of the Initial Decision Regarding the Request for Correction to NIST's Final Report on the Collapse of World Trade Center Building 7 (Information Quality #20-01) was submitted to NIST on September 28, 2020.

116.    Plaintiffs submitted to NIST on June 1, 2021, a Request for Issuance of Final Decision, and Alternative Notice of Intent to Sue due to NIST's eight-month delay in deciding Plaintiffs' Appeal.

117.    On June 30, 2021, NIST issued its decision denying Plaintiffs' administrative Appeal of NIST's denial of Plaintiffs' RFC.

118.    The corrected information regarding the collapse of WTC 7 that Plaintiffs sought to obtain via their RFC and administrative Appeal to NIST, via a corrected WTC 7 Report, a report required to be made available to the Public under the NCST Act and required to meet transparency standards under the IQA, is information that goes to the heart of the organizational mission of Plaintiff AE.

119.    NIST's denial of the Plaintiffs' RFC and subsequent administrative appeal, and NIST's underlying lack of transparency, and use of information in the WTC 7 Report that lacks integrity, objectivity, utility, and reproducibility obstructs Plaintiff AE's ability to perform its nonprofit public interest mission.

120.    Plaintiff Matt Campbell, Plaintiff Robert McILvaine, and Plaintiff Architects and Engineers for 9/11 Truth each have one or more petitions pending under either the Constitution of the United States, 18 U.S.C. § 3332(a), British law regarding opening an inquest, and/or the U.S. State Department's Rewards for Justice Program, including a petition to Congress and a

**Page A56**

petition to a U.S. Attorney and a federal grand jury, the outcome of which could be materially affected by whether NIST corrects its WTC 7 Report and acknowledges that the cause of the collapse of WTC 7 was the use of explosives and incendiaries. Plaintiffs have invested considerable time and significant amounts of money into preparing and prosecuting these petitions, as well as the RFC and administrative Appeal.

121.    Plaintiff Architects and Engineers for 9/11 Truth filed an application, along with the Lawyers' Committee, to the State Department under the Rewards for Justice Program (RFJ). The RFJ is the U.S. Department of State's Counter-Terrorism Rewards Program, and was established by the 1984 Act to Combat International Terrorism, Public Law 98-533 (codified at 22 U.S.C. § 2708). Administered by the State Department's Bureau of Diplomatic Security, RFJ's goal is to bring international terrorists to justice and prevent acts of international terrorism against U.S. persons or property. Under this program, the Secretary of State may authorize rewards for information that leads to the arrest or conviction of anyone who plans, commits, or attempts international terrorist acts against U.S. persons or property.

122.    Most RFJ reward offers are for up to $5 million. However, reward offers can range from under $1 million to up to $25 million. In addition, RFJ can also pay rewards in cases where there is no prior reward offer, in appropriate circumstances. Since its inception, RFJ has paid more than $125 million to over 80 individuals for information that prevented international terrorist attacks or helped bring to justice those involved in prior acts. Reward payment amounts are based on a number of factors, including, but not limited to, the threat posed by a given terrorist, the severity of the danger or injury to U.S. persons or property, and the value of the information provided.

123.    Although the collapse of WTC 7 on 9/11 is not known to have directly caused the

death of any member of the family of the Plaintiffs, the collapse on 9/11 of WTC 1 and WTC 2 did. If evidence were revealed or confirmed by NIST that any one of these three WTC buildings, WTC 1, WTC 2, or WTC 7, collapsed on 9/11 due to the use of explosives and incendiaries, then the collapses of the other two of these WTC buildings on 9/11 would be immediately suspect as having had the same cause. The ensuing investigations, government and private, would lead to the discovery that explosives and incendiaries were used to cause the complete collapse of all three of these WTC buildings.

**COUNT I:    Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying Plaintiffs' IQA Request for Correction, and Subsequent Administrative Appeal, Regarding NIST's WTC 7 Report, in Adopting an Irrational Rationale for Omitting a Known WTC 7 Structural Feature, the Presence of Which Would Have Precluded NIST's Asserted Collapse Sequence**

124.    All of the foregoing and subsequent paragraphs are incorporated herein by reference.

125.    This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

126.    NIST's modelling is reported by NIST in NIST's WTC 7 Report to have shown that World Trade Center Building 7 (WTC 7) collapsed due to Girder A2001, the girder spanning between Columns 79 and 44, walking off of its support at Column 79 due to stresses and flexure caused by heat from fires in WTC 7 on 9/11, heat that caused Beam K3004 to expand pushing Girder A2001 off of its seat.

127.    WTC 7 Girder A2001 had partial height web stiffeners measuring 3/4 inches thick x 5.5 inches wide x 18 inches high, as indicated in WTC 7 fabrication shop drawing "Frankel 9114."

128.    A primary purpose of the web stiffeners is to prevent web crippling failures, a

30

**Page A58**

purpose NIST has acknowledged.

129.   In addition to stiffening a girder web, these stiffeners significantly increase the bending resistance of the girder flange and would have prevented it from failing due to the stresses and flexure NIST's WTC 7 modelling predicted.

130.   NIST in its final 16-story ANSYS modelling and WTC 7 Report omitted the presence of web stiffeners on WTC 7 Girder A2001 that significantly increase the bending resistance of the Girder A2001 flange and would have prevented Girder A2001 from failing due to flexure, thus preventing it from walking off its support at Column 79. When the web stiffeners that NIST omitted from its analyses are included, the first major step leading to the initiating local failure in NIST's Probable Collapse Sequence is physically impossible.

131.   Those web stiffeners would have prevented the girder flange failure and walk-off of Girder A2001 from its support on Column 79, which NIST concluded was a necessary step in the sequence of events that NIST asserts caused the collapse of WTC 7 on 9/11.

132.   NIST's omission of these web stiffeners is evident in Figure 8-21 of NIST's NCSTAR 1-9 report.

133.   The omission of these web stiffeners was also confirmed via email on October 25, 2013, by NIST public affairs officer Michael Newman.

134.   NIST did not address the omission of the Girder A2001 web stiffeners either in the NIST WTC 7 Report or in the NIST WTC 7 FAQs.

135.   The NIST WTC 7 Report provides no analysis, calculations, or figures explaining how or why Girder A2001 actually walked off of its support at Column 79 in its 16-story ANSYS model. NIST provided only a conclusory, but erroneous, assertion that the thermal expansion of Beam K3004 pushed Girder A2001 far enough to cause this walk-off.

**Page A59**

136.   NIST's excuse in its Initial Decision for omitting the partial height web stiffeners in its final 16-story ANSYS modelling was that the stiffeners were not needed to prevent flange bending because no flange bending occurred in NIST's preliminary LS-DYNA analysis.

137.   This NIST excuse is simply irrational because NIST's Final Report notes that flange bending is an instrumental part of the WTC 7 Girder A2001 walk-off of its support at Column 79, a failure that NIST concludes occurred, and because in NIST's preliminary LS-DYNA analysis, Girder A2001 was not pushed to a position where flange bending and walk-off would occur.

138.   Plaintiff AE did request and fund a study by Professor Leroy Hulsey of the University of Alaska ("UAF Report") which conducted computer modelling of the WTC 7 collapse. That study cost AE $316,153.

139.   The UAF report, and basic engineering analysis, make clear that the girder flange bending and Girder A2001 walk-off at Column 79 reported by NIST in its WTC 7 Report would not occur if the stiffener plates were included in the computer modelling.

140.   When the web stiffeners that NIST omitted from its analyses are included in computer modelling, the first major step leading to the initiating local failure in NIST's Probable Collapse Sequence presented in NIST's WTC 7 Report is shown to be physically impossible.

141.   There was no rational basis for NIST to exclude the stiffeners from its 16-story ANSYS model final modelling of the WTC 7 collapse. NIST arbitrarily and intentionally omitted a known structural feature of WTC 7 that materially affected the result of NIST's analysis of the cause of the collapse of WTC 7 on 9/11.

142.   NIST had no rational basis to deny Plaintiffs' request in the Plaintiffs' RFC and subsequent Appeal to re-run its computer modelling with the stiffeners included.

**Page A60**

143.    There is no reasonable basis for NIST not performing the new analyses requested by Plaintiffs in their RFC and subsequent Appeal since NIST has acknowledged it omitted the web stiffeners from its analyses, and this omission has been shown to have materially affected the results of NIST's analyses.

144.    Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in omitting the stiffeners, NIST's WTC 7 Report is also contrary to the IQA, the OMB Guidelines and the NIST IQS standards for Quality, which include Objectivity, Utility, and Integrity, because it is inaccurate, unreliable, and biased due to the intentional omission of a known structural feature, the stiffeners, that materially affects the result of the analysis. This violates the objectivity element of information quality under the OMB Guidelines and NIST IQS.

145.    NIST's claim also violates the objectivity element of information quality because it is not presented in a complete manner.

146.    NIST's claim also violates the utility element of information quality because care was not taken to make sufficient background and detail available regarding its analysis and claims regarding Girder A2001 walk off in the presence or absence of the Stiffeners, even though greater transparency would have enhanced the usefulness of the information disseminated. NIST merely provides a brief summary of its analysis results and provides no statement regarding the omission of a known structural feature.

147.    NIST's WTC 7 Report and its analysis therein violates the transparency standard imposed upon influential information because NIST did not practice a degree of transparency sufficient to facilitate reproducibility. NIST's assertion that Girder A2001 walked off of its seat at Column 79, without addressing NIST's intentional omission of the stiffeners and the effect

33

**Page A61**

thereof, violates the reproducibility standard imposed upon influential information because — to the extent that independent analysis of the original data using identical methods could be performed — contradictory analytic results were generated by the UAF study.

148.     Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in omitting the stiffeners, NIST's WTC 7 Report is also contrary to the NIST IQS standards for Quality of "influential" information, which standards include Transparency and Reproducibility, due to the intentional omission of a known structural feature, the stiffeners, that materially affects the result of the analysis. If independent investigators, scientists, researchers, or another government agency attempted to reproduce NIST's WTC 7 study results with the information provided in the NIST WTC 7 Report, they would not know that NIST had omitted the stiffeners and their independent modelling would result in significantly different conclusions (because the presence of the stiffeners in the independent modelling would effectively prevent the WTC 7 collapse sequence, and collapse, that NIST asserts in its WTC 7 Report).

149.     In light of the admitted fact that the stiffeners were present on WTC 7 Girder A2001, NIST's claim that Girder A2001 walked off its support at Column 79 based on computer modelling that did not include the stiffeners, fails to comply with the OMB Guidelines and NIST IQS.

150.     NIST, in its actions alleged in this Count I, and also in its actions alleged in Counts II-VIII and X, abdicated its statutory responsibilities under the IQA.

151.     For all the reasons stated herein, this Court should issue an order declaring NIST to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs' RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to correct its WTC

**Page A62**

7 Report to include valid and transparent computer modelling of the collapse of WTC 7 that incorporates the presence of the partial height web stiffeners on WTC 7 Girder A2001 (and in all locations on WTC 7 where these stiffeners were actually installed).

152.    This injunction should also require NIST, pending the results of its new analysis, to revise the NIST WTC 7 Report to reflect that Girder A2001 would not have walked off its support at Column 79 and require NIST to discard its Probable Collapse Sequence and develop a new Probable Collapse Sequence for WTC 7 that is physically possible.

**COUNT II:    Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying Plaintiffs' IQA Request for Correction, and Subsequent Administrative Appeal, Regarding NIST's WTC 7 Report, in Adopting an Irrational Rationale, Contrary to Established Scientific Principles, Mathematics, and the Available Evidence, that the Thermal Expansion of Beam K3004 Could Cause Girder A2001 to Walk Off Its Column 79 Support Initiating NIST's WTC 7 Probable Collapse Sequence**

153.    All of the foregoing and subsequent paragraphs are incorporated herein by reference.

154.    This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

155.    In NIST's WTC 7 Report, NIST concluded that the thermal expansion of beam K3004 (from fires in the building) could and probably did cause Girder A2001 to walk off its Column 79 support (seat), which was the key initiating event in NIST's asserted WTC 7 collapse sequence.

156.    Beam K3004 was the closest beam to Column 79, framing into Girder A2001 from the east. Therefore, the thermal expansion of Beam K3004 dictated the extent of westward displacement of Girder A2001 at Column 79.

157.    Initially, the NIST WTC 7 Report stated that the amount of westward

35

displacement required to make Girder A2001 walk off its support at Column 79 was 5.5 inches, based on the bearing seat having a width of 11 inches (see NCSTAR 1-9, p. 527).

158.    Subsequently, independent researchers discovered that the bearing seat at Column 79 was actually 12 inches wide and informed NIST of the error.

159.    NIST was then forced to revise its dimensions for the seat to 12 inches wide. In response to the independent researchers' discovery and report to NIST, NIST issued an erratum in June 2012 that adjusted the bearing seat width to 12 inches and the distance needed for walk-off to 6.25 inches.

160.    In its erratum, NIST claimed that the errors were merely typographical and that "[t]he dimensions and lateral displacements used in the analyses were correct. (See Errata for NIST NCSTAR 1A, NIST NCSTAR 1-9, and NIST NCSTAR 1-9A, p. 2.).

161.    NIST acknowledged, given this correction/erratum, that 6.25 inches of expansion of beam K3004 would be required to cause Girder A2001 to walk off its Column 79 seat.

162.    This correction regarding the amount of expansion of Beam K3004 required, from 5.5 inches to 6.25 inches, made the walk-off of Girder A2001 under NIST's Probable Collapse Sequence physically impossible, a fact NIST has yet to admit.

163.    Mathematical calculations show that the maximum thermal expansion of beam K3004 that could be reached at any of the different temperatures experienced in WTC 7 on 9/11 is 5.728 inches, which occurs at 654 °C. It is at this temperature that the marginal increase in *shortening* due to heat-induced *sagging* begins to *exceed* the marginal increase in heat-induced *expansion*. Beyond this temperature, Beam K3004 becomes progressively *shorter* as it is heated to higher temperatures.

164.    It was physically impossible for beam K3004 to push Girder A2001 westward at

**Page A64**

least 6.25 inches, because the furthest beam K3004 could expand was 5.728 inches.

165.    Mathematical analysis of the thermal expansion potential of beam K3004 shows that Beam K3004 could not expand far enough to push girder A2001 off its seat.

166.    NIST has provided no analysis calculations, or figures in its WTC 7 Report, in its FAQ, in its Erratum, in its Initial Decision on Plaintiffs' RFC, or in its final decision on Plaintiffs' Appeal, showing otherwise.

167.    Because the width of the Column 79 seat supporting Girder A2001 was 12 inches, one inch wider than NIST initially reported and one inch wider than NIST assumed in its computer modelling calculations, the first major step leading to the initiating local failure in NIST's WTC 7 Probable Collapse Sequence -- Girder A2001 walk off of its Column 79 seat due to thermal expansion of Beam K3004 -- is physically impossible.

168.    NIST ignored the limit of how far Beam K3004 could thermally expand and its resulting inability to cause the walk-off of Girder A2001.

169.    NIST did not re-run its computer modelling of the WTC 7 building collapse after learning that the width of the Column 79 seat for Girder A2001 was 12 inches rather than 11 inches.

170.    In light of the fact that Beam K3004 could not have thermally expended 6.25 inches, and therefore WTC 7 Girder A2001 could not have been pushed off of its Column 79 seat, NIST's claim that Girder A2001 walked off its support at Column 79 fails to comply with the OMB Guidelines and NIST IQS because it lacks objectivity, utility, transparency, and reproducibility.

171.    Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in its calculation of thermal

expansion of Beam K3004 and use of an incorrect width for Girder A2001's Column 79 seat,

NIST's WTC 7 Report is also contrary to the IQA, the OMB Guidelines and the NIST IQS

standards for Quality, which include Objectivity, Utility, and Integrity because it is inaccurate,

unreliable, and biased due to use of knowingly false or clearly incorrect calculations of thermal

expansion of Beam K3004, and/or knowingly false or clearly in error dimensions for the Column

79 seat for Girder A2001. Such use of false or clearly incorrect information of these types

materially affects the result of the analysis of the collapse of WTC 7.

172.    Apart from and in addition to NIST's above referenced decisions and actions

regarding the WTC 7 Report being arbitrary and capricious in its calculation of thermal

expansion of Beam K3004 and use of an incorrect width for Girder A2001's Column 79 seat,

NIST's WTC 7 Report is also contrary to the NIST IQS standards for Quality of "influential"

information, which standards include Transparency and Reproducibility, due to use of knowingly

false or clearly incorrect calculations of thermal expansion of Beam K3004, and/or knowingly

false or clearly in error dimensions for the Column 79 seat for Girder A2001.

173.    If independent investigators, scientists, researchers, or another government

agency attempted to reproduce NIST's WTC 7 study results with the information provided in the

NIST WTC 7 Report, they would either: A) Be forced to use key factual information either

known to be false or clearly in error regarding the dimensions for the Column 79 seat for Girder

A2001, and/or regarding calculations of thermal expansion of Beam K3004, or B) Would have to

find their own correct sources of fact information for the Column 79 seat dimensions and for the

thermal expansion calculations for Beam K3004.

174.    The consequence of this data dilemma created by NIST's improper non-IQA

approach to the WTC 7 modelling and the WTC 7 Report is that the independent researchers'

modelling would, if they followed approach "B" referenced immediately above, result in significantly different conclusions (because they would have used the correct data and calculations) than NIST's WTC 7 collapse sequence, i.e. the independent researchers would not be able to replicate or reproduce NIST's results.

175.    Alternatively, these independent researchers would, if they followed approach "A" referenced above, use the false and inaccurate dimensions and calculations in NIST's WTC 7 Report. Although this approach would, theoretically, replicate NIST's WTC 7 collapse sequence asserted in NIST's WTC 7 Report (if NIST were to make its modelling program and inputs available to independent researchers, which has yet to occur, and that modelling was functional and valid), at minimum this approach would not comply with the IQA and would be arbitrary and capricious, if not fraudulent, because it would be based on false dimensions for a key structural component and false calculations for the thermal expansion of a key beam, which materially alter the results.

176.    NIST's claim is inaccurate, unreliable, and apparently biased because it is inconsistent with the limit of how far beam K3004 could thermally expand.

177.    NIST's failure to show how far beam K3004 expanded in its 16-story ANSYS model violates the objectivity element of information quality because NIST's claim is not presented in a complete manner. If the analyses indicated that Girder A2001 was pushed laterally at least 6.25 inches, as NIST claimed in its June 2012 erratum, NIST should specify how far beam K3004 expanded. NIST's failure to show how far beam K3004 expanded also violates the utility element of information quality because care was not taken to make sufficient background and detail available regarding its claim, even though greater transparency would have enhanced the usefulness of the information disseminated.

**Page A67**

178.    NIST's claim violates the transparency standard imposed upon influential

information because NIST did not practice a degree of transparency sufficient to facilitate

reproducibility.

179.    NIST's claim violates the reproducibility standard imposed upon influential

information because — to the extent that independent analysis of the original data could be

performed — contradictory analytic results were generated by the UAF study.

180.    For all the reasons stated herein, this Court should issue an order declaring NIST

to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs'

RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to correct its WTC

7 Report to include valid and transparent computer modelling of the collapse of WTC 7 that

incorporates the correct width for the Column 79 seat for Girder A2001 and that correctly

calculates the maximum thermal expansion of Beam K3004.

181.    This injunction should also require NIST, pending the results of its new analysis,

to revise the NIST WTC 7 Report to reflect that Beam K3004 could not thermally expand

enough to cause Girder A2001 to walk off its support at Column 79 and require NIST to discard

its Probable Collapse Sequence and develop a new Probable Collapse Sequence for WTC 7 that

is physically possible.

**COUNT III:   Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying
Plaintiffs' IQA Request for Correction, and Subsequent Administrative
Appeal, in Omitting and Failing to Analyze Key Available Evidence of
Sulfidation and Erosion of WTC 7 Steel on 9/11, Evidence that Is
Inconsistent with NIST's WTC 7 Report Conclusion of a Fire Driven
Collapse, and which Supports the Alternative Explanation that Use of
Explosives and Incendiary Materials Caused the WTC 7 Collapse**

182.    All of the foregoing and subsequent paragraphs are incorporated herein by

reference.

40

**Page A68**

183.   This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

184.   Photos, physical samples, and expert analysis of WTC steel, after the collapse on 9/11 of WTC 1, WTC 2, and WTC 7, demonstrate the occurrence of sulfidation and erosion of WTC steel.

185.   As documented in Appendix C of the FEMA World Trade Center Building Performance Study (referred to herein as the "FEMA Report"), published in May 2002, a metallurgical examination was conducted on samples taken from two structural members found in the World Trade Center debris. The three authors of Appendix C — Jonathan Barnett, Ronald R. Biederman, and R. D. Sisson, Jr., who were all professors at the Worcester Polytechnic Institute (WPI) — conducted the metallurgical examination. One of the samples they examined was taken from a beam that appeared to be from WTC 7. The second sample was taken from a beam that appeared to be from WTC 1 or WTC 2. Although the exact location of the beam in the WTC 7 structure could not be determined, the authors noted that "the severe erosion found in several beams warranted further consideration."

186.   Appendix C of the FEMA Report provided the following analysis of the sample taken from WTC 7 (see FEMA Report, p. C-1 to C-2):

> Evidence of a severe high temperature corrosion attack on the steel, including oxidation and sulfidation with subsequent intergranular melting, was readily visible in the near-surface microstructure. A liquid eutectic mixture containing primarily iron, oxygen, and sulfur formed during this hot corrosion attack on the steel. This sulfur-rich liquid penetrated preferentially down grain boundaries of the steel, severely weakening the beam and making it susceptible to erosion. The eutectic temperature for this mixture strongly suggests that the temperatures in this region of the steel beam approached 1,000 °C (1,800 °F), which is substantially lower than would be expected for melting this steel.

187.   The concluding section of Appendix C, entitled "Suggestions for Future

Research," stated 7 (see FEMA Report, p. C-13):

> The severe corrosion and subsequent erosion of Samples 1 and 2 are a very unusual event. No clear explanation for the source of the sulfur has been identified. The rate of corrosion is also unknown. It is possible that this is the result of long-term heating in the ground following the collapse of the buildings. It is also possible that the phenomenon started prior to collapse and accelerated the weakening of the steel structure. A detailed study into the mechanisms of this phenomenon is needed to determine what risk, if any, is presented to existing steel structures exposed to severe and long-burning fires. (Emphasis added.)

188.    The observed erosion of the steel was such an unusual event that The New York Times published a story in February 2002 calling it "perhaps the deepest mystery uncovered in the investigation." Transformations, a publication at WPI, published an article entitled "The 'Deep Mystery' of Melted Steel," which described the eroded steel as follows:

> [S]teel — which has a melting point of 2,800 degrees Fahrenheit — may weaken and bend, but does not melt during an ordinary office fire. Yet metallurgical studies on WTC steel brought back to WPI reveal that a novel phenomenon — called a eutectic reaction — occurred at the surface, causing intergranular melting capable of turning a solid steel girder into Swiss cheese. . . . The New York Times called these findings "perhaps the deepest mystery uncovered in the investigation." The significance of the work on a sample from Building 7 and a structural column from one of twin towers becomes apparent only when one sees these heavy chunks of damaged metal. A one-inch column has been reduced to half-inch thickness. Its edges — which are curled like a paper scroll — have been thinned to almost razor sharpness. Gaping holes — some larger than a silver dollar — let light shine through a formerly solid steel flange. This Swiss cheese appearance shocked all of the fire-wise professors, who expected to see distortion and bending — but not holes.

189.    The NIST WTC 7 Report omits any mention of the severely eroded steel from WTC 7, and the NIST WTC 7 FAQs go as far as claiming that no identifiable steel from WTC 7 was recovered.

190.    The documented phenomenon of sulfidation and erosion of WTC steel cannot be accounted for by a jet fuel fire in, or by a gravity-driven collapse of, WTC 1, WTC 2, and WTC 7. Experiments by independent scientists attempted to reproduce the sulfidation and erosion

observed in the WTC steel using fire and fuels representing office building fires but those experiments did not produce such sulfidation or erosion of steel.

191.    The documented phenomenon of sulfidation and erosion of WTC steel can be accounted for by the use of thermate-based explosives and/or incendiaries. This hypothesis was first posited by retired BYU physics professor Steven Jones in the paper "Revisiting 9/11/2001 — Applying the Scientific Method," which, in addition to being published in The Journal of 9/11 Studies, is archived on NIST's website. "Thermate" is made by adding sulfur to thermite, which is a well-known incendiary consisting of a mixture of powdered aluminum and iron oxide. According to Jones, thermate "combines aluminum powder and iron or other metal oxides with sulfur. The thermate reaction proceeds rapidly and is in general faster than basic thermite in cutting through steel due to the presence of sulfur. (Elemental sulfur forms a low-melting-temperature eutectic with iron)."

192.    Professor Jones notes that, in addition to explaining the observed eutectic reaction, thermate also explains the observed oxidation and sulfidation: "When you put sulfur into thermite it makes the steel melt at a much lower temperature, so instead of melting at about 1538 °C it melts at approximately 988 °C, and you get sulfidation and oxidation in the attacked steel . . ." (See Jones, 2007.)

193.    NIST offers three reasons for dismissing the use of thermite/thermate: (1) the amount needed and the impracticality of applying it, (2) that the observed fires have been shown to explain WTC 7's collapse, and (3) that testing for thermite and thermate would not necessarily have been conclusive.

194.    With respect to the amount of thermite/thermate needed and the impracticality of applying it, NIST's answer totally ignores the possible use of thermite cutter charges capable of

**Page A71**

directing molten iron from the thermite/thermate reaction toward a steel member so as to rapidly and efficiently cut through the steel member. This technology was well developed prior to 9/11. Therefore, the first reason NIST gives for dismissing the use of thermite/thermate in FAQ #14 of the NIST WTC 7 FAQs is arbitrary, misleading, and totally insufficient as a ground for dismissing the thermate hypothesis.

195.   Second, with respect to NIST's claim that the observed fires have been demonstrated to explain WTC 7's collapse, Plaintiffs' RFC and subsequent Appeal make it clear, as alleged in the other counts of this Complaint, that the observed fires have not been demonstrated to explain the collapse. NIST's Probable Collapse Sequence both is physically impossible and fails to explain the observed structural behavior. Thus, NIST cannot use the alleged viability of its demonstrably unviable hypothesis to dismiss a competing hypothesis.

196.   Third, with respect to NIST's claim that "analysis of the WTC steel for the elements in thermite/thermate would not necessarily have been conclusive," the possibility of a scientific investigation or experiment not confirming a hypothesis (or confirming it) is not a logical or legally justifiable reason for NIST not performing its statutory duty to identify the cause of WTC 7's collapse.

197.   NIST claims irrationally in its Initial Decision that it does not need to test the steel at WPI and perform other experiments to determine the cause of sulfidation and erosion of certain WTC steel because it has not been shown with absolute certainty that this steel came from WTC 7.

198.   While Appendix C of the FEMA Report does state that the first sample "appeared" to be from WTC 7, there is no doubt expressed throughout the rest of the appendix, nor in a prior paper co-authored by the WPI professors in the JOM journal (see Barnett et al.,

44

**Page A72**

Dec. 2001) nor in a follow-up 2006 paper co-authored by Sisson and Biederman, that the beam was from WTC 7. In the BBC documentary 9/11: The Third Tower referenced by Dr. Sunder in the 2008 technical briefing, Jonathan Barnett explains how his team was able to determine that the steel member was from WTC 7: "This was the size of steel that they used in the construction of Tower 7. They didn't use this particular kind of steel in Towers 1 or Towers 2. So that's why we know its pedigree. It was a surprise to me because it was so eroded and deformed, and so we took it for analysis in the lab."

199.    Appendix D of the FEMA Report, which documents the steel data collection efforts undertaken at the WTC site and nearby salvage yards, indicates that several pieces of recovered steel were identified as being from WTC 7 (see FEMA Report, p. D-1, D-10, and D-13), and several pieces of WTC steel were shipped to NIST. The spreadsheet documenting the inspected steel includes 4 entries that are explicitly regarding steel from WTC 7 (see page 2 of 13 in the Steel Data Collection Summary of Appendix D) as well as several references to "burnt" and "fire-damaged" steel members, which may have been identified as being from WTC 7 but not noted as such in the spreadsheet. Appendix D includes two photos of columns identified as being from WTC 7.

200.    There are numerous fact indications that this steel is from WTC 7. NIST's representative on the FEMA investigation, John Gross, was present for the documentation and preservation of the severely eroded steel from WTC 7. At a technical briefing on August 26, 2008, for the release of NIST's WTC 7 draft report, NIST's lead investigator Dr. Shyam Sunder was asked if NIST had tested "any WTC 7 debris for explosive or incendiary chemical residues." Dr. Sunder gave the following response: "With regard to the issue of residue, there is reference often made to a piece of steel from Building 7 that is documented in the earlier FEMA report that

deals with some kind of a residue that was found, sulfur-oriented residue. ..."

201.   If testing did conclude that the erosion and sulfidation of this WTC steel could only be caused by thermate, and if there is sufficient evidence to establish with reasonable certainty that this WTC steel came from WTC 7, it would then be clear that such use of thermate would be related to the intentional destruction of WTC 7 by use of explosives and/or incendiaries. There is no other plausible explanation that would account for the presence of thermate at the WTC on 9/11, particularly in quantities sufficient to cause the sulfidation and erosion observed in the WTC steel after 9/11.

202.   In the alternative, if testing did conclude that the erosion and sulfidation of this WTC steel could only be caused by thermate, but there is insufficient evidence to establish with reasonable certainty that this WTC steel came from WTC 7, it would then nonetheless be clear that such use of thermate would be related to the intentional destruction of one or more of the WTC buildings that collapsed on 9/11, by use of explosives and/or incendiaries.

203.   There is no other plausible explanation that would account for the presence of thermate at the WTC on 9/11, particularly in quantities sufficient to cause the sulfidation and erosion observed in the WTC steel after 9/11.

204.   If thermate was used to destroy one of the WTC buildings that collapsed on 9/11 (WTC 1, WTC 2, and WTC 7), there is a reasonable probability that it was used to destroy all three of these WTC buildings, including WTC 7.

205.   NIST avoids analysis of this evidence of sulfidation and erosion of WTC steel by merely assuming that the evidentiary steel at issue came from, or may have come from, another WTC building and not WTC 7.

206.   NIST has no rational basis for failing to determine the cause of the erosion and

sulfidation in the WTC steel.

207.    Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in ignoring WTC steel sulfidation and erosion evidence, NIST's WTC 7 Report is also contrary to the IQA, the OMB Guidelines and the NIST IQS standards for Quality, which include Objectivity, Utility, and Integrity, because it is inaccurate, unreliable, and biased due to the intentional omission of known material evidence that could and likely would materially affect the results of NIST's WTC 7 Report analysis regarding the cause of WTC 7's collapse thus violating the objectivity element of information quality under the OMB Guidelines and NIST IQS. NIST's omission of this evidence violates the objectivity element of information quality because NIST's WTC 7 Report and NIST's analysis is not presented in a complete manner.

208.    The objectivity and integrity IQS standards are also violated because NIST has intentionally avoided evidence that would be inconsistent with its reported conclusions regarding the cause of the collapse of WTC 7.

209.    NIST's WTC 7 Report violates the utility element of information quality because care was not taken to make sufficient background and detail available regarding its conclusions as to the cause of the collapse of WTC 7, specifically a description and analysis of this evidence of WTC steel that was subject to sulfidation and erosion.

210.    Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in ignoring WTC steel sulfidation and erosion evidence, NIST's WTC 7 Report is also contrary to the NIST IQS standards for Quality of "influential" information, which standards include Transparency and Reproducibility, because it is based on the intentional omission of known material evidence that could and likely

would materially affect the results of NIST's WTC 7 Report analysis regarding the cause of WTC 7's collapse.

211.    Greater transparency by NIST as to what this steel sulfidation and erosion evidence could indicate regarding the cause of the collapse of WTC 7 would have enhanced the usefulness of the NIST WTC 7 Report and related information that was disseminated.

212.    If independent investigators, scientists, researchers, or another government agency attempted to reproduce NIST's WTC 7 study results, with the WTC steel sulfidation and erosion evidence omitted and ignored as NIST did, then they would not know that this omitted evidence strongly evinces the use of explosives and incendiaries to destroy WTC 7, but had that evidence been analyzed and the results disclosed by NIST, the independent researchers would likely reach a significantly different conclusion about the cause of the collapse of WTC 7 than NIST did, because the steel sulfidation and erosion evidence would support the conclusion that use of explosives and incendiaries (thermate or nano-thermate) caused WTC 7 to collapse.

213.    For all the reasons stated herein, this Court should issue an order declaring NIST to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs' RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to include in its WTC 7 Report an analysis of WTC steel samples showing evidence of sulfidation and erosion, and requiring NIST to conduct experiments to attempt to reproduce the severe erosion observed in the WTC 7 steel. This injunction should also, pending the results of its new analysis, require NIST to revise the NIST WTC 7 Report to reflect that the only plausible cause of such sulfidation and erosion of WTC steel is the use of thermate and require NIST to discard its Probable Collapse Sequence and develop a new Probable Collapse Sequence for WTC 7 that is

48

physically possible and reflects the intentional use of such incendiary and/or explosive material to cause WTC 7 to collapse.

**COUNT IV:** **Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying Plaintiffs' IQA Request for Correction, and Subsequent Administrative Appeal, in Omitting and Failing to Analyze Key Available Evidence of Eyewitness Reports of Explosions Inside WTC 7 on 9/11, Evidence that Is Inconsistent with NIST's WTC 7 Report Conclusion of a Fire Driven Collapse, and which Supports the Alternative Explanation of Use of Explosives and Incendiary Materials**

214.    All of the foregoing and subsequent paragraphs are incorporated herein by reference.

215.    This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

216.    According to NIST, "Considerable effort was expended to compile evidence and to determine whether intentionally set explosives might have caused the collapse of WTC 7." (See NCSTAR 1A, p. 26.) This statement is inaccurate and misleading. NIST's analysis of "Hypothetical Blast Scenarios," described in Appendix D of NCSTAR 1-9, consisted of determining the lowest mass of explosive needed to sever a critical structural member (Column 79 was chosen) and performing blast modeling to determine the amount of window breakage and noise that would result. Working with contractors from Loizeaux Group International and Applied Research Associates, NIST determined the lowest mass of explosive needed to sever Column 79 was 4 kg (9 lb) of RDX explosives in linear shaped charges, and that detonating this amount of RDX explosives would result in a sound level of approximately 130 to 140 decibels 1 km away for locations where sound propagation was unobstructed. However, NIST and its contractors assumed no attempts at noise abatement and dismissed the possibility of much quieter thermite-based devices being used, despite the fact that steel recovered from WTC 7

49

**Page A77**

exhibited severe erosion indicative of a thermate reaction.

217.     Using the strawman premise that a noise of 130 to 140 decibels would need to have been emitted from WTC 7 if the building had been destroyed with explosives, NIST ignored and distorted eyewitness reports and audio recordings indicative of explosions occurring at the onset of and during WTC 7's collapse.

218.     NIST's claim that "there were no witness reports of such a loud noise, nor was such a noise heard on the audio tracks of video recordings of the WTC 7 collapse" fails to comply with the OMB Guidelines and NIST IQS because it lacks objectivity. NIST's claim is inaccurate, unreliable, and biased because it ignores and distorts a number of eyewitness reports and audio recordings indicative of explosions, in part based on the strawman premise that a noise of 130 to 140 decibels would need to have been emitted from WTC 7 if the building had been destroyed with explosives.

219.     There are a number of eyewitness reports and audio recordings of noises that indicate the occurrence of explosions at the onset of and during WTC 7's collapse. Far more important than whether the observed noises reached NIST's strawman decibel level (based on the flawed premise that RDX was used to sever a column) is whether these noises could have been caused by structural failures and/or the impact of falling debris. Careful review of the eyewitness reports and audio recordings supports the conclusion that the noises could not have been caused by structural failures or the impact of falling debris, leaving explosions as the only remaining explanation.

220.     The NIST WTC 7 Report distorts eyewitness reports of an explosion occurring inside WTC 7 on the morning of 9/11. These eyewitness reports were first given on television on September 11, 2001, by Michael Hess, the New York City corporation counsel, and Barry

**Page A78**

Jennings, deputy director of the Emergency Services Department for the New York City Housing Authority, after the two men had been trapped together inside WTC 7 for at least 90 minutes. Both men were also interviewed by NIST in the spring of 2004. Jennings then gave two more videotaped interviews in subsequent years, before his untimely death in 2008, and Hess gave one more videotaped interview.

221.    NIST's account of Hess and Jennings' experience in WTC 7 is striking for the fact that it omits the most notable aspect of what Jennings, and initially Hess, described witnessing as they reached the 6th floor: a big explosion occurring inside the building, which, according to Jennings, caused the landing they were standing on to give way.

222.    Although Hess later changed his account to the narrative put forward by NIST — according to which the event that Hess and Jennings experienced was actually debris from the collapse of WTC 1 impacting WTC 7 at 10:28 AM — Jennings continued to maintain that he had witnessed an explosion. In any case, assuming that Jennings provided the same account to NIST that he did in every other interview he gave, the NIST WTC 7 Report ignores and distorts the vast majority of his account.

223.    Without even mentioning Jennings' interpretation of what he witnessed, the NIST WTC 7 Report claims that the event Jennings witnessed on the 6th floor landing that he perceived as an explosion was actually caused by debris from the collapse of WTC 1 impacting WTC 7 at 10:28 AM. However, NIST's account is untenable for the simple reason that Hess and Jennings must have reached the 6th floor well before 10:28 AM.

224.    As Jennings noted in his 2007 interview with Dylan Avery, he recalls reaching the 6th floor before the collapse of WTC 2 at 9:59 AM. His account is based on his recollection of being called to WTC 7 shortly after the first airplane strike at 8:46 AM, reaching the 23rd the

floor around the time of the second airplane strike at 9:03 AM, and leaving the 23rd floor with Hess after finding the emergency operations center (EOC) already evacuated. Also, Jennings distinctly remembers, after busting out the 8th floor window and calling for help, watching firefighters come to their aid and then run away twice — the first time following the collapse of WTC 2 at 9:59 AM and the second time following the collapse of WTC 1 at 10:28 AM.

225.    Contrary to Jennings' account, the NIST WTC 7 Report states that Hess and Jennings began to leave the 23rd floor at 9:59 AM. But even if it is assumed that Hess and Jennings began to leave the 23rd floor at 9:59 AM, it is improbable that it would take them 29 minutes to descend 17 floors, which would mean an average of 1 minute and 42 seconds per floor. As noted above, Jennings said in his interview with the BBC, "I wanted to get out of that building in a hurry. So I started, instead of taking one step at a time, I'm jumping landings."

226.    Given the speed at which Hess and Jennings were probably descending the staircase, even a conservative estimate of 20 seconds per floor means that it would have taken them about 6 minutes to reach the 6th floor. Add 1 minute for the amount of time it might have taken them to find the stairwell starting at 9:59 AM (although NIST's account suggests no delay in finding the stairwell), and they would still reach the 6th floor by 10:06 AM, which is 22 minutes before the collapse of WTC 1.

227.    There is no factual or rational basis for NIST's conclusion that debris impacting the south face of WTC 7 could cause a landing in a stairwell on the northern side of the building's core to give way or at least make the stairwell impassable. Apparently recognizing this issue, the NIST WTC 7 Report fails to disclose Mr. Jennings' mention of the landing giving way and structural damage to the stairwell. Instead, the NIST WTC 7 Report implies that Hess and Jennings retreated to the 8th floor because the staircase "filled with smoke and debris." The

NIST WTC 7 Report does not explain how debris impacting the south face of WTC 7 could cause a stairwell on the northern side of the building's core to fill with debris. Nor does it attempt to account for the damage described by Jennings.

228.   As a result, NIST's claim that the event witnessed by Hess and Jennings was caused by the collapse of WTC 1 at 10:28 AM fails to comply with the OMB Guidelines and NIST IQS because it lacks objectivity. This NIST claim is inaccurate, unreliable, and biased because it distorts the initial reports of Hess and Jennings, as well as the account that Jennings continued to stand by in subsequent interviews.

229.   NIST's WTC 7 Report is inaccurate, unreliable, and biased because it relies on the untenable assertion that it took Hess and Jennings approximately 29 minutes to descend 17 stories despite the fact that they were rushing to evacuate the building ("jumping landings").

230.   NIST in its Initial Decision gave no rational basis justifying its untenable assertion that it took Hess and Jennings approximately 29 minutes to descend 17 stories, merely stating: "NIST disagrees with the assertion that it distorted eyewitness reports of an explosion occurring inside WTC 7. The rescue events documented in NCSTAR 1-9, Section 6.5.2, are based on eight independent interviews."

231.   NIST's WTC 7 Report is inaccurate, unreliable, and biased because it does not explain how debris impacting the south face of WTC 7 could cause a stairwell on the northern side of the building's core to fill with debris, nor does it attempt to account for the damage described by Jennings.

232.   NIST's WTC 7 Report is inaccurate, unreliable, and biased because it ignores other video and eyewitness evidence that is consistent with Jennings' account. NIST ignored media reports and first responder reports of explosions occurring on 9/11 at WTC 7. Numerous

**Page A81**

examples of such eyewitness reports of explosions are presented and documented in Plaintiffs'

RFC submitted to NIST.

233.    There is no rational basis for NIST discounting the eyewitness accounts that were

submitted and no rational basis for NIST not interviewing witness Gigi Stone Wood and other

eyewitnesses to explosions identified by Plaintiffs in their submissions to NIST.

234.    NIST's WTC 7 Report violates the utility element of information quality

because care was not taken to make sufficient background and detail available regarding NIST's

assertions in this Report, even though greater transparency would have enhanced the usefulness

of the information disseminated. Given the obvious importance of Hess' and Jennings'

interviews, NIST should have published all, or at least relevant portions of, these interviews.

235.    NIST's claim violates the transparency standard imposed upon influential

information because NIST did not practice a degree of transparency sufficient to facilitate

reproducibility. NIST's WTC 7 Report conclusions, which NIST asserts are based on its

interviews with Hess and Jennings, cannot be validated or invalidated because the public has not

been given access to NIST's interviews with Hess and Jennings.

236.    If independent investigators, scientists, researchers, or another government

agency attempted to reproduce NIST's WTC 7 study results with only the information provided

in the NIST WTC 7 Report, they would not know of most of the eyewitness reports, and their

independent modelling would proceed in ignorance of all these eyewitness reports of explosions

at the WTC, including at least one *in* WTC 7, on 9/11. Absent NIST's omission of these reports

of explosions from credible witnesses including firefighters and police, the independent

researchers' attempts to reproduce NIST's findings as to the cause of the collapse of WTC 7

would result in significantly different conclusions than NIST's because the eyewitness reports of

explosions that would be available in this scenario not only would directly evince use of explosives but would cause closer scrutiny by the researchers of various scientific evidence indicating the use of explosives, such as the sulfidation and erosion of WTC steel and the WTC 7 collapse period of free fall.

237.    For all the reasons stated herein, this Court should issue an order declaring NIST to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs' RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to correct its WTC 7 Report to include a full and complete analysis of the available eyewitness reports of explosions at the WTC generally and in WTC 7 specifically.

238.    The Court's injunction should require NIST, pending the results of NIST's new analysis, to revise the NIST WTC 7 Report to reflect that there are eyewitness reports and audio recordings indicative of explosions at the onset of and during the collapse of WTC 7.

239.    The Court's injunction should require NIST to revise Section 6.5.2 of NCSTAR 1-9 to faithfully reflect the account of Barry Jennings, according to which there was a big explosion inside WTC 7 before 10:28 AM that caused the 6th floor landing he and Michael Hess were standing on to give way.

240.    The Court's injunction should require NIST, pending the results of NIST's new analysis, to discard its Probable Collapse Sequence and develop a new Probable Collapse Sequence that is consistent with the occurrence of an explosion at the onset of the east penthouse collapse as well as explosions later in the collapse sequence and explosions earlier in the day. This could be accomplished by simulating the failure of Columns 79, 80, and 81 high in the building, followed by the near-simultaneous failure of all columns lower in the building over 8 stories.

**Page A83**

241.    Because NIST's assertion that the testimony of Hess and Jennings is "not directly related to the building failure" defies reason, these interviews should not be considered exempt from disclosure and should be ordered to be released to the public by NIST in order to satisfy the IQA, OMB, and NIST information quality Transparency standard.

**COUNT V:    Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying Plaintiffs' IQA Request for Correction, and Subsequent Administrative Appeal, in Mischaracterizing the Initiation of the WTC 7 Collapse, in Adopting in Its WTC 7 Report a Computer Modelling of the WTC 7 Collapse the Results of which Are Facially Contrary to Or Omit Observable and Measurable Features of the Videotaped Actual WTC 7 Collapse, Including a Period of Free Fall, and in Keeping Its Computer Modelling Secret**

242.    All of the foregoing and subsequent paragraphs are incorporated herein by reference.

243.    This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

244.    NIST mischaracterized the initiation of WTC 7's collapse.

245.    NIST's computer modelling failed to reproduce the observable and video recorded features of the collapse of WTC7 as the collapse progressed.

246.    In the section of the NIST WTC 7 Report titled "Accuracy of the Probable Collapse Sequence," NIST states (emphasis added):

Given the complexity of the modeled behavior, the global collapse analyses matched the observed behavior **reasonably well**. The close similarity of the timing and the nature of the events **up to the initiation of global collapse** is strong confirmation of the extent and nature of the structural failures in the interior of the building and the accuracy of the four-step simulation process. ... . The global collapse analysis confirmed the leading collapse hypothesis, which was based on the available evidence.

247.    Contrary to the above assertions, NIST's global collapse analyses do not match

56

**Page A84**

the observed behavior reasonably well and do not confirm NIST's leading collapse hypothesis. NIST's global collapse analyses fail to match most of the observed behavior — predicting fundamentally different structural behavior from what was observed — and therefore they actually disconfirm NIST's leading collapse hypothesis.

248.    NIST's modelling fails to replicate the lack of deformation, vertical descent, and free fall nature of the WTC 7 collapse.

249.    NIST's global collapse analysis predicts significant deformation of the upper exterior walls both before and after the initiation of global collapse. Yet, per NIST's own observations, there is no observed deformation or displacement of the upper exterior corners as late as 7.5 seconds after the initiation of the east penthouse collapse (which is .6 seconds after NIST claims that global collapse initiated). The figures in NIST's WTC 7 Report (i.e. from NCSTAR 1-9) which compare the position of WTC 7's exterior at 5.0 seconds and 7.5 seconds after the initiation of the east penthouse collapse, demonstrate the total absence of deformation or displacement in the upper exterior corners, with NIST actually commenting: "Interestingly, little movement of the northeast and northwest corners of the building is indicated." (NCSTAR 1-9, p. 274.)

250.    NIST claims in NIST WTC 7 FAQ #35 that "Only in the later stages of the animation, after the initiation of global collapse, do the upper exterior wall deformations from the NIST analysis differ from the video images." That NIST claim is simply false. The upper exterior wall deformations appear in the animation prior to the initiation of collapse.

251.    The second way that NIST's global collapse analysis fails to match most of the observed behavior is in the direction of the collapse. The northwest edge of WTC 7 descended

**Page A85**

nearly symmetrically during the first 4 seconds of the global collapse. NIST stated in its WTC 7

Report:

> In this sequence of images, both the northeast and northwest edges began to tilt
> toward the north shortly after the building began to move downward. The
> northeast edge tilt continued to increase until the edge was obscured by dust and
> smoke. The northwest edge initially tilted in a similar manner, but then settled
> back to its original line and fell nearly vertically (or directly toward or away from
> the camera).

In contrast, NIST's global collapse analysis predicts both the northeast and northwest

edges of WTC 7 tipping to the south — not to the north — in a manner that appears they would

not have tilted back to the north and, in the case of the northwest edge, that it would not have

settled back to its original line.

252.    The third way that NIST's global collapse analysis fails to match most of the

observed behavior is by its failure to a predict the observed rate of downward motion from the

initiation of global collapse through to the end of free fall. This downward motion as video

recorded during the actual collapse is characterized by a sudden transition from stasis to free fall

followed by a period of free fall lasting approximately 2.5 seconds, during which WTC 7 fell

downward approximately 8 stories without encountering any resistance (at the acceleration of

gravity).

253.    The NIST WTC 7 Report mischaracterizes the sudden transition to free fall,

instead alleging an initial stage of 1.75 seconds where "the descent was slow and the acceleration

was less than that of gravity." NIST's measurements of the downward motion are based on the

video that NIST labeled as Camera 3. NIST's method of measuring the building's downward

motion by tracking the vertical position of a single point "near the center of the roofline"

oversimplifies and misrepresents the actual downward motion of the entire roofline.

254.    Careful measurement by physicist and researcher David Chandler using the video

**Page A86**

that NIST labeled as Camera 2, which has a line of sight approximately level with the roofline, shows that a point near the center of the roofline did indeed begin to move downward at about 6.9 seconds after the east penthouse collapse initiation, but that the northeast and northwest corners of the roofline did not begin to move downward until about 8.2 seconds after the east penthouse collapse initiation.

255.     Chandler's measurement is corroborated by Figure 5-201 of NCSTAR 1-9, which shows a slight displacement at the middle of the roofline and zero displacement of the upper exterior corners 7.5 seconds after the east penthouse collapse initiation. Then, at 8.2 seconds, within a tenth of a second, all three points along the roofline suddenly began descending uniformly in free fall. While the northeast corner became difficult to track partway into the descent because of smoke, the measurements indicate that the middle of the roofline and the northwest corner stayed in free fall for approximately 2.5 seconds.

256.     Thus, the downward motion of WTC 7's north face roofline at the onset of global collapse is more accurately characterized as a sudden transition to free fall.

257.     NIST's mischaracterization of the sudden transition to free fall is significant not only because it misrepresents the nature of the observed behavior so as to make it seem more consistent with a natural, progressive collapse, but also because it helped NIST claim that its global collapse analysis "matched the observed behavior reasonably well." The NIST WTC 7 Report makes this claim when it asserts: "The three stages of collapse progression described above are consistent with the results of the global collapse analyses discussed in Chapter 12 of NIST NCSTAR 1-9."

258.     In addition to failing to predict the sudden transition to free fall, NIST's global collapse analysis fails to predict the observed period of free fall itself. Because NIST terminates

**Page A87**

the animation of the global collapse analysis 8.1 seconds after the initiation of the east penthouse

collapse, the model effectively cuts off just as it might have been expected to show the observed

period of free fall.

259.    The NIST WTC 7 Report states the following about the global collapse analysis

in a subsection titled "Aspects following the Global Collapse Initiation" (see NCSTAR 1A, p.

44):

> Once simulation of the global collapse of WTC 7 was underway, there
> was a great increase in the uncertainty in the progression of the collapse sequence,
> due to the random nature of the interaction, break up, disintegration, and falling
> debris. The uncertainties deriving from these random processes increasingly
> influenced the deterministic physics-based collapse process, and the details of the
> progression of the horizontal failure and final global collapse were increasingly
> less precise. (Emphasis added.)

But because free fall means that there is no interaction between the falling top section of the

building and the structure below it, it should have been easier for NIST's global collapse analysis

to simulate the observed period of free fall, not more difficult.

260.    The evidence supports the conclusion that NIST terminated its global collapse

analysis 8.1 seconds after the east penthouse collapse initiation because the model had failed to

match most of the observed behavior up until that point, and the model's ability to match the

observed behavior only worsened after that point, as noted by NIST. In NIST's model,

significant deformation and tipping were underway and likely to increase, and there was no

indication in NIST's model that the building was about to enter vertical free fall (but it was, and

was recorded on videotape doing so).

261.    NIST's claim that "the three stages of collapse progression . . . are consistent

with the results of the global collapse analyses discussed in Chapter 12 of NIST NCSTAR 1-9"

is unambiguously false. The second stage, which NIST belatedly admitted based on teacher and

**Page A88**

researcher David Chandler's work, to be 2.25 seconds of free fall, is not shown in NIST's global collapse analysis. Furthermore, NIST's admission that there was increasing uncertainty and less precision in NIST's model following global collapse initiation strongly supports the conclusion that NIST's model would not have shown the observed period of free fall if it had been allowed to continue.

262.    Because NIST's global collapse analysis fails to match most of the observed behavior — predicting fundamentally different structural behavior from what was observed — NIST should have interpreted its global collapse analysis as disconfirming, not confirming, its leading collapse hypothesis.

263.    One fundamental flaw in NIST's claim that its global collapse analysis "matched the observed behavior reasonably well" and therefore "confirmed the leading collapse hypothesis" is that all of the observables NIST relied on for this conclusion are also consistent with the hypothesis of controlled demolition, or more consistent. Further, the hypothesis of controlled demolition readily explains the other fundamental aspects of WTC 7's structural behavior that NIST's global collapse analysis fails to predict: lack of deformation, vertical descent, and free fall.

264.    NIST asserts in its June 30, 2021, Response to the Requestors' IQA Appeal that both NIST's initial denial of the RFC and NIST's rejection of the Requestors' later appeal are justified because there are "differences" in NIST's modelling, assumptions, and evidence collection approaches compared to those of AE and the other Requestors, and therefore, NIST asserts, different results are to be expected.

265.    Plaintiff AE's UAF modelling did obtain materially different results than NIST's WTC 7 Report, and the UAF study did reach materially different conclusions than NIST

regarding what was and what was not the cause of the collapse of WTC 7.

266.    One conclusion of the UAF study is that only an analysis and model that provides for the simultaneous removal/failure of multiple building columns, as was done in Professor Hulsey's UAF study modelling, can predict and explain the WTC 7 collapse behavior actually observed and filmed.

267.    The UAF team, under the direction of Professor Hulsey, after simulating other scenarios, simulated the simultaneous failure of all core columns over 8 stories followed 1.3 seconds later by the simultaneous failure of all exterior columns over 8 stories. The UAF team found that "the simultaneous failure of all core columns followed by the simultaneous failure of all exterior columns produces almost exactly the behavior observed in videos of the collapse."

268.    The UAF team also found that the simultaneous failure of all core columns over 8 stories followed 1.3 seconds later by the simultaneous failure of all exterior columns over 8 stories resulted in a downward velocity and acceleration that matched almost exactly with the observed 2.5 seconds of free fall.

269.    This simultaneous removal/failure of multiple columns in a building is the essence of a controlled demolition.

270.    Unlike Professor Hulsey in the University of Alaska study, NIST fails to evaluate WTC 7 collapse scenarios involving the simultaneous removal/failure of multiple building columns as in a controlled demolition.

271.    NIST arbitrarily included only certain "blast" scenarios, scenarios that could not have predicted/matched the observed behavior of WTC 7 during its collapse, and arbitrarily excluded other scenarios involving use of high-tech incendiaries and explosives that would predict — and do match — the actual behavior of WTC 7 as it collapsed.

**Page A90**

272.    NIST failed to evaluate WTC 7 collapse scenarios involving use of high-tech explosives/incendiaries such as thermate and nano-thermite to achieve a simultaneous removal of multiple columns.

273.    NIST's WTC 7 Report did not explain how WTC 7 experienced, and was video recorded to have experienced, a symmetric straight-down collapse into its own footprint, despite incurring asymmetric damage due to impact from debris falling from the collapsing WTC1.

274.    Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in adopting computer modelling results that do not account for features of the actual WTC 7 collapse, NIST's WTC 7 Report is also contrary to the IQA, the OMB Guidelines and the NIST IQS standards for Quality, which include Objectivity, Utility, and Integrity, because it fails to predict or explain the observable video recorded features of the WTC 7 collapse, and any modelling that does predict and explain these observed features of the collapse would lead to materially different results for a predicted WTC 7 collapse sequence and cause of WTC 7's collapse.

275.    Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in adopting computer modelling results that do not account for features of the actual WTC 7 collapse, NIST's WTC 7 Report is also contrary to the NIST IQS standards for Quality of "influential" information, which standards include Transparency and Reproducibility, because it is based on a "black box" computer modelling that has been kept secret from the public and independent investigators who would like to see if NIST's modelling can be replicated.

276.    NIST's secret "black box" computer model is suspect on its (hidden) face because it fails to predict or explain the observable video recorded features of the WTC 7 collapse.

277.   NIST's claim that its global collapse analysis matched the observed behavior reasonably well violates the reproducibility standard imposed upon influential information because — to the extent that independent analysis of the original data using identical methods could be performed — contradictory analytic results were generated. The UAF analysis found that, contrary to NIST's WTC 7 Report, simulating the failure of Columns 79, 80, and 81 from the Floor 6 to Floor 13 did not cause the east penthouse to collapse into the building.

278.   NIST's termination of its global collapse analysis 8.1 seconds after the east penthouse collapse initiation violates the utility element of information quality because care was not taken to make sufficient background and detail available regarding its claim. Similarly, NIST's termination of its global collapse analysis 8.1 seconds after the east penthouse collapse initiation also violates the transparency standard imposed upon influential information because NIST did not practice a degree of transparency sufficient to facilitate reproducibility. Specifically, even despite the increase in uncertainty and decrease in precision — or precisely because of it — NIST should have terminated its global collapse analysis later in order to increase the usefulness of the information and to better allow members of the public to evaluate whether the global collapse analysis matched the observed behavior well.

279.   NIST's claim that its global collapse analysis confirmed its leading collapse hypothesis violates the NIST IQS because it is inaccurate, unreliable, and apparently biased because it matched only some of the observables, while the hypothesis of controlled demolition also explains those observables in addition to explaining the fundamental aspects of WTC 7's structural behavior that NIST's global collapse analysis failed to predict (lack of deformation, vertical descent, and free fall).

280.    NIST's claim that its global collapse analysis matched the observed behavior reasonably well is inaccurate, unreliable, and apparently biased because NIST's global collapse analysis fails to match most of the observed behavior, actually predicting fundamentally different structural behavior from what was observed, thus violating the objectivity element of information quality under the OMB Guidelines and NIST IQS.

281.    NIST's claim that there was 1.75-second period of slow descent prior to free fall, which helped NIST claim that its global collapse analysis matched the observed behavior reasonably well, is inaccurate, unreliable, and apparently biased because careful measurement shows a sudden transition to free fall.

282.    NIST's claim that its global collapse analysis confirmed its leading collapse hypothesis violates the reproducibility standard imposed upon influential information because the UAF analysis found that simulating what is effectively a controlled demolition scenario matches the observed behavior far better than NIST's global collapse analysis does.

283.    If independent investigators, scientists, researchers, or another government agency attempted to reproduce NIST's WTC 7 study results with the information provided in the NIST WTC 7 Report, they would not have access to the computer modelling code and inputs used by NIST because NIST continues to keep that modelling information secret, i.e. it remains a "black box." Absent access to the modelling code and inputs in the "black box", independent researchers attempting to replicate NIST's modelling would be driving blind and would have little chance of replicating NIST's modelling results and its WTC 7 Probable Collapse Sequence or fire-driven collapse conclusion.

284.    If independent scientists cannot see the details of NIST's analysis and modelling, including the input and assumptions used therein, because all of these are being kept secret by NIST, there is a gross lack of transparency.

285.    There can be no independent replication, no reproducibility, of NIST's analysis and findings based on NIST's "black box" approach of keeping the details of its WTC 7 collapse computer modelling secret.

286.    NIST's refusal to simply run a valid computer model for WTC 7's collapse that adjusts inputs/modelling assumptions (such as which columns failed when) until it at least proximately simulates the observed and videotaped features of WTC 7's actual collapse, a collapse that visually closely resembles a controlled demolition using explosives, and to compare the results to the observable video recorded features of the WTC 7 collapse, is irrational and arbitrary and capricious under the circumstances.

287.    For all the reasons stated herein, this Court should issue an order declaring NIST to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs' RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to correct its WTC 7 Report to include valid and transparent computer modelling of the global collapse of WTC 7 that does not involve walk-off of Girder A2001 at its Column 79 support, does not involve a cascade of floor failures (see Count VII below), and actually replicates the observable video recorded features of the WTC 7 collapse.

288.    This Court's injunction should also require NIST to make its computer modelling code and inputs available to the public and independent researchers.

289.     This Court's injunction should also require NIST to revise the NIST WTC 7

Report to reflect that, based on measurement of video footage of the movement of 3 points along

the WTC 7 roofline, the north face roofline of WTC 7 underwent a sudden transition to free fall.

290.     This injunction should also require NIST, pending the results of its new analysis,

to revise the NIST WTC 7 report to discard its Probable Collapse Sequence and develop a new

Probable Collapse Sequence for WTC 7 that matches and explains the observable video recorded

features of the WTC 7 collapse.

**COUNT VI:   Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying
Plaintiffs' IQA Request for Correction and Subsequent Administrative Appeal, in
Adopting Conclusions in NIST's WTC 7 Report Regarding 9/11 WTC Seismic Evidence
that Are Unsupported by the Available Evidence and Contrary to the Laws of Physics**

291.     All of the foregoing and subsequent paragraphs are incorporated herein by

reference.

292.     This claim is brought pursuant to the Administrative Procedures Act (APA), 5

U.S.C. §§ 702, 706.

293.     Plaintiffs submitted with their RFC the report of an expert in acoustic waves

explaining why, using established scientific principles, the nature of the seismic waves generated

on 9/11 from the WTC, their velocities, frequencies, and magnitudes, support the conclusion that

there were explosives detonated in WTC 7.

294.     The seismology expert whose report was submitted to NIST by Plaintiffs is Dr.

André Rousseau. Dr. Rousseau has a doctorate degree in geophysics and geology and is a former

researcher in geophysics and geology at the National Center for Scientific Research (CNRS) of

France for 35 years, a specialist in acoustic waves, who has published 50 papers on the

relationship between the characteristics of progressive mechanical waves and geology.

**Page A95**

295.    Two seismic events with Richter magnitudes of .6 occurred at approximately

5:20:42 PM and 5:20:50 PM on September 11, 2001, which is the approximate time of WTC 7's

collapse. The seismic signals emitted from these events were recorded on seismometers at the

Lamont-Doherty Earth Observatory of Columba University (LDEO) in Palisades, New York,

about 34 kilometers away from Lower Manhattan. Appendix B of NCSTAR 1-9 documents the

occurrence of these seismic events and analyzes their possible source.

296.    The NIST WTC 7 Report attributes the first seismic signal at approximately

5:20:42 PM to the alleged cascade of floor failures in its Probable Collapse Sequence, which

allegedly led to the buckling of Column 79 and the collapse of the east penthouse. It then

attributes the second seismic signal at approximately 5:20:50 to the initiation of global collapse.

Although the NIST WTC 7 Report does not explicitly claim that the second signal corresponded

to the initiation of global collapse, it is implied by the second signal being generated

approximately 7 to 8 seconds after the first seismic signal (the initiation of the east penthouse

collapse and the initiation of global collapse were approximately 7 to 8 seconds apart).

297.    A fundamental flaw in NIST's interpretation of the seismogram data, i.e. that

debris impact caused the observed seismic signals, is that debris impact, whether inside the

building or directly against the ground, simply does not produce a force sufficient to create

seismic waves that will travel further than several hundred meters. This fact is attested to by

Plaintiffs' expert Dr. André Rousseau.

298.    NIST's claim that the first seismic signal was generated by "interior debris falling

onto the lower floors of WTC 7" is especially implausible. Dr. Rousseau concluded, "even if

there were tremendous percussion caused by the impact of several floors [Floor 14 to Floor 6] in

the northeastern corner of the building falling onto a lower, stronger floor [Floor 5], any seismic

68

**Page A96**

wave created in the adjoining steel columns would hit the ground only in the form of seismic noise. Further, because the passage from metal to rock is a refraction that absorbs energy, there would be insufficient energy left to propagate in the ground."

299.    Dr. Rousseau concluded, "[t]he part of the collapse that would be most expected to generate seismic energy — the top section falling onto the lower section after free-falling for 8 stories, and then directly impacting the ground — did not generate a unique seismic signal." In other words, NIST's claim implies, irrationally, that the collapse of several floor sections onto one floor in one corner of the building somehow generated a stronger seismic signal than the impact load caused by the entire top section free-falling for 105 feet.

300.    Dr. Rousseau concluded, "[t]he hypothesis of controlled demolition involving two subaerial explosions is perfectly consistent with the recorded seismic activity." Dr. Rousseau offers four key scientific observations to support his conclusion. First, "[e]xplosions caused by demolition charges can create seismic waves that will travel further than several hundred meters." Second, "explosions caused by demolition charges create seismic waves with frequencies around 1 Hz." Third, "[t]he bell-like form in the LDEO seismogram is consistent with an impulsive source of energy such as that generated by an explosion." Fourth, "[t]he occurrence of two seismic signals approximately 7 seconds apart, occurring just before the initiation of the east penthouse collapse initiation and just before the initiation of global collapse, is readily explained by the detonation of demolition charges."

301.    NIST's claim that the two seismic signals were created by a cascade of floor failures and the initiation of global collapse, respectively, fails to comply with the OMB Guidelines and NIST IQS because it lacks objectivity. NIST's claim is inaccurate, unreliable, and biased because it contradicts the straightforward and indisputable interpretation of the

seismogram data indicating that the seismic signals were created by explosions.

302.   Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in its treatment of the WTC seismic evidence, NIST's WTC 7 Report is also contrary to the IQA, the OMB Guidelines and the NIST IQS standards for Quality, which include Objectivity, Utility, and Integrity, because it is inaccurate, unreliable, and biased due to the omission and mischaracterization of the seismic evidence related to WTC 7's collapse.

303.   Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in its treatment of the WTC seismic evidence, NIST's WTC 7 Report is also contrary to the NIST IQS standards for Quality of "influential" information, which standards include Transparency and Reproducibility, because it is not transparent regarding NIST's analysis of the WTC seismic evidence, and its conclusions regarding the seismic evidence are contrary to established scientific principles.

304.   For all the reasons stated herein, this Court should issue an order declaring NIST to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs' RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to correct its WTC 7 Report and include a scientifically valid and transparent analysis of the seismic evidence, and modify its WTC 7 Probable Collapse Sequence consistent with that corrected analysis of the seismic evidence, including accounting for the occurrence of a subaerial explosion at the onset of the east penthouse collapse and a subaerial explosion at the onset of global collapse.

305.   NIST should be required to revise the NIST WTC 7 Report to reflect that subaerial explosions as opposed to the NIST alleged cascade of floor failures and the initiation of

global collapse, were the actual source of the seismic signals generated during the collapse of

WTC 7.

**COUNT VII: Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying Plaintiffs' IQA Request for Correction and Subsequent Administrative Appeal, in Concluding in NIST's WTC 7 Report that a Cascade of Floor Failures Would Occur, a Conclusion Unsupported by the Available Evidence and Contrary to the Laws of Physics**

306.    All of the foregoing and subsequent paragraphs are incorporated herein by

reference.

307.    This claim is brought pursuant to the Administrative Procedures Act (APA), 5

U.S.C. §§ 702, 706.

308.    NIST in its WTC 7 Report asserts a scenario of a cascade of floor failures in its

WTC 7 Probable Collapse Sequence, but never offers an explanation of how such a cascade of

floor failures would be physically possible.

309.    The NIST WTC 7 Report claims that after Girder A2001 walked off its support at

Column 79, "[t]he unsupported girder and other local fire-induced damage caused Floor 13 to

collapse, beginning a cascade of floor failures down to the 5th floor." (See NCSTAR 1A, p. 22.)

Aside from this brief summary, the NIST WTC 7 Report provides no other description, analysis,

or calculations showing how the collapse of Floor 13 began a cascade of floor failures down to

Floor 5. NIST's Initial Decision and Final Decision also fail to provide any description, analysis,

or calculations showing how the collapse of Floor 13 began a cascade of floor failures down to

Floor 5.

310.    The NIST WTC 7 Report neglects to specify which girder connections on Floor

12 were broken by the collapse of Floor 13. One might assume that the girder directly beneath

Floor 13's Girder A2001, Floor 12's Girder A2001, would be impacted and have its connections

**Page A99**

broken. But that assumption is contradicted by NIST's claim that "[t]here was still some lateral support in the north direction at Floors 8 to 12 and Floor 14, as the erection bolts in the seated connections had all failed at these girder ends, but the girders had not walked off the bearing seats." (See NCSTAR 1-9, p. 573.) NIST's Initial Decision and Final Decision also neglected to specify which girder connections on Floor 12 were broken by the collapse of Floor 13.

311.   NIST relies on its LS-DYNA original modelling as support for this cascade of floor failures conclusion but has declined to disclose the results files of its LS-DYNA analysis on the grounds that releasing this data "might jeopardize public safety."

312.   The UAF study calculations demonstrate unequivocally that the impact of Floor 13 falling onto Floor 12 would be greatly insufficient to shear the girder connections of any of the girders framing into Column 79 on Floor 12.

313.   The impact force of Floor 13 falling onto Floor 12 is insufficient to shear the girder connection of Girder A2015 by a factor of more than 10 and is insufficient to shear the girder connection of Girder A2002 by a factor of more than 6.

314.   The fire-induced damage at 4 hours of heating in NIST's 16-story ANSYS model, which NIST cites in the Initial Decision, does not help explain how the impact load of Floor 13 falling onto Floor 12 would be sufficient to cause Floor 12 to fail (presumably by breaking the girder connection of Floor 12's Girder A2002 on the south side of Column 79). As shown in Figure 11-34 of NCSTAR 1-9, Floor 12's Girder A2002 and its connections to both Column 79 and Column 80 were undamaged. Therefore, the calculation presented above of the force required to shear the undamaged Girder A2002 connection at Column 79 applies fully.

315.   Given the above stated facts, the second major step leading to the initiating local failure in NIST's Probable Collapse Sequence — the cascade of floor failures from Floor 13

down to Floor 5 — was physically impossible.

316. NIST had no valid basis for its conclusion that the impact load of Floor 13 falling onto Floor 12 would be sufficient to cause Floor 12 to fail and initiate a cascade of floor failures down to Floor 5. NIST also offered no such valid basis in its Initial Decision or Final Decision.

317. Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in assuming a cascade of floor failures, NIST's WTC 7 Report is also contrary to the IQA, the OMB Guidelines and the NIST IQS standards for Quality of Objectivity, Utility, and Integrity, because it concludes that a physically impossible cascade of floor failures will occur during its WTC 7 Probable Collapse Sequence based on false assumptions and erroneous inputs into its modelling, that remain secret.

318. Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in assuming a cascade of floor failures, NIST's WTC 7 Report is also contrary to the NIST IQS standards for Quality of "influential" information, which standards include Transparency and Reproducibility, due to reliance on a physically impossible cascade of floor failures occurring during its WTC 7 Probable Collapse Sequence that is supported only by a "black box" (secret calculations, secret input data, secret assumptions, and secret computer code that would specify how scientific principles would or would not be properly applied to the data and assumptions to result in calculations supporting conclusions).

319. If independent investigators, scientists, researchers, or another government agency attempted to reproduce NIST's WTC 7 study results with the limited information provided in the NIST WTC 7 Report regarding the NIST hypothesized cascade of floor failures, they would not know what false assumptions and erroneous inputs NIST used in its final 16-

**Page A101**

story ANSYS modelling because that information continues to be kept secret by NIST. Consequently, independent researchers could not reproduce NIST's modelling or analyses and their independent modelling, if done, would have to based on guesses as to those NIST modelling assumptions and inputs.

320.   NIST's claim is inaccurate, unreliable, and apparently biased because it severely overestimates the ability of Floor 13 falling onto Floor 12 to cause Floor 12 to fail, thus violating the objectivity element of information quality under the OMB Guidelines and NIST IQS. NIST's claim also violates the objectivity element of information quality because it is not presented in a complete manner, failing to even specify which girder connections on Floor 12 were broken by the collapse of Floor 13.

321.   NIST's claim violates the utility element of information quality because care was not taken to make sufficient background and detail available regarding its claim, even though greater transparency would have enhanced the usefulness of the information disseminated. NIST merely provides a brief summary of its analysis results and has declined to disclose the results files of its LS-DYNA analysis.

322.   NIST's claim violates the transparency standard imposed upon influential information because NIST did not practice a degree of transparency sufficient to facilitate reproducibility due to keeping critical modelling information secret.

323.   NIST's claim violates the reproducibility standard imposed upon influential information because — to the extent that independent analysis of the original data could be performed notwithstanding NIST's secrecy — contradictory analytic results were generated by the UAF study.

**Page A102**

324.     For all the reasons stated herein, this Court should issue an order declaring NIST to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs' RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to correct its WTC 7 Report to include valid and transparent computer modelling of the collapse of WTC 7, that reveals the assumptions and inputs that led NIST to conclude that there would be a cascade of floor failures during WTC 7's collapse, and that allows independent researchers to reproduce NIST's modelling of WTC 7's collapse.

325.     This injunction should also require NIST, pending the results of its new analysis, to revise the NIST WTC 7 report to reflect that a cascade of floor failures would not have occurred, because such a cascade of floor failures would have been physically impossible, require NIST to discard its Probable Collapse Sequence, and require NIST to develop a new Probable Collapse Sequence for WTC 7 that is physically possible.

**COUNT VIII: Defendant Agency NIST Acted Arbitrarily and Capriciously in Denying Plaintiffs' IQA Request for Correction, and Subsequent Administrative Appeal, Regarding NIST's WTC 7 Report, in Adopting an Irrational Rationale that Girder A2001 Would Not Become Trapped Behind the Side Plate Prior to Having the Opportunity to Walk Off of Its Column 79 Seat, Contrary to NIST's Own Prior Computer Modelling**

326.     All of the foregoing and subsequent paragraphs are incorporated herein by reference.

327.     This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

328.     Column 79 was a W14 x 730 standard structural shape column with 2" x 26" built-up side plates welded to its flanges at Floor 13.

329.     The girder bearing seat at Column 79 is 12 inches wide. The flange width for

75

**Page A103**

W33 x 130 girder A2001 is 11.510 inches wide and centered on the seat; its web is 0.580 inches thick. This would require a lateral travel distance of 6.290 inches for the web to be beyond the seat.

330.   However, the distance between the column side plates is 17.89 inches. The girder and bearing seat are slightly off center to the east, with just 3.678 inches between the girder's western edge and Column 79's western side plate.

331.   Both NIST's preliminary LS-DYNA modelling and the AE funded study "A Structural Reevaluation of World Trade Center 7," an analysis conducted at the University of Alaska Fairbanks (UAF) using ABAQUS software, showed that Girder A2001, the girder spanning between Columns 79 and 44, would, if pushed by the thermally expanding Beam K3004 when heated according to NIST's assumptions, have become trapped behind the side plate, preventing Girder A2001 from walking off its support at Column 79 (contrary to NIST's purported final 16-story ANSYS computer modelling prediction).

332.   NIST failed to explain to any acceptable degree of scientific precision why Girder A2001 became trapped behind the Column 79 side plate in NIST's preliminary LS-DYNA analysis but not in NIST's 16-story ANSYS model.

333.   All available evidence (NIST's computer modelling code remains a "black box," secret from the public) indicates that NIST's 16-story ANSYS model ignored (i.e. was programed to ignore) the effect that Column 79's side plate would have had in preventing the walk-off of Girder A2001.

334.   Apart from and in addition to NIST's above referenced decisions and actions regarding the WTC 7 Report being arbitrary and capricious in reaching opposite conclusions in two different modellings as to whether Girder A2001 would become trapped behind the side

**Page A104**

plate or instead "walk off," NIST's WTC 7 Report is also contrary to the IQA, the OMB

Guidelines and the NIST IQS standards for Quality, which include Objectivity, Utility, and

Integrity, because it is based on false assumptions and erroneous computer modelling inputs in

NIST's final 16-story ANSYS computer modeling. These assumptions and inputs differed so

materially from NIST's original WTC 7 LS-DYNA modeling that in the original NIST

modelling Girder A2001 became trapped behind the side plate so that it could not walk off of its

support at Column 79 and initiate a collapse of WTC 7. But, in the later NIST 16-story ANSYS

modelling, Girder A2001 did not become trapped and did walk off its support at Column 79

(resulting in the collapse of WTC 7). NIST does not explain in the NIST WTC 7 Report nor in its

Initial Decision or Final Decision what different assumptions or inputs were used in NIST's final

16-story ANSYS model that resulted in this significant discrepancy, or otherwise justify this

material difference in outcomes from NIST's two different computer modelling attempts.

335.    Apart from and in addition to NIST's above referenced decisions and actions

regarding the WTC 7 Report being arbitrary and capricious in its treatment of whether Girder

A2001 would become trapped behind the side plate or instead "walk off," NIST's WTC 7 Report

is also contrary to the NIST IQS standards for Quality of "influential" information, which

standards include Transparency and Reproducibility, because it is based on a second computer

modelling, the 16-story ANSYS modelling, that didn't just ignore NIST's earlier LS-DYNA

modelling results that showed that Girder A2001 became trapped behind the side plate so that it

could not walk off of its support at Column 79, it intentionally used different modelling inputs

and assumptions, and kept that information secret, in order to achieve a materially different and

false result (that Girder A2001 would *not* became trapped behind the side plate and *would* walk

off of its support at Column 79).

**Page A105**

336.    NIST was not transparent in showing the public and independent investigators the different modelling inputs and assumptions used in the second modelling to get this materially different result, which remained in the secret "black box."

337.    If independent investigators, scientists, researchers, or another government agency attempted to reproduce NIST's WTC 7 study results with the information provided in the NIST WTC 7 Report, they would not know what these different modelling assumptions and inputs were that allowed NIST in its second modelling, the 16-story ANSYS model, to create its WTC 7 Probable Collapse Sequence, and their independent modelling would consequently have to be based on essentially guesses as to NIST's modelling assumptions and inputs. Such an uninformed process would not allow reproduction of NIST's technical analysis and conclusions but would result in significantly different conclusions.

338.    NIST's WTC 7 Report claim regarding Girder A2001 being pushed off of its seat and not being trapped by the side plate is inaccurate, unreliable, and apparently biased because it contradicts the valid findings of its own analysis and those of the UAF analysis, thus violating the objectivity element of information quality under the OMB Guidelines and NIST IQS. NIST's claim also violates the objectivity element of information quality because it is not presented in a complete manner.

339.    NIST's claim violates the utility element of information quality because care was not taken to make sufficient background and detail available regarding its claim, even though greater transparency would have enhanced the usefulness of the information disseminated. NIST merely provides a brief summary of its analysis results and a superficial FAQ that falls well short of explaining the discrepancies in its analyses to an acceptable degree of scientific precision.

340.    NIST's claim violates the transparency standard imposed upon influential information because NIST did not practice a degree of transparency sufficient to facilitate reproducibility.

341.    NIST's claim violates the reproducibility standard imposed upon influential information because — to the extent that independent analysis of the original data using identical methods could be performed — contradictory analytic results were generated by the UAF study.

342.    For all the reasons stated herein, this Court should issue an order declaring NIST to have acted irrationally, and therefore arbitrarily and capriciously, in its denial of Plaintiffs' RFC and subsequent appeal, and issue a mandatory injunction requiring NIST to correct its WTC 7 Report to include valid computer modelling of the collapse of WTC 7 that is transparent in showing the assumptions and inputs used in NIST's second modelling, the 16-story ANSYS modelling, that differed from those used in NIST's first modelling, the LS-DYNA modelling, that resulted in NIST getting materially different results in the second modelling.

343.    This Court should also issue an injunction requiring NIST to revise the NIST WTC 7 report to correct any false assumptions and erroneous inputs (still hiding in NIST's secret 16-story ANSYS modelling black box) that produced the factually false NIST prediction that Girder A2001 was able to and did walk off its support at Column 79, without being trapped behind the side plate, thus initiating NIST's WTC 7 Probable Collapse Sequence.

344.    This Court should also issue an injunction, pending the results of NIST's new analysis, requiring NIST to develop a new Probable Collapse Sequence for WTC 7 that is not based on false assumptions and erroneous inputs.

**Page A107**

**COUNT IX:**    **Defendant Agency NIST's WTC 7 Report and Investigation Were Arbitrary and Capricious and Not in Accordance with Law Because NIST's Report and Investigation Were Prepared and Conducted in a Manner Contrary to the Spirit and Letter of the National Construction Safety Team Act, and Unlawfully withheld from the Public a Report with an Analysis of the Likely Technical Cause of the WTC 7 Collapse**

345.    All of the foregoing and subsequent paragraphs are incorporated herein by reference.

346.    This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

347.    The NCST Act, 15 U.S.C. § 7301-7311, requires NIST to establish national construction safety teams to investigate major building failures in order to improve the safety and structural integrity of buildings in the United States. NIST, based on safety team investigations under this Act, is required to establish and issue a public report on the likely technical cause or causes of a building failure that falls within the scope of the Act. NIST is also required under the Act to recommend, as necessary, specific improvements to building standards, codes, and practices based on its investigation findings.

348.    NIST is required under the NCST Act, after completing an investigation, to have its safety team issue a public report which includes: (1) an analysis of the likely technical cause or causes of the building failure investigated; (2) any technical recommendations for changes to or the establishment of evacuation and emergency response procedures; (3) any recommended specific improvements to building standards, codes, and practices; and (4) recommendations for research and other appropriate actions needed to help prevent future building failures.

349.    The NCST Act, 15 U.S.C. § 7304, also requires that hold regular public briefings on the status of investigative proceedings and findings, including a final briefing after the report

**Page A108**

required by § 7307 is issued. Under the Act, NIST may also hold public hearings to inform the public on the progress of the investigation.

350.    The NCST Act also requires NIST, after issuance of a public report, to comprehensively review the report and, working with other appropriate Federal and non-Federal agencies and organizations, (1) conduct, or enable or encourage the conducting of, appropriate research recommended by the Team; and (2) promote (consistent with existing procedures for the establishment of building standards, codes, and practices) the appropriate adoption by the Federal Government, and encourage the appropriate adoption by other agencies and organizations, of the recommendations of the Team with respect to (A) technical aspects of evacuation and emergency response procedures; (B) specific improvements to building standards, codes, and practices; and (C) other actions needed to help prevent future building failures.

351.    A copy of a record, information, or investigation submitted or received by a NIST national construction safety team is required to be made available to the public on request and at reasonable cost, unless one of the exceptions specified in the Act applies. Those exceptions are not applicable to the NIST WTC 7 computer modelling and other records and information that Plaintiffs request this Court to order released as a part of the remedy required on the Plaintiffs' claims asserted in the twelve counts of this Complaint.

352.    The NCST Act requirements apply to activities of the National Institute of Standards and Technology in response to the attacks of September 11, 2001. 15 U.S.C. § 7311.

353.    NIST was required by law to generate the NIST WTC 7 Report under the National Construction Safety Team Act ("NCST Act") (Pub. Law 107-231, 15 U.S.C. § 7301 et seq.)

**Page A109**

354.    NIST did generate the NIST WTC 7 Report in November 2008.

355.    The "black box" secrecy implemented by NIST in regard to its WTC 7 Report and WTC 7 Probable Collapse Sequence analysis and computer modelling violates the NCST Act requirement for issuance of public reports by NIST, or at minimum represents an arbitrary and capricious failure to honor the spirit and purpose of the NCST Act.

356.    NIST's actions failed to comply with the purpose and the requirements of the NCST Act by:

a)    Adopting an irrational rationale for omitting a known WTC 7 structural feature, the Stiffeners, the presence of which would have precluded NIST's asserted WTC 7 Probable Collapse Sequence;

b)    Adopting an irrational rationale, contrary to established scientific principles, mathematics, and the available evidence, that the thermal expansion of Beam K3004 could cause Girder A2001 to walk off its Column 79 support initiating NIST's WTC 7 Probable Collapse Sequence;

c)    Omitting and failing to analyze key available evidence of sulfidation and erosion of WTC steel on 9/11, evidence that is inconsistent with NIST's WTC 7 Report's conclusion of a fire driven collapse, and which supports the alternative explanation that use of explosives and incendiary materials caused the WTC 7 Collapse;

d)    Omitting and failing to analyze key available evidence of eyewitness reports of explosions at the WTC and inside WTC 7 on 9/11;

e)    Mischaracterizing the initiation of the WTC 7 collapse, adopting in its WTC 7 Report a computer modelling of the WTC 7 collapse the results of which are facially contrary to observable and measurable features of the videotaped actual WTC 7 collapse (including a period

82

**Page A110**

of free fall), and keeping its computer modelling secret;

f)       Adopting an irrational rationale that Girder A2001 would not become trapped behind the side plate prior to having the opportunity to walk off of its Column 79 seat, contrary to NIST's own prior computer modelling;

g)       Concluding in NIST's WTC 7 Report that a cascade of floor failures would occur, a conclusion unsupported by the available evidence and contrary to the laws of Physics; and

h)       Adopting conclusions in NIST's WTC 7 Report regarding 9/11 WTC seismic evidence that are unsupported by the available evidence and contrary to the laws of Physics.

357.     NIST, in its actions alleged in this Count IX abdicated its statutory responsibilities under the NCST Act.

358.     NIST's actions in concealing from AE, the other Plaintiffs-Petitioners, and the public key material facts referenced herein, including the fact that NIST's exclusion of the web stiffeners from its final computer modelling of the collapse of WTC 7 caused its analysis of the collapse of WTC 7 to be scientifically invalid and knowingly misleading, and NIST's affirmative misrepresentations to the contrary during the period of 2008 to 2020 (until the UAF Report was published and made NIST's concealment of material facts and material misrepresentations apparent at least to professional observers) constitutes fraudulent concealment in relation to Plaintiffs' NCST Act violation claims in this Count IX.

359.     NIST's fraudulent concealment of the material facts relating to its failure to comply with the NCST Act requirement to issue a public report of the likely technical cause of the collapse of WTC 7 (as opposed to the publishing of a sham report that knowing misrepresented as a likely technical cause of the WTC 7 collapse a cause that NIST knew could

**Page A111**

not be a likely technical cause of the collapse), provides a basis for the tolling of the applicable statute of limitations.

360.     The statute of limitations governing the filing of Plaintiffs' APA claims in this Count IX relating to violations of the NCST Act by Defendants should be tolled due to Defendants' fraudulent concealment and Plaintiffs' Count IX claims should not be deemed to have accrued until the 2020 publishing of the UAF Report.

361.     For all the reasons stated herein, this Court should issue an order declaring NIST to have acted arbitrarily and capriciously, and contrary to law, and issue a mandatory injunction requiring NIST to correct its WTC 7 Report to comply with the requirements of the NCST Act, including an injunction compelling NIST to issue a public report with an actual valid scientific analysis of the likely technical cause of the WTC 7 collapse, which to date has been unlawfully withheld.

**COUNT X:**     **Defendant Agency NIST's Decisions to Deny Plaintiffs' IQA Request for Correction and Subsequent Administrative Appeal Were without Observance of Procedure Required by Law Because the Agency Process for Making These Decisions Did Not Comport with Procedural Requirements of the IQA, OMB's IQA Guidelines, and NIST's Own IQS**

362.     All of the foregoing and subsequent paragraphs are incorporated herein by reference.

363.     This claim is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 706.

364.     Pursuant to OMB Guidelines, the NIST IQS provide an administrative appeal process to allow for objective and independent review of the agency's Initial Decision.

365.     NIST, in deciding Plaintiffs' IQA Request for Correction, violated NIST's own adopted procedures intended to assure that the NIST official(s) deciding an RFC would be

**Page A112**

different than the NIST official(s) deciding an administrative appeal of an RFC denial, and that

the agency processes of deciding an RFC and an administrative appeal would be independent,

with agency officials involved in one of these processes not influencing the decision of agency

officials involved in the other.

366.    NIST officials involved in deciding Plaintiffs' RFC consulted with, prior to

deciding Plaintiffs' RFC, higher level NIST and/or DOC officials regarding Plaintiffs RFC, and

those higher level NIST and/or DOC officials who were consulted on the decision to deny

Plaintiffs' RFC were either involved in deciding Plaintiffs' appeal of NIST's denial of their RFC

or were the superiors of the    officials involved in deciding Plaintiffs' appeal.

367.    NIST's IQA procedures adopted pursuant to the OMB Guidelines also require

that NIST, in deciding an appeal of a RFC denial, provide in a NIST decision on an appeal a

point-by-point response to each information quality argument presented in such appeal. NIST

IQS, Part III(C)(3).

368.    NIST failed to include in either its decision on Plaintiffs' RFC or its decision on

Plaintiffs' appeal of NIST's denial of Plaintiffs' RFC a point-by-point response to most of the

information quality arguments presented in Plaintiffs' appeal, in violation of the NIST IQS, Part

III(C)(3).

369.    For all the reasons stated herein, this Court should issue an order declaring NIST

to have acted arbitrarily and capriciously, and without observance of procedure required by law,

and issue a mandatory injunction remanding this matter to NIST for a new decision on Plaintiffs'

Appeal of NIST's denial of Plaintiffs' RFC to be made with observance of all procedures

required under NIST's policies and procedures adopted pursuant to the IQA and the OMB

Guidelines. Such remand should require that Plaintiffs' administrative appeal of NIST's denial of

Plaintiffs' RFC be decided by officials within the DOC at a level higher than any agency official involved in or consulted on NIST's prior decisions denying Plaintiffs' RFC and denying Plaintiffs' administrative appeal of that RFC denial.

**PRAYER FOR RELIEF**

370.    WHEREFORE, Plaintiff respectfully requests this Court, pursuant to its authority under the Administrative Procedures Act, 5 U.S.C. §§ 702, 706, to:

A.    Declare that Defendants' denials of Plaintiffs' RFC and subsequent administrative Appeal were arbitrary and capricious, not in accordance with law, and without observance of procedure required by law;

B.    Issue an injunction requiring NIST to correct its WTC 7 Report so that this report complies with the IQA, including requiring NIST to develop a new WTC 7 "Probable Collapse Sequence" that is both physically possible and consistent with the evidence;

C.    Issue an injunction requiring NIST to correct its WTC 7 Report so that this report complies with the NCST Act;

D.    Issue an injunction requiring NIST to make public all of its WTC 7 computer modelling(s) including all computer code, data, assumptions, and input used with or for that modelling;

E.    Issue an injunction requiring NIST to make public all evidence in its possession, and to disclose and describe all evidence that has been destroyed, and all other evidence known to Defendants to exist, that evinces or is consistent with the use of explosives and/or incendiaries having caused or contributed to the collapse of WTC 7;

F.    Award Plaintiffs their reasonable attorney fees incurred in this action; and

G.    Grant such other and further relief as the Court may deem just and proper.

**Page A114**

Respectfully submitted

/s/ John M. Clifford
John M. Clifford, #191866
Clifford & Garde, LLP
815 Black Lives Matter Plaza, NW, #4082
Washington, D.C. 20006
Tel. 202.280.6115
jclifford@cliffordgarde.com

/s/ Mick G. Harrison
Mick G. Harrison, Esq. (Pro Hac Vice)
Pennsylvania Bar # 65002
520 S. Walnut Street, #1147
Bloomington, IN   47402
Tel. 812.361.6220
E-mail: mickharrisonesq@gmail.com

Counsel for Plaintiff

Dated: January 31, 2022

**Page A115**

## DECLARATION OF ROLAND ANGLE

1.      My name is Roland Angle. I was a licensed civil engineer in the State of
California for more than 50 years and am now retired from professional practice. My education
includes graduating from the University of California at Berkeley with a Bachelor of Science
degree in Civil Engineering and obtaining a Standard Secondary Teaching Credential issued by
the California Department of Education. My professional experience includes designing launch
control facilities for intercontinental missiles, hydraulic facilities, blast containers, compacted
soil barriers, flood control facilities, light commercial buildings, residential projects, retaining
walls, and harbor terminal facilities; testing concrete batch samples and revetment grading
samples; owning three construction companies (a sole proprietorship, a partnership, and a
corporation incorporated in two states); and teaching engineering subjects to high school
students. I currently serve as President and Chief Executive Officer of the non-profit
organization Architects & Engineers for 9/11 Truth (AE), incorporated in California.

2.      AE's mission is to establish the full truth surrounding the events of September 11,
2001. We pursue this mission by conducting research and educating the public about the
scientific evidence related to the destruction of the three World Trade Center towers and by
working with victims' families and other stakeholders to advocate for a new investigation. At the
heart of AE's work is the deeply held conviction that establishing the truth is essential to
achieving justice for the nearly 3,000 people murdered on 9/11 and their families.

3.      Since its founding in 2006, AE has conducted an independent, multi-year
scientific investigation into the causes of the destruction of World Trade Center Building 7
(WTC 7) as well as the destruction of the World Trade Center Twin Towers (WTC 1 and 2).

**Page A116**

4.      AE has made hundreds of public presentations and produced hundreds of publications and videos over the years regarding the technical evidence that supports the conclusion that pre-placed explosives and/or incendiaries were used to destroy WTC 7, WTC 1, and WTC 2 on 9/11.

5.      AE has submitted a petition to the U.S. Congress, now signed by more than 3,500 verified architects and engineers, calling upon the U.S. Congress to open a new investigation into the causes of the destruction of WTC 7, WTC 1, and WTC 2 on 9/11.

6.      It is my understanding that the National Construction Safety Team Act required the National Institute of Standards and Technology (NIST) to not only prepare a report that included an analysis of the likely technical cause of the destruction of WTC 7 but that it also required NIST to make its WTC 7 Report available to the public, including to AE.

7.      The WTC 7 Report prepared and publicly released by NIST in 2008 was so technically erroneous and incomplete in its description of the alleged probable collapse sequence, so opaque in regard to its computer modelling (still kept secret), and so misleading from a factual, technical, and engineering standpoint that not only did it not serve the goal of Congress in making such reports public (to inform the public and relevant professions regarding the causes of significant building collapses), it was more harmful to AE's mission than would have been the case had NIST issued no report at all.

8.      Had NIST issued no WTC 7 Report, AE could have provided the public transparent engineering, architectural, and scientific analyses explaining the technical causes of the WTC 7 building collapse that could have simply been objectively and independently evaluated by the public and other engineers, architects, and scientists. Instead, AE has, in addition, had to expend considerable time and resources to rebut the erroneous and misleading

**Page A117**

NIST WTC 7 Report, which many in the public assume to be credible because it was issued by a government agency.

9.      AE's mission has also been made more difficult than necessary by NIST's conscious decision to use "black box" (secret) computer modelling, which prevents independent engineers, architects, and scientists from determining whether NIST's technical findings as to the cause of WTC 7's collapse can be independently replicated, and if NIST's findings cannot be replicated, where NIST's computer modelling work was in error (or intentionally misleading).

10.     From the moment that NIST issued its draft report for public comment on the destruction of WTC 7 on August 21, 2008, AE has been involved in costly examination of the NIST WTC 7 Report. This NIST report purports to provide an analysis of the likely technical cause of the destruction of WTC 7 but, in fact, fails to provide a complete, coherent, and evidentially supported technical cause of the building's destruction. NIST's demonstrable failure to establish and provide an analysis of the likely technical cause of the destruction of WTC 7 has severely impeded for 13 years AE's mission of establishing the full truth surrounding the events of 9/11, leading AE to devote substantial resources to scrutinizing the NIST WTC 7 Report and publicly critiquing NIST's findings.

11.     As part of AE's now-13-year effort to scrutinize the NIST WTC 7 Report and publicly critique its findings, AE commissioned and funded a computer modeling study by researchers at the University of Alaska Fairbanks (UAF), expending $316,153 that it paid to UAF from 2015 to 2020. The UAF researchers, led by Professor Leroy Hulsey, concluded that "fire did not cause the collapse of WTC 7 on 9/11, contrary to the conclusions of NIST and private engineering firms that studied the collapse," and that "the collapse of WTC 7 was a

global failure involving the near-simultaneous failure of every column in the building" (see

https://ine.uaf.edu/wtc7).

12.     Further, as part of AE's 13-year effort to scrutinize the NIST WTC 7 Report and

educate the public regarding the errors in NIST's findings, AE in 2019 and 2020 expended

$38,304 to print and mail postcards to approximately 100,000 engineers in the U.S. informing

them about the release and findings of the UAF study. In addition, AE expended $54,044 to

produce a 45-minute documentary film titled "SEVEN" that followed the four-year process of

the UAF study and explained the study's findings to both technical and lay audiences, and AE

expended $9,000 to have a 5-minute version of SEVEN air on PBS to approximately 3 million

viewers across the U.S. In addition, AE expended $16,860 on sending teams of engineers to

three American Society of Civil Engineers (ASCE) conferences in 2018 and 2019 for the

purpose of educating other engineers about AE's findings relative to the NIST WTC 7 Report

and the findings of the UAF WTC 7 study. (These outreach efforts to major conferences largely

ceased in 2020 and 2021 due to the Covid-19 pandemic.)

13.     Further, as part of AE's 13-year effort to scrutinize and educate the public

regarding the NIST WTC 7 Report , AE expended $4,000 on attorney fees and devoted an

estimated 300 hours of staff time at a cost of approximately $37.50 per hour to research and draft

the Request for Correction to the WTC 7 Report submitted to NIST on April 20, 2020, the

administrative Appeal of NIST's Initial Decision submitted on September 28, 2020, and the

Supplement to this appeal submitted on December 7, 2020.

14.     AE has also devoted substantial staff and volunteer resources over the years to

publishing booklets and articles scrutinizing the NIST WTC 7 Report. These booklets and

articles include:

**Page A119**

- Beyond Misinformation: What Science Says About the Destruction of World Trade Center Buildings 1, 2, and 7 (50-page booklet)

- The NIST Analyses: A Close Look at WTC 7 (article)

- Free Fall and Building 7 on 9/11 (article)

- 25 Areas of Specific Concern in the NIST WTC Report (article)

- NIST's WTC 7 Reports: Filled with Fantasy, Fiction, and Fraud (article series)

- 15 years later: on the physics of high-rise building collapses (article published in *Europhysics News*, of which the primary author was an AE staff member)

15.     All of the activities and expenditures described above would have been unnecessary, and AE's mission would not have been severely impeded, had NIST issued a report that provided a complete, coherent, and evidentially supported technical cause for the destruction of WTC 7.

16.     Should NIST be ordered by this court to respond in a substantive, meaningful, and non-erroneous way to the Request for Correction, which would necessarily entail conducting new analyses and revising the NIST WTC 7 Report to address the information quality violations contained therein, the harm caused to AE's mission would be  remedied, and AE's expenditures of its resources over the past 13 years will have contributed significantly to serving the public interest and AE's mission.

17.     Pursuant to 28 USC Section 1746, I, Roland Angle, hereby swear, under penalty of perjury, that the foregoing statements are true and correct to the best of my information and belief.

Roland E. Angle, P.E.                                           1/31/22
_____                      _____
Roland Angle, P.E.                                                  Date

5

**Page A120**

# DECLARATION OF ROBERT MCILVAINE

1. My name is Robert McILvaine. I am the father of Bobby McILvaine. Bobby was killed in the World Trade Center (WTC) on 9/11. Bobby is survived by his parents, Helen and I, and his brother, Jeff.

2. Before entering Princeton, Bobby was an honor student who played basketball and soccer at Upper Dublin High School in Fort Washington, Pa. After excelling in his studies at Princeton, Bobby entered the New York publishing world, working for Random House and Henry Holt & Co. He eventually moved to Merrill Lynch, where he was Assistant Vice President for Media Relations. At the time of his death, he had been applying to graduate programs at Penn and Harvard.

3. When we received word of the Twin Towers being attacked, my wife, son Jeff, and I weren't overly concerned because Bobby did not work at the Towers. He had an office in the World Financial Center, just across the street. We later learned, much to our dismay, that Bobby had been in charge of setting up a banking conference at the Towers that morning. Our worry became acute by nightfall when Bobby hadn't telephoned, which was so unlike him, since he called every day.

4. The next morning, we felt compelled to drive to New York and search for Bobby. We went from hospital to hospital searching for any information on him but found nothing. On Thursday we received word that a body identified possibly as Bobby had been brought to the morgue. Our hearts fell as we headed there to identify our beloved son.

5. Bobby's body was identified by dental records. The coroner disclosed that Bobby suffered massive trauma to his upper body and face. Based on the injuries my son sustained, I have

concluded that Bobby was killed by a massive explosion as he was entering the WTC North Tower. He was one of the first bodies to be found and identified.

6. Because of the circumstances of his death and because government officials were not giving direct and complete answers to 9/11 family members regarding what happened on that day, I have felt an ongoing need to investigate what really happened at the WTC on 9/11, an investigation I have pursued to this day. I have continued my pursuit of truth for my son, Bobby.

7. My wife, my son Jeff, and I were requesters on the request for correction submitted to NIST on April 15, 2020. We joined the request for correction because we believed that establishing the true cause of World Trade Center Building 7's destruction would provide a more complete picture of what happened on 9/11 and would undoubtedly lead to further investigation of the Twin Towers' destruction, as the Twin Towers were destroyed in a manner similar to Building 7 and were operated by the same companies. If the Defendants are ordered to comply with the requested information quality corrections, it will assist me and other family members of the 9/11 victims in reaching closure regarding this tragedy and may result in disclosure of criminal conduct related to 9/11.

8. Pursuant to 28 USC Section 1746, I, Robert McILvaine, hereby swear, under penalty of perjury, that the foregoing statements are true and correct to the best of my information and belief.

Robert McILvaine
_____
Robert McILvaine

1/30/22
_____
Date

**Page A122**

# Declaration of Ronald H. Brookman

1. My name is Ronald H. Brookman. I am a licensed Structural Engineer in the state of California. My education includes Bachelor of Science and Master of Science degrees in Civil/Structural Engineering from the University of California at Davis. My professional experience includes over 35 years of analysis, design, evaluation and rehabilitation of commercial buildings, including numerous steel structures.

2. I have studied the World Trade Center (WTC) tragedy extensively since 2007, with a primary focus on the structural aspects of WTC 7 since the final NIST reports NCSTAR 1A, 1-9 and 1-9A were released in 2008. NIST was responsible for establishing the likely cause of the building failure.

3. Licensed professional engineers are charged with safeguarding life, health, property and public welfare. I take this obligation seriously and have thus dedicated countless hours to understanding the failure of WTC 7. My study is strictly research-oriented and not speculative. I have no interest in simulating building collapses or devising ways to destroy buildings, a concern cited by NIST as the basis for its finding that disclosing certain data related to its WTC 7 investigation "might jeopardize public safety." (Gallagher 2009)

4. I have made numerous attempts to communicate my technical questions and concerns with NIST. My inquiries include Freedom of Information Act (FOIA) requests 09-49, 09-50, 10-037, 11-209, 12-009, and 2014-001436 as well as correspondence with NIST Director Patrick Gallagher and Senior Communications Officer Michael Newman in 2010.

5. Several of my FOIA requests resulted in the release of original design and construction drawings of WTC 7. These drawings enabled me and others to independently review critical framing members and connections in the undamaged, pre-fire state. Independent verification is an integral part of science and is required to validate the complex NIST analysis.

6. FOIA request DOC-NIST-2014-001436 (attached) was submitted on 7/21/2014. My request for information regarding the omission of stiffeners in the NIST analysis was denied on 9/22/2014. I appealed on 10/1/2014. The appeal was denied on 6/25/2015. I have never received a statement from NIST regarding the omission of stiffeners.

7. Ethical standards require professional engineers to be objective and truthful in reports, statements and testimony; all relevant information shall be included in reports, statements and testimony. Significant omissions constitute a violation of these ethical standards.

8. Relevant information was omitted from NIST's NCSTAR 1-9 report. This includes the bearing stiffeners shown on Frankel Steel drawing 9114 that were typical at floors eight through 21. These stiffeners were omitted from the analytical models of the seated-beam connection at floor 13 that was allegedly responsible for collapse initiation.

9. The most recent explanation from NIST for omitting the stiffeners was in NIST's 8/28/2020 response, signed by Catherine Fletcher, to the 4/15/2020 request for correction,

**Page A123**

which I joined as a requester. Her letter to Mr. Ted Walter states "***Girder A2001 did not experience any deformation of its web or flange elements at the seated connection to Column 79 in the absence of web stiffeners [in NIST's preliminary analysis of the northeast corner floor system]. Therefore, the web stiffener was not needed to prevent web or flange buckling or bending in the 16-story ANSYS model.***" I agree that web and flange buckling were not failure modes. Flange bending, however, provided justification for the loss of vertical support for girder A2001 at column 79. This was clearly stated in NCSTAR 1-9 on page 488: "***… when the web was no longer supported by the bearing seat, the beam was assumed to have lost support, <u>as the flexural stiffness of the bottom flange was assumed to be insufficient for transferring the gravity loads.</u>***" The same assumption was clearly stated on page 112 of the January 2012 Journal of Structural Engineering published by ASCE: "***… the flexural stiffness of the bottom flange was assumed to be insufficient to transfer the gravity loads.***" This statement implies a loss of vertical support for a critical girder and its tributary floor area was assumed based on the pretense of a bottom-flange bending failure even though the flange was stiffened to prevent such a failure. NIST's omission of stiffeners still has not been justified, and the preceding statement by Ms. Fletcher is inconsistent with NCSTAR 1-9 and the ASCE technical paper (McAllister 2012).

10. I must conclude that the NIST authors cannot justify the assumption that collapse initiation resulted from the flange bending and lateral walk-off failure of girder A2001 at column 79. NIST has provided incomplete and misleading responses—or no responses— to serious technical inquiries regarding this failure mechanism.

11. Detailed independent analyses conducted and reported by researchers at the University of Alaska Fairbanks clarified many questions that NIST has refused to address. These comprehensive studies (Hulsey 2020) arrived at different conclusions from the NIST studies regarding the collapse initiation and the global collapse, including that the stiffeners would indeed prevent flange bending and lateral walk-off failure of girder A2001 at column 79.

12. My trust in the research and publishing institutions involved (NIST and ASCE) has significantly eroded as a result of what I consider unethical conduct surrounding obvious errors and omissions in the reports in question.

I, Ronald H. Brookman, hereby swear under penalty of perjury that the preceding statements are true and correct to the best of my knowledge.

*Ronald H. Brookman*

Ronald H. Brookman, S.E.
January 29, 2022

Ronald H. Brookman, Structural Engineer
775 Story Book Court, Novato, CA 94947
rhbrookman@comcast.net
(415)892-6452

July 21, 2014

Catherine S. Fletcher, FOIA & Privacy Act Officer
National Institute of Standards and Technology
100 Bureau Drive, STOP 1710
Gaithersburg, MD 20899-1710

Re: Freedom of Information Act Request, 5 U.S.C. § 552

Dear Ms. Fletcher:

On March 19, 2012 I requested all available public information under the control of NIST regarding ten questions related to the 7 World Trade Center (WTC 7) collapse initiation outlined in Chapters 8 and 11 of NIST NCSTAR 1-9.[1] You forwarded my request to the Engineering Lab for a response, and the request was not assigned a FOIA log number. Most of my questions were never answered.

I recently learned that others with similar questions have received responses from NIST to two or more of the questions that were not answered in June 2012 when the WTC Investigation Team updated the errata file and FAQs for WTC 7. Does this mean new information was found or developed by NIST in the last two years?

The recent responses originated from Michael Newman in the Public and Business Affairs Office[2] and from Jim Schufreider in the Congressional and Legislative Affairs Office.[3] These two responses are neither correct nor germane to the question of flange stiffness and strength—questions 4 and 9 in my letter dated 3/19/12, and they are invalid from the standpoint of a scientific inquiry into the collapse mechanism.

---

[1] Therese P. McAllister et al., NIST NCSTAR 1-9, Structural Fire Response and Probable Collapse Sequence of World Trade Center Building 7, Washington: U.S. Government Printing Office, November 2008.

[2] Michael Newman, Public Affairs Officer. "The web stiffeners shown at the end of the girder in Frankel drawing #9114 prevent web crippling. The structural analyses of WTC 7 did not show any web crippling failures. Therefore, the web crippling plates did not need to be included in the models/analyses." October 25, 2013.

[3] Jim Schufreider, Director, Congressional and Legislative Affairs Office. "NIST detailed structural analysis of the girder in question indicated that web buckling did not occur under the combined effects of gravity loads and fire. Because there was no web buckling of Girder A2001, NIST did not consider the web stiffeners as a factor in the final NIST analyses." July 11, 2014.

**Page A125**

The bearing stiffeners shown on Frankel Steel drawing 9114 prevent flange local bending as well as web local yielding, web local crippling, and web sidesway buckling. The lateral walk-off and removal of critical framing members from the ANSYS model was *assumed* based on the pretense of a girder flange local bending failure;[4] the stiffeners were therefore required to be included in the analysis.

I repeat my question and my request.

> The ANSYS model for the seated-beam connection at column 79 shown in Figure 11-15[5] did not account for the presence of bearing stiffeners shown in Frankel Steel drawing 9114. A lateral displacement of 5 ½ inches[6] or 6 ¼ inches[7] would not cause a loss of vertical support with the stiffeners in place. NIST assumed that the girder flange would yield in flexure when the girder web moved past the edge of the bearing seat. Why were these stiffeners omitted from the 16-story ANSYS model when they obviously affect the bending stiffness and strength of the girder bottom flange?

I understand that you are not required to create a record that does not exist; I am requesting all available information in NIST's possession related to this question and the decisions that NIST has made in relation to it including written correspondence, meeting minutes, calculations, etc. If you decide to forward this to the Engineering Lab again, then I respectfully request a technical response signed by a licensed engineer qualified to address the question in a professional and scientific manner.

This inquiry is made for a scholarly purpose; it is not for any commercial use.  Thank you for your consideration.

Sincerely,
Ronald H. Brookman, SE

Cc:     Dr. Willie E. May, Acting NIST Director
        Dr. Howard H. Harary, Acting Director, Engineering Laboratory

---

[4] McAllister et al., p. 488. "Gravity shear loads in a beam were transferred to the bearing seat primarily in the proximity of the web on the bottom flange. Therefore, when the web was no longer supported by the bearing seat, the beam was assumed to have lost support, as the flexural stiffness of the bottom flange was assumed to be insufficient for transferring the gravity loads. Under such conditions, the beam was removed."

[5] McAllister et al., p. 483.

[6] McAllister et al., p. 482.

[7] McAllister, Therese P. (2009) Errata for NIST NCSTAR 1A, NIST NCSTAR 1-9, and NIST NCSTAR 1-9A, Federal Building and Fire Safety Investigation of the World Trade Center Disaster: Structural Fire Response and Probable Collapse Sequence of World Trade Center Building 7, January 30. Updated June 27, 2012.

**Page A126**

https://www.nist.gov/nist-information-quality-standards



# NIST Information Quality Standards

**NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY GUIDELINES, INFORMATION QUALITY STANDARDS, AND ADMINISTRATIVE MECHANISM**

**PART I: BACKGROUND, MISSION, DEFINITIONS, AND SCOPE**

**BACKGROUND**

Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554), hereinafter "Section 515," directs the Office of Management and Budget (OMB) to issue government-wide guidelines that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies." OMB complied by issuing guidelines which direct each federal agency to (A) issue its own guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by the agency; (B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information that does not comply with the OMB Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies (67 Fed. Reg. 8451 (Feb. 22, 2002) (https://www.federalregister.gov/documents/2002/02/22/R2-59/guidelines-for-ensuring-and-maximizing-the-quality-objectivity-utility-and-integrity-of-information)), and the agency guidelines; and (C) report periodically to the Director of OMB on the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency and how such complaints were handled by the agency. OMB subsequently issued a memorandum to reinforce, clarify, and interpret agency responsibilities, M-19-15, *Imp Implementation of the Information Quality Act* (April 24, 2019) (https://www.whitehouse.gov/wp-content/uploads/19-15.pdf). This document will refer to both documents issued by OMB collectively as the "OMB Guidelines."

**Page A127**

In compliance with the OMB Guidelines, the Department of Commerce (DOC) has issued Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Disseminated Information (67 Fed. Reg. 62,685 (Oct. 8, 2002 (https://www.federalregister.gov/documents/2002/10/08/02-25340/guidelines-for-ensuring-and-maximizing-the-quality-objectivity-utility-and-integrity-of-disseminated))) ("DOC Guidelines").

The National Institute of Standards and Technology Guidelines, Information Quality Standards, and Administrative Mechanism ("NIST Guidelines") are in accordance with Section 515, the OMB Guidelines, and the DOC Guidelines. The NIST Guidelines may be revised periodically, based on experience, evolving requirements in the National Institute of Standards and Technology (NIST), and concerns expressed by the public. Covered information disseminated by NIST will comply with all applicable OMB Guidelines, DOC Guidelines, and NIST Guidelines.  NIST is committed to maintaining a high level of quality in the information it disseminates.

In implementing these guidelines and standards, NIST acknowledges that ensuring the quality of information is an important management objective that takes its place alongside other NIST objectives, such as ensuring the success of the NIST mission, observing budget and resource priorities and constraints, and providing useful information to the public. NIST intends to implement these guidelines and standards in a way that will achieve all these objectives in a harmonious way.

## MISSION

NIST's mission is to promote U.S. innovation and industrial competitiveness by advancing measurement science, standards, and technology in ways that enhance economic security and improve our quality of life.

## DEFINITIONS

The definitions in this section apply throughout the NIST Guidelines and are based on the OMB Guidelines and supporting information except where noted.

**Quality** is an encompassing term comprising utility, objectivity, and integrity. Therefore, the OMB Guidelines sometimes refer to these four statutory terms, collectively, as "quality."

**Utility** refers to the usefulness of the information to its intended users, including the public. In assessing the ~~s~~ of information that the agency disseminates to the public, NIST considers the uses of the information not onl~~y~~ own perspective but also from the perspective of the public. As a result, when transparency of information is ~~relevant for~~

**Page A128**

USCA Case #22-5267      Document #1981784          Filed: 01/17/2023      Page 128 of 145

assessing the information's usefulness from the public's perspective, NIST takes care to ensure that transparency has been addressed in its review of the information.

**Objectivity** consists of two distinct elements: presentation and substance. The presentation element includes whether disseminated information is presented in an accurate, clear, complete, and unbiased manner and in a proper context. The substance element involves a focus on ensuring accurate, reliable, and unbiased information. In a scientific, financial, or statistical context, the original and supporting data will be generated, and the analytic results will be developed, using sound statistical and research methods.

**Integrity** refers to security – the protection of information from unauthorized access or revision, to ensure that the information is not compromised through corruption or falsification.

**Information** means any communication or representation of knowledge such as facts or data, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual forms. This definition includes information that an agency disseminates from a Web page but does not include the provision of hyperlinks to information that others disseminate. This definition does not include opinions, where the agency's presentation makes it clear that what is being offered is someone's opinion rather than fact or the agency's views.

**Government information** means information created, collected, processed, disseminated, or disposed of by or for the federal government.

**Information dissemination product** means any books, paper, map, machine-readable material, audiovisual production, or other documentary material, regardless of physical form or characteristic, an agency disseminates to the public. This definition includes any electronic document, CD-ROM, or Web page.

**Dissemination** means agency initiated or sponsored distribution of information to the public. Dissemination does not include distribution limited to government employees or agency contractors or grantees; intra- or inter-agency use or sharing of government information; and responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act or other similar law. This definition also does not include distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes.

**Agency-initiated distribution of information to the public** refers to information that the Agency dist releases which reflects, represents, or forms any part of the support of the policies of the Agency. In addition, if the

Agency, as an institution, distributes or releases information prepared by an outside party in a manner that reasonably suggests that the Agency agrees with the information, this would be considered Agency initiated distribution and hence Agency dissemination because of the appearance of having the information represent Agency views.

**Agency-sponsored distribution of information to the public** refers to situations where the Agency has directed a third party to distribute or release information, or where the Agency has the authority to review and approve the information before release. By contrast, if the Agency simply provides funding to support research, and if the researcher (not the Agency) decides whether to distribute the results and - if the results are to be released - determines the content and presentation of the distribution, then the Agency has not "sponsored" the dissemination even though it has funded the research and even if the Agency retains ownership or other intellectual property rights because the federal government paid for the research.

**Influential**, when used in the phrase "influential scientific, financial, or statistical information," means that the agency can reasonably determine that dissemination of the information will have or does have a clear and substantial impact on important public policy and private sector decisions.

**Scientific information** means factual inputs, data, models, analyses, technical information, or scientific assessments based on the behavioral and social sciences, public health and medical sciences, life and earth sciences, engineering, or physical sciences. This includes any communication or representation of knowledge such as facts or data, in any medium or form, including textual, numerical, graphic, cartographic, narrative or audiovisual forms that involves a field identified in the preceding sentence. This definition includes scientific information that an agency disseminates from a web page but does not include the provision of hyperlinks to scientific information that others disseminate. This definition does not include opinions, where the agency's presentation makes clear that what is being offered is someone's opinion rather than fact or the agency's views.

**Influential scientific information** means scientific information the agency reasonably can determine will have or does have a clear and substantial impact on important public policies or private sector decisions.

**Scientific assessment** means an evaluation of a body of scientific or technical knowledge, which typically synthesizes multiple factual inputs, data, models, assumptions, and/or applies best professional judgment to bridge uncertainties in the available information. These assessments include, but are not limited to, state of science reports; technology assessments; weight of evidence analyses; meta analyses; health, safety, or ecological risk assessments; toxicological characterizations of substances; integrated assessment models; hazard determinations; or exposure assessments.

The term **highly influential scientific assessment** means influential scientific information that the agency or the Administrator of the Office of Information and Regulatory Affairs in the Office of Management and Budget determines to be a scientific assessment that: (i) could have a potential impact of more than $500 million in any year, or (ii) is novel, controversial, or precedent setting or has significant interagency interest.

**Reproducibility** means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased). With respect to analytic results, "capable of being substantially reproduced" means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error.

**Transparency** is not defined in the OMB Guidelines, but the Supplementary Information to the OMB Guidelines indicates (p. 8456) that "transparency" is at the heart of the reproducibility standard. The Guidelines state that "The purpose of the reproducibility standard is to cultivate a consistent agency commitment to transparency about how analytic results are generated: the specific data used, the various assumptions employed, the specific analytic methods applied, and the statistical procedures employed. If sufficient transparency is achieved on each of these matters, then an analytic result should meet the reproducibility standard." In other words, transparency – and ultimately reproducibility – is a matter of showing how the results that are being disseminated were obtained.

**SCOPE**

These guidelines cover information disseminated by NIST on or after October 1, 2002, regardless of when the information was first disseminated, except that pre-dissemination review procedures shall apply only to information first disseminated on or after October 1, 2002.

**Information Disseminated by NIST and Covered by the NIST Guidelines**

**Corporate or general information** includes all non-scientific, non-financial, non-statistical information. NIST disseminates many types of non-scientific, non-financial, non-statistical information, including but not limited to:

- Non-scientific training materials
- Catalogs for NIST products and services

**Page A131**

- Descriptive programmatic information, including brochures, pamphlets, newsletters, fact sheets, and website descriptions
- NIST Laboratory and Division annual reports
- Directories
- Program handbooks, manuals, and guidelines
- NIST impacts by state
- Conference information
- Job opportunities
- NIST videos
- Lists of accredited laboratories and validated products.

**Scientific, financial, and statistical information** includes all scientific, financial, and statistical information disseminated to the public by NIST in formats including but not limited to:

- Standard Reference Data
- Standard Reference Materials
- Economic impact studies
- Exhibits
- Web sites.

It does not include scientific information disseminated in the form of fundamental research communications.

Information quality is an integral part of the pre-dissemination review of information disseminated by NIST. Information quality is also integral to information collections conducted by NIST and is incorporated into the clearance process required by the Paperwork Reduction Act (PRA) to help improve the quality of information that NIST collects and disseminates to the public. NIST programs already are required to demonstrate in their PRA submissions to OMB the utility of a proposed collection of information that they plan to disseminate. Additionally, for all proposed collections of information that will be disseminated to the public, NIST programs should demonstrate in their PRA clearance submissions to OMB that the proposed collection of information will result in information that will be collected, maintained, and used in a way consistent with applicable information quality guidelines and standa...

**Information Not Covered by these Guidelines**

- Information with distribution intended to be limited to government employees or agency contractors or grantees, including but not limited to the Manufacturing Extension Partnership Extranet Information for Center grantees.
- Information with distribution intended to be limited to intra- or inter-agency use or sharing of government information, including but not limited to programmatic performance, budget, human resources, and strategic planning information.
- Responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act, or other similar laws.
- Information relating solely to correspondence with individuals or persons, including but not limited to calibration reports, and Internal or Interagency Reports prepared and released to a single customer.
- Press releases, fact sheets, press conferences, or similar communications in any medium that announce, support the announcement, or give public notice of information NIST has disseminated elsewhere.
- Archival records, including library holdings.
- Archival information disseminated by NIST before October 1, 2002, and still maintained by NIST as archival material.
- Information presented to Congress as part of legislative or oversight processes, such as testimony of NIST officials, and information or drafting assistance provided to Congress in connection with proposed or pending legislation, that is not simultaneously disseminated to the public.
- Public filings.
- Subpoenas.
- Information limited to adjudicative processes, such as pleadings, including information developed during the conduct of any criminal or civil action or administrative enforcement action, investigation or audit against specific parties, or information distributed in documents limited to administrative action determining the rights and liabilities of specific parties under applicable statutes and regulations.
- Solicitations (e.g., program announcements, requests for proposals).
- Hyperlinks to information that others disseminate, as well as paper-based information from other sources referenced but not approved or endorsed by NIST.
- Policy manuals and management information produced for the internal management and operations of NIST, and not primarily intended for public dissemination.
- Documents not authored by NIST and not intended to represent NIST's views, including information a͟ and distributed by NIST grantees, as long as the documents are not disseminated by NIST.
- Scholarly and technical publications, research data, code developed for research purposes, findings, rep͟ other materials published or otherwise distributed by employees or by NIST contractors or grantees.

USCA Case #22-5267      Document #1981784      Filed: 01/17/2023      Page 133 of 145

- Opinions where the presentation makes it clear that what is being offered is not the official view of NIST.

Although information delivered to specific customers is not "disseminated" for purposes of these information quality standards, NIST's commitment to quality extends to this information. For example, NIST has entered into a Mutual Recognition Arrangement with the International Committee on Weights and Measures (CIPM), pursuant to which NIST has adopted a system for assuring quality in the results of measurement services delivered to customers.

## PART II: INFORMATION QUALITY STANDARDS AND PRE-DISSEMINATION REVIEW

Information quality is composed of three elements – utility, integrity, and objectivity. Quality will be ensured and established at levels appropriate to the nature and timeliness of the information to be disseminated. Information quality is an integral part of the pre-dissemination review of information disseminated by NIST. Information quality is also integral to information collections conducted by NIST and is incorporated into the clearance process required by the Paperwork Reduction Act.

As OMB has recognized (OMB Guidelines, 67 Fed. Reg. at 8452-8453), "information quality comes at a cost." In this context, OMB directed that "agencies should weigh the costs (for example, including costs attributable to agency processing effort, respondent burden, maintenance of needed privacy, and assurances of suitable confidentiality) and the benefits of higher information quality in the development of information, and the level of quality to which the information disseminated will be held." Therefore, in deciding the appropriate level of review and documentation for information disseminated by NIST, the costs and benefits of using a higher quality standard or a more extensive review process will be considered. Where necessary, other compelling interests such as privacy and confidentiality protections will be considered.

The utility and integrity standards below pertain to all information disseminated by NIST. Objectivity standards for each of the specific categories of NIST-disseminated information are also provided below. Because most of the standards presented in this document reflect existing practice at NIST, the present tense has been used when describing them; regardless of tense used, a performance standard is intended.

## UTILITY

Utility means that disseminated information is useful to its intended users. "Useful" means that the content of information is helpful, beneficial, or serviceable to its intended users, or that the information supports the us      f

**Page A134**

other disseminated information by making it more accessible or easier to read, see, understand, obtain, or use. Where the usefulness of information will be enhanced by greater transparency, care is taken that sufficient background and detail are available, either with the disseminated information or through other means, to maximize the usefulness of the information. The level of such background and detail is commensurate with the importance of the particular information, balanced against the resources required, and is appropriate to the nature and timeliness of the information to be disseminated.

NIST's mission is to promote U.S. innovation and industrial competitiveness by advancing measurement science, standards, and technology in ways that enhance economic security and improve our quality of life. NIST maintains ongoing contact with a broad spectrum of information users through a variety of means, including but not limited to public meetings, public workshops, individual contacts, and formal and informal collaborations and partnerships, to ensure that the information it disseminates continues to remain relevant. NIST attends and holds public workshops, conferences, and meetings to gather input about what types of information would be useful to industry; universities; other not-for-profit entities; and federal, state, and local governments; and maintains memberships in many industry groups and Standards Development Organizations for the purpose of facilitating such discussions.

**INTEGRITY**

Prior to dissemination, NIST information, independent of the specific intended distribution mechanism, is safeguarded from improper access, modification, or destruction, to a degree commensurate with the risk and magnitude of harm that could result from the loss, misuse, or unauthorized access to or modification of such information.

**OBJECTIVITY**

Objectivity ensures that information is accurate, reliable, and unbiased, and that information products are presented in an accurate, clear, complete, and unbiased manner. In a scientific, financial, or statistical context, the original and supporting data are generated, and the analytic results are developed, using sound statistical and research methods.

**Third-Party Information.** Third-party information from both domestic and international sources, such as states, municipalities, agencies, and private entities may be included in information that NIST disseminates. Although third-party sources may not be directly subject to Section 515, information from such sources, when used by NIST i information products or to form the basis of a decision or policy must be of known quality and consistent wit

applicable information quality guidelines and standards. When such information is used, any limitations, assumptions, collection methods, or uncertainties concerning it are taken into account and disclosed.

**Corporate and General Information.** Corporate and general information disseminated by NIST is presented in a clear, complete, and unbiased manner, and in a context that enhances usability to the intended audience. The sources of the disseminated information are identified to the extent possible, consistent with confidentiality, privacy, and security considerations and protections, and taking into account timely presentation, the medium of dissemination, and the importance of the information, balanced against the resources required and the time available.

Information disseminated by NIST is reliable and accurate to an acceptable degree of error as determined by factors such as the importance of the information, its intended use, time sensitivity, expected degree of permanence, relation to the primary mission(s) of the disseminating office, and the context of the dissemination, balanced against the resources required and the time available. A body of information is considered to be reliable if experience shows it to be generally accurate. Accurate information, in the case of non-scientific, non-financial, non-statistical information, means information which is reasonably determined to be factually correct in the view of the disseminating office at the time of dissemination.

Review of corporate and general information disseminated by NIST is incorporated into the normal process of formulating the information to take advantage of inherent quality checks that are part of the formulation process. This review is at a level appropriate to the information, taking into account the information's importance, balanced against the resources required and the time available. NIST treats information quality as integral to every step in its process of developing the information, including creation, collection, maintenance, and dissemination.

Review can be accomplished in a number of ways, including but not limited to combinations of the following:

- Active personal review of information by supervisors and managers, either by reviewing each individual dissemination or selected samples, or by any other reasonable method.
- Use of quality check lists, charts, statistics, or other means of tracking quality, completeness, and usefulness.
- Process design and monitoring to ensure that the process itself imposes checks on information quality.
- Peer monitoring during information preparation.
- Use of management controls.
- Review of comments from the public.
- Any other method that serves to enhance the accuracy, reliability, and objectivity of the information.

**Scientific, Financial, and Statistical Information.** Scientific and financial information disseminated by NIST is presented in a clear, complete, and unbiased manner, and in a context which enhances usability to the intended audience. The sources of the disseminated information are identified to the extent possible, consistent with confidentiality, privacy, and security considerations and protections, and taking into account timely presentation, the medium of dissemination, and the importance of the information, balanced against the resources required and the time available.

Scientific and financial information disseminated by NIST is reliable and accurate to an acceptable degree of error as determined by factors such as the importance of the information, its intended use, time sensitivity, expected degree of permanence, relation to the primary mission(s) of the disseminating office, and the context of the dissemination, balanced against the resources required and the time available. A body of information is considered to be reliable if experience shows it to be generally accurate. Accurate information, in the case of scientific and financial information, means information which is reasonably determined to be factually correct in the view of the disseminating office as of the time of dissemination.

## Preparation of Scientific Information

*Laboratory Notebooks:* NIST Laboratory staff engaged in measurement and in research and development activities are responsible for maintaining a thorough and accurate record of their work by keeping a laboratory or research notebook. Staff using electronic media for measurement, research, and development are responsible for maintaining a bound or electronic notebook that chronologically documents the progress of their activity and indexes work files so that experimental data and results may be retrieved. The implementation of this policy provides transparency as to the sources of data and the methodologies used to prepare the information disseminated. It also provides the means for ensuring "reproducibility" as defined in the OMB guidelines:

*"Reproducibility"* means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased). If agencies apply the reproducibility test to specific types of original or supporting data, the associated guidelines shall provide relevant definitions of reproducibility (e.g., standards for replication of laboratory data). With respect to analytic results, "capable of being substantially reproduced" means that ind analysis of the original or supporting data using identical methods would generate similar analytic results, su acceptable degree of imprecision or error.  (For metrological purposes, NIST subscribes to the definition of

**Page A137**

USCA Case #22-5267      Document #1981784      Filed: 01/17/2023      Page 137 of 145

"reproducibility" provided in the International Vocabulary of Metrology published by the International Bureau of Weights and Measures.)

*Uncertainty Policy:* NIST Policy 1800.00 requires that NIST measurement results be accompanied by quantitative statements of their uncertainty, and that a uniform approach to expressing measurement uncertainty be followed. Guidance is provided in "Guidelines for Evaluating and Expressing the Uncertainty of NIST Measurement Results" (NIST Technical Note 1297, 1994 Edition (https://nvlpubs.nist.gov/nistpubs/Legacy/TN/nbstechnicalnote1297.pdf)) and in "Simple Guide for Evaluating and Expressing the Uncertainty of NIST Measurement Results" (NIST Technical Note 1900, 2015 (https://nvlpubs.nist.gov/nistpubs/TechnicalNotes/NIST.TN.1900.pdf)). The policy applies to most NIST measurement results, including results associated with international comparisons of measurement standards, basic research, applied research and engineering, calibrating client measurement standards, certifying Standard Reference Materials, and generating Standard Reference Data. The implementation of this policy provides additional transparency as to the accuracy of the information disseminated.

**Pre-Dissemination Review Process for Scientific Information**

The pre-dissemination review process enables NIST to substantiate the quality of disseminated scientific information through documentation or other means appropriate to the nature and importance of the information, balanced against resources required and the time available.

Pre-dissemination review of scientific information disseminated by NIST is incorporated into the normal review processes for each type of information to take advantage of inherent quality checks that are part of the process of formulating the information. This review is at a level appropriate to the information, taking into account the information's importance, balanced against the resources required and the time available. NIST treats information quality as integral to every step in its process of developing the information, including creation, collection, maintenance, and dissemination. All scientific information disseminated by NIST receives a level of scrutiny commensurate with the critical nature of the information and its intended use.

Pre-dissemination review of scientific information can be accomplished in a number of ways, including but not limited to combinations of the following:

- Active personal review of information by supervisors and managers, either by reviewing each individual dissemination, or selected samples, or by any other reasonable method.

**Page A138**

- Use of quality check lists, charts, statistics, or other means of tracking quality.
- Careful design and monitoring of review processes to ensure they are effective.
- Peer monitoring during information preparation.
- Use of management controls.
- Review of comments from the public.
- Any other method which serves to enhance the objectivity, utility, and integrity of the information.

Although they are not included in the scope of the OMB Guidelines, NIST also expects fundamental research communications to adhere to information quality standards. In addition to the methods listed above, all fundamental research communications, including manuscripts for technical journal publications; manuscripts for the NIST Technical Publication Series; computer software documentation; and other forms of fundamental research communication regardless of the media or method used, receive technical, policy, and editorial review by the NIST Editorial Review Board, which includes a chairperson and representatives of each major technical activity or division at NIST to ensure a broad array of technical expertise. If requested by the Editorial Review Board or laboratory management, fundamental research communications may also receive legal review by the Office of the Chief Counsel for NIST.

In addition, NIST papers published in external scientific journals receive external peer review as provided by the individual journal. NIST does not assume a rebuttable presumption from these reviews, as allowed by the OMB guidelines; rather, NIST uses such external peer review as an additional pre-dissemination review process.

**Pre-Dissemination Review and Peer Review of Influential Scientific Information:**  The OMB Guidelines characterize a subset of agency information as "influential" scientific information, and apply stricter quality standards to the dissemination of information that is considered influential.  Specifically, if an agency is responsible for disseminating influential scientific, financial, or statistical information, agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties. Additional requirements for influential scientific information (including highly influential scientific assessments) are found in M-05-03, OMB's Final Information Quality Bulletin for Peer Review (https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2005/m05-03.pdf) (OMB Peer Review Bulletin), which requires that agencies subject "influential" scientific information to peer review prior to dissemination.Program managers should consider a NIST information product to be influential when it represents an official view of          y, and falls within the guidance provided in M-19-15, *Improving Implementation of the Information Quality A*         24, 2019):

**Page A139**

In the context of a [federal] policy decision, a specific piece or body of information is "influential" when it is a principal basis for a decision by a federal decision-maker, that is, if the same decision would be difficult to reach in that information's absence or if the decision would lose its fundamental scientific, financial, or statistical underpinnings absent the information. Even if a decision is very important, a particular piece of information supporting it may or may not be "influential," depending on whether the decision could be reached in the information's absence. Each agency is authorized to define whether information is "influential" given the nature of issues for which the agency is responsible.

Because NIST is a non-regulatory federal agency, it is not anticipated that NIST will disseminate influential scientific information.

**Pre-Dissemination Review Process for Financial Information (Economic Impact Studies and Policy Analyses):**

Economic impact studies prepared by NIST staff are reviewed by the NIST Editorial Review Board; reports prepared by contractors are not. Instead, the contractor reports are reviewed by the NIST employees with oversight for the contract. In addition, economic impact studies funded by other agencies receive external peer review if required by the funding agency.

Policy studies of financial issues prepared by NIST staff receive internal peer and management review, Department of Commerce review, and possibly higher-level reviews, but are not reviewed by the NIST Editorial Review Board.

**PART III. ADMINISTRATIVE CORRECTION MECHANISM**

**A. Definitions.**

**Affected person** means an individual or entity that uses, benefits from, or is harmed by the disseminated information at issue.

**Person** means an individual, partnership, corporation, association, public or private organization, or state or local government.

**Responsible office** means the office within an agency that is designated to make the initial decision on a re correction based on that agency's information quality guidelines and standards. For NIST, this is the NIST Division.

**Page A140**

**B. Procedures for Submission of Initial Requests for Correction**

1. Any affected person may request, where appropriate, timely correction of disseminated information that does not comply with applicable information quality guidelines and standards.  The burden of proof is on the requester to show both the necessity and type of correction sought. Information that is subjected to formal, independent, external peer review is presumed to be objective provided that, for "influential scientific information" and "highly influential scientific assessments," the peer review fulfills the requirements of the OMB Peer Review Bulletin.  The requester has the burden of rebutting that presumption

An affected person should submit a request for such action to:

Director, NIST Management and Organization Office
National Institute of Standards and Technology
100 Bureau Drive, Mail Stop 3220
Gaithersburg, MD 20899-3220
Email: (https://www.nist.govmailto:info.quality@nist.gov)

2. An initial request for correction of disseminated information must be made in writing and submitted to the point of contact identified in III.B.1. above. Any employee receiving a misdirected request should make reasonable efforts to forward the request to the point of contact identified in paragraph 1. above, but the time for response does not commence until the responsible office receives the request.

3. No initial request for correction will be considered under these procedures concerning:

   1. a matter not involving "information"
   2. information that has not actually been "disseminated" or
   3. disseminated information the correction of which would serve no useful purpose. For example, correction of disseminated information would serve no useful purpose with respect to information that is not valid, used, or useful after a stated short period of time (such as atomic time). However, this would not preclude a request for correction alleging a recurring or systemic problem resulting in repeated similar or consistent errors. Additionally, requests that are duplicative, repetitious, or frivolous may be rejected.

Any request rejected under this provision will nevertheless be accounted for in the Department's report to OM

4. At a minimum, to be considered proper, initial requests must include:

    1. the requester's name, current home or business address, and telephone number or e-mail address (to assist with timely communication)

    2. a statement that the request for correction of information is submitted under Section 515 of Public Law 106-554 (to ensure correct and timely routing)

    3. an accurate citation to or description of the particular information disseminated which is the subject of the request, including: the date and source from which the requester obtained the information; the point and form of dissemination; an indication of which office or program disseminated the information (if known); and any other details that will assist in identifying the specific information that is the subject of the request

    4. an explanation of how the requester is affected and

    5. a specific statement of how the information at issue fails to comply with applicable information quality guidelines and standards and why the requester believes that the information is not correct.

5. For any proper request (i.e., one including all the elements of III.B.4.) above, the Director, NIST Management and Organization Office will forward the proper request through the NIST Organizational Unit ("OU") Director to the Chief of the NIST division responsible for the information dissemination being challenged (hereinafter called "the Division Chief"). The Director, NIST Management and Organization Office will attempt to communicate either a decision on the request, or a statement of the status of the request and an estimated decision date, within 60 calendar days after receipt of the request.  NIST will not take more than 120 days to respond to a request without the concurrence of the party that requested the correction.

6. No action will be taken regarding a request not including all the elements of paragraph III.B.4. (including a request made by a person unaffected by the dissemination of the information), or a request that does not state a claim according to paragraph III.C.1. The submitter of any such request will be notified, usually within 60 calendar days, of this disposition, and may amend the request and resubmit it. Whether resubmitted or not, such requests will be a for in the Department's annual report to OMB.

**Page A142**

7. A proper request received concerning information disseminated as part of and during the pendency of the comment period on a proposed rule or other action involving an opportunity for prior notice and public comment, including a request concerning the information forming the record of decision for such proposed rule or action, will be treated as a comment filed on that proposed rule or action, and will be addressed in issuance of any final rule or action.

## C. Action by the Responsible Office on Initial Requests for Correction

1. Upon receipt of a proper request, the Division Chief will make a preliminary determination whether the request states a claim. A request for correction states a claim if it reasonably demonstrates, on the strength of the assertions made in the request alone, and assuming they are true and correct, that the information disseminated was based on a misapplication or non-application of applicable published information quality guidelines and standards. In other words, to state a claim, a request for correction must actually allege that NIST disseminated some information that does not comply with applicable information quality guidelines and standards.

A determination that a request does not state a claim will be communicated, along with an explanation of the deficiencies, to the requester, by the Director, NIST Management and Organization Office, usually within 60 calendar days of receipt. NIST will not take more than 120 days to respond to a request without the concurrence of the party that requested the correction.  The request may be amended and resubmitted as indicated in paragraph III.B.6. above.

2. If a proper request is preliminarily determined to state a claim, the Division Chief will objectively investigate and analyze relevant material to determine whether the disseminated information complies with the applicable published information quality guidelines and standards. The Division Chief will make an initial decision, based on the request and any internal investigation and analysis, whether the information should be corrected because it does not comply with the applicable information quality guidelines and standards ("granted request") or not corrected because it does comply with the applicable information quality guidelines and standards ("initial denial"). The Division Chief will make an initial decision whether the information should be corrected and what, if any, corrective action should be taken. No opportunity for personal appearance, oral argument, or hearing is provided.

If the agency determines that corrective action is appropriate, corrective measures may be taken through a number of forms, including but not limited to: personal contacts via letter or telephone, form letters, press releases, postings on an appropriate website, or withdrawal or correction of the information in question. The form of corrective action determined by the nature and timeliness of the information involved and such factors as the significance of th the use of the information, and the magnitude of the error.

**Page A143**

3. The Division Chief will communicate his/her initial decision or the status of the request through the NIST OU Director to the Director, NIST Management and Organization Office, who will communicate the initial decision to the requester, usually within 60 calendar days of NIST's receipt of the request.  NIST will not take more than 120 days to respond to a request without the concurrence of the party that requested the correction.  Initial decisions will not contain opinions regarding policy issues; will contain a point-by-point response to any relevant data quality arguments contained in the request; and will refer to any peer review that directly considers the issues being raised, if applicable.

4. The initial decision or status update will contain the name and title of the Division Chief and a notice that the requester may appeal an initial denial to the NIST Associate Director for Laboratory Programs (with the name, title, and address of that official), pursuant to paragraph III.D.1. below, within 30 calendar days of the date of the initial denial.

An initial denial will become a final decision if no appeal is filed within 30 calendar days.

## D. Appeals from Initial Denial

1. An appeal from an initial denial must be made within 30 calendar days of the date of the initial decision. Such appeal must be in writing and addressed to:

NIST Associate Director for Laboratory Programs
National Institute of Standards and Technology
100 Bureau Drive, Mail Stop 1000
Gaithersburg, MD 20899-1000

An appeal of an initial denial must include:

1. the requester's name, current home or business address, and telephone number or e-mail address (in order to ensure timely communication)
2. a copy of the original request and any correspondence regarding the initial denial and
3. a statement of the reasons why the requester believes the initial denial was in error.

2. Where an initial denial has been made concerning information that is part of a rule or other action identified in paragraph III.B.7., and an administrative appeal mechanism, such as a reconsideration process, exists, an appeal e considered pursuant to that process.

**Page A144**

3. The NIST Associate Director for Laboratory Programs will decide whether the information should be corrected based on all the information presented in the appeal record. No individuals who were involved in the initial denial will be involved in the review of or response to the appeal. No opportunity for personal appearance, oral argument, or hearing on appeal is provided. The NIST Associate Director for Laboratory Programs will communicate that decision to the requester usually within 60 calendar days after receipt of the appeal. The decision of the NIST Associate Director for Laboratory Programs will constitute a final decision by the Department of Commerce.

---

NIST does not currently produce or sponsor the distribution of influential scientific information (including highly influential scientific assessments). As a result, NIST has no agenda of forthcoming influential scientific disseminations to post on its website in accordance with OMB's Peer Review Bulletin.

Conformity assessment (https://www.nist.gov/topic-terms/conformity-assessment)
Created July 31, 2009, Updated February 11, 2020