**[ORAL ARGUMENT NOT SCHEDULED]**

No. 22-5267

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

ARCHITECTS & ENGINEERS FOR 9/11 TRUTH, *et al.*,

*Plaintiffs-Appellants,*

*v.*

GINA M. RAIMONDO, in her official capacity as
Secretary of Commerce, *et al.*,

*Defendants-Appellees.*

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

BRIEF FOR APPELLEES

————————————

*Of Counsel:*

MICHAEL BOGOMOLNY
 *Senior Counsel for Privacy and*
  *Information*
 *Office of the General Counsel*
 *Department of Commerce*

BRIAN M. BOYNTON
 *Principal Deputy Assistant*
  *Attorney General*

MATTHEW M. GRAVES
 *United States Attorney*

MARK B. STERN
CATHERINE PADHI
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7712*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-5091*
 *catherine.m.padhi@usdoj.gov*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

The appellants are Architects & Engineers for 9/11 Truth, Robert McIlvaine, Helen McIlvaine, Matt Campbell, Diana Hetzel, Kacee Papa, Drew DePalma, Francine Scocozzo, Justin Myers, Bill Brinnier, Ron Brookman, Seth McVey, Mike Henry, Dave Parker, Peter Kosmoski, Kamal Obeid, and Lynn Affleck.

The appellees are Gina M. Raimondo, in her official capacity as Secretary of Commerce; Laurie Locascio, in her official capacity as Director of the National Institute of Standards and Technology (formerly James Olthoff, in his official capacity as Director of the National Institute of Standards and Technology); and the National Institute of Standards and Technology.

There are no amici or intervenors in these proceedings.

### B.    Rulings Under Review

Appellants have appealed the memorandum opinion and the order granting defendants' motion to dismiss in *Architects & Engineers for 9/11*

*Truth v. Raimondo*, No. 1:21-cv-2365-TNM (D.D.C. Aug. 2, 2022)

(McFadden, J.), Dkt. Nos. 22, 23.

### C.    Related Cases

This case has not previously been before this court.  Counsel is aware of no other related cases currently pending in this court or in any other court.

*/s/ Catherine Padhi*

Catherine Padhi

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES

GLOSSARY

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUE .............................................................1

STATUTES AND REGULATIONS.......................................................1

STATEMENT OF THE CASE...............................................................2

      A.    Statutory and Administrative Background ...................................2

           1.  Information Quality Act and Implementing
                Guidelines.........................................................................2

           2.  National Construction Safety Team Act ...................................6

      B.    Factual Background and Administrative Proceedings................7

      C.    Prior Proceedings ...........................................................10

SUMMARY OF ARGUMENT.............................................................17

STANDARD OF REVIEW ..................................................................22

ARGUMENT:

THE DISTRICT COURT CORRECTLY HELD THAT
PLAINTIFFS LACK STANDING .......................................................22

A.  Plaintiffs have no cognizable informational injury ...............................23

  1.  The Information Quality Act and its associated guidelines do not create a legal entitlement to information .......................................................................................24

  2.  Plaintiffs did not suffer an informational injury under the National Construction Safety Team Act ....................26

B.  Architects & Engineers for 9/11 truth has suffered no organizational injury sufficient to confer standing ..............................30

C.  Plaintiffs' claimed injuries are not redressable ......................................38

CONCLUSION ................................................................................................40

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
  469 F.3d 129 (D.C. Cir. 2006) ............................................................32

*American Anti-Vivisection Soc'y v. U.S. Dep't of Agric.,*
  946 F.3d 615 (D.C. Cir. 2020) ...................................................... 30- 31

*American Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
  659 F.3d 13 (D.C. Cir. 2011)..............................................................31

*Center for Law & Educ. v. Department of Educ.,*
  396 F.3d 1152 (D.C. Cir. 2005) ....................................................... 33

*Cole v. Copan,*
  485 F. Supp. 3d 243 (D.D.C. 2020) ................................................... 7

*Cole v. Copan,*
  No. 19-cv-1182, 2020 WL 7042814 (D.D.C. Nov. 30, 2020) .............. 7, 29-30

*Davis v. Federal Election Comm'n,*
  554 U.S. 724 (2008)............................................................................37

*Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on
  Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ...................................... 15, 24, 34, 36

*Family Farm All. v. Salazar,*
  749 F. Supp. 2d 1083 (E.D. Cal. 2010) .......................................... 25

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) .................................... 17, 20, 22, 31, 32, 33, 36

*Friends of Animals v. Jewell,*
  828 F.3d 989 (D.C. Cir. 2016)....................................................14, 16, 24, 28, 29

*Harkonen v. U.S. Dep't of Justice,*
  800 F.3d 1143 (9th Cir. 2015) ......................................................... 3

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ................................................................. 31, 35

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Barr*,
  No. 19-8312, 2021 WL 1143618 (S.D.N.Y. Mar. 24, 2021),
  *aff'd sub nom. Lawyers' Comm. for 9/11 Inquiry, Inc. v. Garland*,
  43 F.4th 276 (2d Cir. 2022) ...............................................................12

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Garland*,
  43 F.4th 276 (2d Cir. 2022), *cert. denied,*
  143 S. Ct. 573 (2023) ................................................................... 12, 37

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*:
  424 F. Supp. 3d 26, 35 (D.D.C. 2020) .........................................17, 34
  848 F. App'x 428 (D.C. Cir. 2021), *cert. denied,*
    142 S. Ct. 228 (2021) ............................... 12-13, 14, 15, 17, 21, 28, 34, 36, 37

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ..................................................................... 23, 31

*Mississippi Comm'n on Envtl. Quality v. Environmental Prot. Agency*,
  790 F.3d 138 (D.C. Cir. 2015) ..................................................... 18, 25

*National Family Planning & Reprod. Health Ass'n v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ........................................................... 36

*National Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ..................................................... 32, 33

*Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards and Tech.*,
  775 F. Supp. 2d 174 (D.D.C. 2011) ............................................... 7, 30

*Salt Inst. v. Leavitt*,
  440 F.3d 156 (4th Cir. 2006) ......................................................24, 25

*Single Stick, Inc. v. Johanns*,
  601 F. Supp. 2d 307 (D.D.C. 2009), *aff'd in relevant part
  on other grounds sub nom. Prime Time Int'l Co. v. Vilsack*,
  599 F.3d 678 (D.C. Cir. 2010)......................................................24-25

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ..................................................................... 22, 31

*Town of Chester v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017) ................................................................ 37

*Turlock Irrigation Dist. v. Federal Energy Regulatory Comm'n*,
   786 F.3d 18 (D.C. Cir. 2015) ............................................ 32, 33

*Valley Forge Christian Coll. v. Americans United for Separation of Church &*
   *State, Inc.*,
   454 U.S. 464 (1982) ................................................................ 31

**Statutes:**

Administrative Procedure Act,
   5 U.S.C. § 706 ........................................................................ 11

Freedom of Information Act (FOIA),
   5 U.S.C. § 552(a)(4)(B) .......................................................... 7

Pub. L. No. 106-554, tit. V, § 515,
   114 Stat. 2763A-154-154 (2000)
   (codified at 44 U.S.C. § 3516 note) ........................................2
      § 515(a), ..............................................................................2
      § 515(b), ...........................................................................2, 3
         44 U.S.C. § 3516 note ................................................ 18, 24

15 U.S.C. § 7301(a) ...................................................... 6, 26

15 U.S.C. § 7306(a) ...................................................... 7, 10

15 U.S.C. § 7306(b)(1) .................................................. 7, 29

15 U.S.C. § 7306(d) ...................................................... 7, 29

15 U.S.C. § 7307(1) ................................................ 6, 19, 27

15 U.S.C. § 7307(2)-(4) ................................................... 6-7

28 U.S.C. § 1291 ............................................................... 1

28 U.S.C. § 1331 ................................................................................. 1

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................. 1

**Other Authorities:**

Guidelines for Ensuring and Maximizing the Quality,
Objectivity, Utility, and Integrity of Disseminated
Information, 67 Fed. Reg. 62,685 (Oct. 8, 2002) ........................................ 4, 5

Guidelines for Ensuring and Maximizing the Quality,
Objectivity, Utility, and Integrity of Information
Disseminated by Federal Agencies; Republication,
67 Fed. Reg. 8452 (Feb. 22, 2002) ........................................................ 3, 4, 26

OMB, Memorandum M-19-15, *Improving Implementation
of the Information Quality Act* (Apr. 24, 2019),
https://perma.cc/XC6D-AQXF ...................................................................4

## GLOSSARY

| | |
|---|---|
| FOIA | Freedom of Information Act |
| NIST | National Institute of Standards and Technology |
| OMB | Office of Management and Budget |
| WTC 7 | World Trade Center 7 |

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction pursuant to 28 U.S.C. § 1331. Compl. ¶ 5, A32–A33. The district court dismissed the case for lack of standing on August 2, 2022. Order, A14. Plaintiffs filed a timely notice of appeal on October 3, 2022. Notice of Appeal, A12; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Plaintiffs claim that the National Institute of Standards and Technology violated the Information Quality Act and associated guidelines by publishing an inaccurate report about the collapse of World Trade Center 7 on 9/11 and by denying plaintiffs' Request for Correction of the report. The issue presented is whether the district court correctly concluded that plaintiffs lack standing.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory and Administrative Background

#### 1.  Information Quality Act and Implementing Guidelines

The statutory provision known as the Information Quality Act was included in appropriations legislation for fiscal year 2001 and is codified as a note to the Paperwork Reduction Act.  *See* Pub. L. No. 106-554, tit. V, § 515, 114 Stat. 2763A-154-154 (2000) (codified at 44 U.S.C. § 3516 note). The Information Quality Act directed the Office of Management and Budget (OMB) to issue "guidelines" that provide "policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of . . . the Paperwork Reduction Act."  *Id.* § 515(a).

The Information Quality Act provides that the OMB guidelines should meet three general requirements.  First, they should direct federal agencies to develop their own information quality guidelines within one year of the issuance of OMB's guidelines.  *See* Pub. L. No. 106-554, tit. V, § 515(b).  Second, they should direct the agencies to establish

2

"administrative mechanisms" for the public to seek and obtain correction of information that does not comply with the guidelines. *Id.* Third, they should require federal agencies to report periodically to OMB on the number and nature of complaints that they receive regarding the accuracy of the information they disseminate. *Id.* The Information Quality Act thus "creates an administrative system designed to permit federal agencies and OMB to monitor and improve the information used and disseminated by federal agencies." *Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1148 (9th Cir. 2015).

OMB published final guidelines implementing the statute in 2002. *See* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8452 (Feb. 22, 2002). The guidelines provide that federal agencies are to "adopt a basic standard of quality . . . as a performance goal" and to develop internal processes for reviewing the quality of information "[a]s a matter of good and effective agency information resources management." *Id.* at 8458-59. They also state that "agencies must apply these standards flexibly," because it is "important that these guidelines do not impose unnecessary administrative burdens

3

that would inhibit agencies from continuing . . . to disseminate information that can be of great benefit and value to the public." *Id.* at 8453. The guidelines accordingly leave to each agency the determination of what level of quality is "appropriate to the nature and timeliness of the information to be disseminated." *Id.* at 8458. With respect to the administrative correction mechanisms, OMB explained that agencies "are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved, and explain such practices in their annual fiscal year reports to OMB." *Id.* "[I]n making their determination of whether or not to correct information," agencies "may reject claims made in bad faith or without justification." *Id.*[1]

In compliance with the OMB guidelines, the Department of Commerce issued information quality guidelines in 2002. *See* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Disseminated Information, 67 Fed. Reg. 62,685 (Oct. 8, 2002).

---

[1] In 2019, OMB issued informal guidance advising that agencies, in exercising their authority whether to correct information, should respond substantively to substantive correction requests. *See* OMB, Memorandum M-19-15, *Improving Implementation of the Information Quality Act* 10 (Apr. 24, 2019), https://perma.cc/XC6D-AQXF.

Recognizing the diverse nature and activities of the different units in the

Department, these guidelines delegated to each unit, including the

National Institute of Standards and Technology (NIST), the responsibility

for developing its own information quality standards and establishing

administrative mechanisms for addressing correction requests. *See id.* at

62,686-87.

Under NIST's information quality guidelines, a person who "uses,

benefits from, or is harmed by" information disseminated by NIST "may

request, where appropriate, timely correction of disseminated information

that does not comply with applicable information quality guidelines and

standards." NIST Guidelines, Part III(A)-(B), A140-A141. The requestor

bears the burden of "show[ing] both the necessity and type of correction

sought." *Id.* Part III(B)(1), A141. The chief of the NIST division responsible

for the information at issue will "make a preliminary determination

whether the request states a claim" and if so, "will objectively investigate

and analyze relevant material to determine whether the disseminated

information complies with the applicable published information quality

guidelines and standards." *Id.* Part III(C), A143. NIST "may" take

corrective measures if it determines that corrective action is

5

"appropriate." *Id.* Any corrective action "will be determined by the nature and timeliness of the information involved and such factors as the significance of the error on the use of the information, and the magnitude of the error." *Id.*

A requester who is not satisfied with the NIST division chief's initial decision may appeal that decision within 30 days. NIST Guidelines Part III(D)(1), A144. The NIST guidelines provide that the NIST Associate Director for Laboratory Programs will decide the appeal, and that "[n]o individuals who were involved in the initial denial will be involved in the review of or response to the appeal." *Id.* Part III(D)(3), A145. The appeal decision will usually be communicated to the requester within 60 days. *Id.*

### 2. National Construction Safety Team Act

The National Construction Safety Team Act authorizes NIST to deploy a team to investigate a building collapse "that has resulted in substantial loss of life." 15 U.S.C. § 7301(a). At the end of the investigation, the team is to issue a public report which includes (1) "an analysis of the likely technical cause" of the collapse, *id.* § 7307(1); and (2) the team's recommendations for improvements to building standards, changes to evacuation procedures, and areas of further research. *See id.* § 7307(2)-

6

(4).  Any information submitted or received by the team "shall be made available to the public on request," *id.* § 7306(a), with some exceptions: NIST "shall not publicly release any information" whose disclosure "might jeopardize public safety," *id.* § 7306(d); nor is it required to release any information that is exempt from disclosure under the Freedom of Information Act (FOIA), *id.* § 7306(b)(1).  Requests for information under the National Construction Safety Team Act are processed through the mechanisms established for seeking other disclosures under FOIA, and requestors may challenge denials of these requests under FOIA's judicial review provision, 5 U.S.C. § 552(a)(4)(B).  *See Cole v. Copan*, No. 19-cv-1182, 2020 WL 7042814 (D.D.C. Nov. 30, 2020); *Cole v. Copan*, 485 F. Supp. 3d 243, 253 (D.D.C. 2020); *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards and Tech.*, 775 F. Supp. 2d 174 (D.D.C. 2011).

**B.    Factual Background and Administrative Proceedings**

**1.**  On September 11, 2001, al-Qaeda terrorists hijacked commercial airliners and flew them into the World Trade Center Twin Towers, causing them to collapse.  Later that day, a nearby 47-story building called World Trade Center 7 (WTC 7) also collapsed, although it had not been struck by an airplane.  Compl. ¶ 93, A52–A53.

7

In 2002, pursuant to the National Construction Safety Team Act, NIST assembled a team to investigate the fall of these three World Trade Center buildings:  the Twin Towers and WTC 7.  NIST held 23 public meetings concerning the investigation and ultimately issued a total of 46 reports regarding the World Trade Center collapses.[2]  *See* Compl. ¶ 97, A53.

NIST released its report on the collapse of WTC 7 in November 2008.  Compl. ¶ 98, A53.  In the report, NIST explained that debris from the collapse of the north tower ignited fires in WTC 7, generating so much heat that a structural support inside the building collapsed.  Compl. ¶ 126, A58.

**2.**  Plaintiffs in this suit are 18 individuals and a nonprofit organization (Architects & Engineers for 9/11 Truth).  They believe that "pre-placed explosives and/or incendiaries" caused the collapse of WTC 7 as well as the Twin Towers.  Compl. ¶ 12, A34; Compl. ¶¶ 106, 112-113, A54-A55.  And they expect that if NIST changed the report to say that WTC 7 "collapsed on 9/11 due to the use of explosives and incendiaries," the "ensuing investigations . . . would lead to the discovery that explosives and

---

[2] NIST has published an overview of its World Trade Center investigation at https://www.nist.gov/world-trade-center-investigation (https://perma.cc/GD3J-CJ8L).

incendiaries were used to cause the complete collapse of all three of these [World Trade Center] buildings." Compl. ¶ 123, A57-A58. Plaintiffs believe that this revised "picture of . . . what happened on 9/11" will "assist[] the family members of the 9/11 victims . . . in coming to closure regarding this tragedy." Compl. ¶ 53, A44.

In 2020, over 11 years after NIST issued its WTC 7 report, plaintiffs submitted a Request for Correction of the report pursuant to the Information Quality Act and its implementing guidelines. Compl. ¶ 111, A55 (indicating that plaintiffs submitted their request in April 2020). In plaintiffs' view, their Request for Correction "presented a scientifically and logically irrefutable case" against NIST's conclusion that "the collapse of WTC 7 on 9/11 was due to fires and not the use of explosives and incendiaries." Compl. ¶ 113, A55.

As a part of their Request for Correction, plaintiffs submitted their own WTC 7 report, which had been commissioned by the organizational plaintiff in this action, Architects & Engineers for 9/11 Truth. Compl. ¶ 15, A34; Compl. ¶ 138, A60. The organization paid over $300,000 from 2015-2020 to fund the study. Compl. ¶ 15, A34; Compl. ¶ 138, A60. The resulting report, finalized in March 2020, disputed the accuracy of the 2008

9

NIST report and suggested that explosives and incendiaries caused WTC 7 to fall.  Compl. ¶ 113, A55; Compl. ¶ 282, A93.

NIST denied plaintiffs' Request for Correction in August 2020. Compl. ¶ 114, A56.  Plaintiffs submitted an administrative appeal of this decision in September 2020, along with a supplement to their appeal in December.  Compl. ¶ 115, A56.  NIST denied the appeal on June 30, 2021.  Compl. ¶ 117, A56.

### C.    Prior Proceedings

1.  Plaintiffs filed this action in the United States District Court for the District of Columbia.  Eight of the individual plaintiffs lost family members in the 9/11 attacks.  Op. 2, A16; Compl. ¶ 123, A57-A58.  The other 10 individual plaintiffs are architects and engineers, one of whom has requested and received information from NIST about its WTC 7 analysis pursuant to the National Construction Safety Team Act.  Compl. ¶¶ 54-60, A44-A46; *see* 15 U.S.C. § 7306(a).  The organizational plaintiff, Architects & Engineers for 9/11 Truth, was founded in 2006; its stated mission is "to establish the full truth surrounding the events of September 11."  Compl. ¶¶ 9-10, A33.

10

Plaintiffs asserted 10 claims under the Administrative Procedure Act,

5 U.S.C. § 706.  Nine of the claims (Counts I-VIII, X) concern plaintiffs'

Request for Correction and subsequent administrative appeal.  Plaintiffs

allege that the denial of their Request for Correction was arbitrary and

capricious, a violation of the Information Quality Act and its implementing

guidelines, and otherwise not in accordance with law.  The other claim

(Count IX) asserts that NIST violated the National Construction Safety

Team Act by issuing a "sham report" in 2008 with "irrational" analysis and

conclusions.  Compl. ¶¶ 356-359, A110-A111.  This claim also asserts that

NIST has "unlawfully withheld" agency action by failing to produce the

report that it was statutorily required to provide—that is, a report that

reflects the "likely technical cause of the WTC 7 collapse," Compl. ¶¶ 359,

361, A111-A112, which, in plaintiff's view, was a "controlled demolition"

accomplished by means of "pre-placed explosives and/or incendiaries,"

Op. 2, A16 (first quoting Compl. ¶ 94, A53; and then quoting Compl. ¶ 12,

11

A34).  The district court held that plaintiffs lacked standing and dismissed the case.[3]  Op. 1, A15.

2.  The district court began its analysis by observing that this Court had affirmed the dismissal of a similar case for lack of standing in *Lawyers' Committee for 9/11 Inquiry, Inc. v. Wray*, which was brought by some of the same plaintiffs here (Architects & Engineers for 9/11 Truth and Robert McIlvaine).  Op. 6-7, A20-A21.[4]  In that case, the plaintiffs alleged that the FBI had failed to comply with a statutory mandate to evaluate and report on certain evidence regarding the 9/11 terrorist attacks, and they argued that this statutory mandate gave them informational standing.  848 F.

---

[3] The court thus did not address the other grounds for dismissal urged in the government's motion.  *See* Defs.' Mot. to Dismiss 38-40, Dkt. No. 17-1.

[4] Plaintiffs Architects & Engineers for 9/11 Truth, Robert McIlvaine, and Diana Hetzel were also plaintiffs in a lawsuit in the Second Circuit, which was also dismissed for lack of standing.  *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276 (2d Cir. 2022), *cert. denied,* 143 S. Ct. 573 (2023).  Plaintiffs in that Second Circuit case sought a writ of mandamus compelling the United States Attorney for the Southern District of New York to present information about the 9/11 attacks to a federal grand jury.  That suit, as the district court here noted, was also dismissed for lack of standing, and the dismissal has since been affirmed on appeal.  Op. 7, A21 (citing *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Barr*, No. 19-8312, 2021 WL 1143618 (S.D.N.Y. Mar. 24, 2021), *aff'd sub nom. Lawyers' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276 (2d Cir. 2022)).

App'x 428, 430 (D.C. Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 228 (2021). Architects & Engineers for 9/11 Truth argued that it also had organizational standing based on resources expended "to counteract the harm to [its] interests caused by [d]efendants' failures to comply with the mandate from Congress to assess and report on all 9/11 evidence, and specifically the failure to assess and report on the abundant evidence of the use of controlled demolition at the [World Trade Center] on 9/11." Appellants' Brief at *49, *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428 (D.C. Cir. 2021) (No. 20-5051). In support of that argument, the organization pointed to the resources it expended to fund the same engineering study cited here. *See id.* at *48-49 ("Had the FBI and its 9/11 Review Commission honored its mandate from Congress and assessed and reported to Congress this same evidence of controlled demolition at the [World Trade Center] on 9/11, . . . [Architects & Engineers for 9/11 Truth] would not have had to expend over two hundred thousand dollars for the special engineering study . . . ."); *see supra* pp. 9-10 (describing the organization's commissioned report on the collapse of WTC 7).

This Court held that these allegations were insufficient to confer informational or organizational standing, and thus affirmed the dismissal

13

of the suit against the FBI.  It first explained that the appropriations bill

cited by the plaintiffs did not require the disclosure of information, and it

therefore could not serve as a basis for an informational injury.  848 F.

App'x at 430; *see id.* ("[A]s with any claimed basis for standing, the

plaintiff's reading of a statute for informational standing purposes must at

least be plausible.").  This Court then explained that the claims to

organizational standing based on "a range of efforts . . . made and costs

incurred to advance [the organizational] missions"—including the

commissioning of the engineering study—were, "[t]o a large extent," "part

and parcel of the alleged informational injury and thus fail with it."  *Id.* at

430-31 (quotation marks omitted).

    "In any event," this Court continued, "none of the alleged

organizational injuries constitutes a concrete and demonstrable injury to

the plaintiffs' activities that is likely to be redressed by a favorable court

decision."  848 F. App'x at 431 (alteration and quotation marks omitted).  In

particular, "the plaintiffs' alleged expenditures," including on the

commissioned study of the WTC 7 collapse, "[could] []not plausibly be said

to flow from the claimed unlawful conduct; they were instead 'a self-

inflicted budgetary choice that cannot qualify as an injury in fact.'"  *Id.*

(quoting *Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017)).

3. The district court in this case observed that plaintiffs have attempted to "repackage unsuccessful arguments from those earlier cases," and it concluded that they "fare[d] no better" here. Op. 7, A21. The court first rejected plaintiffs' arguments that they had suffered an "informational injury" by having been "deprived of information that a statute requires NIST to disclose." Op. 5, A19 (quotation marks omitted). The court explained that "[n]owhere does the [Information Quality Act] require disclosure of information," and it observed that, "[t]o Plaintiffs' credit, they do not argue otherwise." Op. 8, A22.

The district court then rejected plaintiffs' contention that the National Construction Safety Team Act "supplie[d] the basis" for standing. Op. 8, A22 (quotation marks omitted). It observed that, "[u]nder its plain terms, the [statute] requires disclosure only of a report on the technical cause of the collapse, among other things," and it further observed that "[p]laintiffs admit that NIST complied with that requirement when it released the WTC 7 Report." Op. 9, A23 (citing Compl. ¶ 89, A52). "That admission," the

15

court reasoned, "means that regardless of the [r]eport's accuracy, NIST had disclosed all information required by the statute." *Id.*

The district court also addressed "[p]laintiffs' theory that NIST violated the [National Construction Safety Team] Act not because it failed to release a report, but because the WTC 7 Report was 'at best an unscientific sham[] and likely fraudulent.'" Op. 9, A23 (second alteration in original) (citation omitted). "That is not enough," the court explained: "To assert an informational injury, [p]laintiffs must be '*deprived of* information' required to be disclosed under the Act." *Id.* (quoting *Jewell*, 828 F.3d at 992) (emphasis added). Plaintiffs' assertion that they want a better or different report is not a deprivation of information. Indeed, plaintiffs contend that they know what the report should state, and they have assembled their own report that contains (in their view) the correct analysis, *supra* pp. 9-10. But as the district court explained, a disagreement with the substance of the report is not an informational injury and has no bearing on NIST's obligations under the statute. *See* Op. 9, A23.

The district court also rejected Architects & Engineers for 9/11 Truth's claim to organizational standing. The court explained that to the extent the organization's claims to injury rested on theories of

16

informational harm, "these theories are part and parcel of the alleged informational injury and thus fail with it." Op. 11, A25 (quotation marks omitted). The court also explained that the organization's expenditures to fund a study producing a report that contested NIST's conclusions did not amount to a cognizable injury. "Use of resources for 'advocacy is not sufficient to give rise to an Article III injury,'" the court explained. Op. 12, A26 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)). And "[t]he point of the study here 'seems to be advocacy—shedding light on what [the organization] believe[s] were the true causes of the September 11 attacks.'" *Id.* (third alteration in original) (quoting *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 35 (D.D.C. 2020)). Indeed, the court observed, the organization had already asserted its "engineering study theory" as a basis for standing in a prior case, and "the D.C. Circuit . . . rejected [it], saying [these] study expenses . . . [were] 'a self-inflicted budgetary choice that cannot qualify as an injury in fact.'" *Id.* (quoting *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x at 431).

## SUMMARY OF ARGUMENT

1. A plaintiff suffers a cognizable informational injury only if a statute gives the plaintiff a right to the information that it seeks. Plaintiffs

17

cite the Information Quality Act and the National Construction Safety Team Act as bases for their allegations of informational injury, but neither requires disclosure of information that NIST has failed to disclose.

The Information Quality Act directs OMB to issue "policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information." 44 U.S.C. § 3516 note. The statute does not require the disclosure of information, nor "does [it] constitute a statutory mechanism by which [an agency's] conclusions . . . can be challenged." *Mississippi Comm'n on Envtl. Quality v. Environmental Prot. Agency*, 790 F.3d 138, 184 (D.C. Cir. 2015). It thus cannot be the source of plaintiffs' claimed entitlement to information; indeed, it "creates no legal rights in any third parties" whatsoever. *Id.* Consistent with the nature of the statute, the OMB and NIST guidelines implementing the Information Quality Act also create no legal entitlement to information. While they establish administrative mechanisms for the public to request correction of disseminated information, they emphasize the agency's discretion in responding to such requests and in taking corrective action if "appropriate." NIST Guidelines, Part III(C)(2), A135. Alleged violations of the Information Quality Act and its implementing

18

regulations therefore cannot establish an injury in fact sufficient to satisfy Article III.

When NIST investigates a building collapse pursuant to the National Construction Safety Team Act, it must issue a report with an analysis of the likely technical cause of the collapse.  15 U.S.C. § 7307(1).  NIST has long since discharged this statutory responsibility with respect to its WTC 7 investigation.  As plaintiffs recognize, NIST investigated the collapse of WTC 7 and issued a report with an analysis of the likely technical cause of the collapse in 2008.  Compl. ¶ 89, A52; Compl. ¶¶ 353-354, A109-110.  Plaintiffs nonetheless complain that they were denied a report describing "the real likely technical cause" of the collapse, which, in plaintiffs' view, involves the use of pre-placed explosives and incendiaries.  But this argument confuses the obligation to issue a report with the obligation to issue a report consistent with their theory.  There is no statutory support for such a proposition.

Plaintiffs' attack on the NIST report's analytical adequacy highlights that their claim is not one of informational injury but a challenge to the report's substantive conclusions.  The concept of informational injury rests on the deprivation of information.  But plaintiffs' theory is that they *know*

19

how WTC 7 collapsed, that they presented a "scientifically and logically irrefutable case" about its collapse to NIST, Compl. ¶ 113, A55, and that NIST failed to affirm the correctness of their analysis.  The decisions of this Court and other courts provide no basis for plaintiffs' assertions that such a grievance amounts to an informational injury cognizable under Article III.

2.  An organization suing on its own behalf must establish Article III standing by showing that it has suffered "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  To plausibly allege an injury in fact, an organizational plaintiff may not rely merely upon a "frustration of its purpose"; rather, it must allege that the defendant's conduct has caused "a concrete and demonstrable injury to its activities."  *Id.* (brackets omitted).  Moreover, "an organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury."  *Id.*

Architects & Engineers for 9/11 Truth argues that it has organizational standing because it has expended substantial resources to rebut the NIST report.  Even if such expenditures could be distinguished from the asserted informational injury, they are "classic . . . advocacy

20

activities" that cannot create Article III standing.  Op. 12, A26.  And although this plaintiff puts particular reliance on its having expended over $300,000 to fund a study of WTC 7's collapse, this Court has already held that the resources expended on this very study are "a self-inflicted budgetary choice that cannot qualify as an injury in fact."  *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 431 (D.C. Cir. 2021).  In any event, the study expenditures are not traceable to the denial of the Request for Correction or the 2008 NIST report.  The study predates the Request for Correction and so cannot be attributed to the denial of the Request.  Additionally, a decision to commission and pay for a study conducted from 2015 to 2020 is not plausibly attributable to a report published almost seven years earlier.

3.  Plaintiffs are also unable to satisfy the redressability element of standing.  Plaintiffs do not seek issuance of *a* report; by plaintiffs' own admission, NIST provided such a report long ago.  Instead, plaintiffs demand issuance of a report that comports with their view of events on 9/11, as illustrated by many of the injunctions requested in their complaint.  But no court has the authority to issue such injunctions, and a favorable court decision is not likely to redress plaintiffs' injuries.

21

## STANDARD OF REVIEW

This Court reviews a district court's standing determinations de novo.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F. 3d 905, 913 (D.C. Cir. 2015).

## ARGUMENT

### THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS LACK STANDING

In 2008, NIST issued a report on the collapse of WTC 7, a building near the Twin Towers that collapsed on 9/11 without having been struck by an airplane.  The NIST report concluded that debris from the fallen north tower ignited fires in WTC 7 and caused its collapse.  In 2020, plaintiffs submitted a Request for Correction of that report, which NIST denied.  Plaintiffs challenge both the 2008 report as well as NIST's denial of its Request for Correction.

To establish the "irreducible constitutional minimum of standing," plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation marks omitted).  A cognizable injury in fact is an "invasion of a legally protected interest which is

22

(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotation marks omitted).

Plaintiffs argue that they have alleged an informational injury sufficient to confer standing on the grounds that NIST denied them access to information that it was statutorily required to provide—that is, a "public report on the likely technical cause of WTC 7's collapse." Br. 34 (citing the Information Quality Act and the National Construction Safety Team Act as bases for their allegations of informational injury). The organizational plaintiff, Architects & Engineers for 9/11 Truth, also argues that it has suffered a distinct injury to its operations as an organization, asserting that the 2008 NIST report on the collapse of WTC 7 caused it to spend over $300,000 to fund a study from 2015-2020 to counteract the report's findings. The district court correctly concluded that neither allegation of injury is sufficient to confer standing.

## A.   Plaintiffs have no cognizable informational injury.

A plaintiff suffers a "sufficiently concrete and particularized informational injury" only if "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to

disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)). Plaintiffs' theory "fails at the first part of the inquiry, the *sine qua non* of informational injury," *Jewell*, 828 F.3d at 992, because neither the Information Quality Act nor the National Construction Safety Team Act requires public disclosure of specific information that NIST has failed to disclose. Op. 8-9, A22-A23.

### 1. The Information Quality Act and its associated guidelines do not create a legal entitlement to information.

The Information Quality Act directs OMB to draft "policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information." 44 U.S.C. § 3516 note. But it "does not create a legal right to access to information or to correctness," *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006); as the district court correctly observed, "[n]owhere does it require disclosure of information." Op. 8, A22 (first citing *Salt Inst*, 440 F.3d at 159; and then citing *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307, 316 (D.D.C. 2009),

24

*aff'd in relevant part on other grounds sub nom. Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010)).  Indeed, this Court has explained that the statute "creates no legal rights in any third parties" whatsoever, and it thus cannot be the source of plaintiffs' claimed entitlement to information. *Mississippi Comm'n on Envtl. Quality v. Environmental Prot. Agency*, 790 F.3d 138, 184 (D.C. Cir. 2015) (per curiam) (quoting *Salt Inst.*, 440 F.3d at 159).  It simply "does not constitute a statutory mechanism by which [an agency's] conclusions . . . can be challenged."  *Id.* at 185 (emphasis omitted); *see also id.* ("[T]his Court has held that the Information Quality Act is not 'an independent measure of [an agency's] decision.'").  Alleged violations of the Information Quality Act, accordingly, cannot "establish an injury in fact sufficient to satisfy Article III."  *Salt Inst.*, 440 F.3d at 159.

Consistent with the nature of the statute, the OMB and NIST guidelines implementing the Information Quality Act also create no legal entitlement to information.  *See Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1103 (E.D. Cal. 2010) (emphasizing the discretionary nature of the Information Quality Act's implementing guidelines, and concluding that the statute and the associated guidelines create "no enforceable legal rights at all").  Instead, they provide guidance recognizing the agency's discretion

25

to determine what level of information quality is "appropriate to the nature and timeliness of the information to be disseminated." 67 Fed. Reg. at 8458-59. The OMB guidelines also recognize that administrative corrective mechanisms "shall be flexible," that agencies are not required to make changes in response to any particular request, and that they may respond informally, as by a letter or a telephone call. *Id.* at 8459. NIST's guidelines similarly recognize that the agency retains discretion "in deciding the appropriate level of review and documentation for information disseminated," NIST Guidelines, Part II, A134, as well as in responding to Requests for Correction, *see id.* Part III(C)(2), A135 (stating that corrective action will be taken if "appropriate," and that it may take various forms, as determined "by the nature and timeliness of the information involved and such factors as the significance of the error on the use of the information and the magnitude of the error").

### 2. Plaintiffs did not suffer an informational injury under the National Construction Safety Team Act.

The National Construction Safety Team Act authorizes NIST to assemble teams to investigate building collapses that have "resulted in substantial loss of life." 15 U.S.C. § 7301(a). After its investigation, a team

26

must issue a public report with "an analysis of the likely technical cause" of the collapse. *Id.* § 7307(1). Plaintiffs acknowledge that "NIST was required by law to generate the NIST WTC 7 Report under the National Construction Safety Team Act . . . , and did so generate the NIST WTC 7 Report in November 2008." Compl. ¶ 89, A52 (citation omitted); Compl. ¶¶ 353-354, A109-110 (same); *see* Op. 9, A23 ("Plaintiffs admit that NIST complied with that requirement when it released the WTC 7 Report."). NIST satisfied its statutory obligation to produce a report about its investigation into the technical cause of the WTC 7 collapse, and there is thus no informational injury.

Plaintiffs confuse the obligation to issue a report with an obligation to issue a report consistent with their theory of the building's collapse, complaining that they have suffered an informational injury because they were denied a report that describes "the real likely technical cause" of the collapse. Opening Br. 31-32. Plaintiffs believe that they have a "scientifically and logically irrefutable case" based on "dispositive evidence" that "explosives and incendiaries" caused the collapse of WTC 7. Compl. ¶ 113, A55. A report that is inconsistent with this "irrefutable" conclusion cannot, in their view, satisfy the statute, because such a report

27

does not include "an actual valid scientific analysis of the likely technical cause of the WTC 7 collapse," Compl. ¶ 361, A112; *see also* Opening Br. 32. Plaintiffs accordingly assert that NIST has failed to release the information required by statute—as they see it, a report consistent with their theory of WTC 7's collapse.

Plaintiffs are mistaken in urging that the district court was obliged at the pleading stage to accept this understanding of "what information a statute requires an agency to publicly report." Opening Br. 31. This Court has explained that "as with any claimed basis for standing, the plaintiff's reading of a statute for informational standing purposes must at least be plausible." *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 430 (D.C. Cir. 2021); *see also Jewell*, 828 F.3d at 992-94 (holding no informational standing where plaintiff conflated a requirement to respond to a petition by a deadline with a disclosure requirement). There is absolutely no statutory support for plaintiffs' view that they are entitled to not only *a* report, but one that is consistent with their theory.

Indeed, plaintiffs' attack on the NIST report's analytical adequacy only highlights that their claim is not one of informational injury but a challenge to the report's substantive conclusions. As the district court

28

explained, the concept of informational injury rests on the *deprivation of information*. Op. 5, A19 (noting that a plaintiff must allege that it has been "deprived of information" (quoting *Jewell*, 828 F.3d at 992)). Plaintiffs' theory of the case is not that they lack information about the cause of WTC 7's collapse. Rather, it is that they *know* how WTC 7 collapsed, that they presented this "scientifically and logically irrefutable case" about its collapse to NIST, Compl. ¶ 113, A55, and that NIST failed to affirm the correctness of their analysis. The decisions of this Court and other courts provide no basis for plaintiffs' assertions that such a grievance amounts to an informational injury cognizable under Article III.

Plaintiffs state in passing that NIST has "ke[pt] secret its purported computer modelling on which the purported validity of NIST's WTC 7 Report superficially stands," Opening Br. 48. Where NIST has declined a request to make records public, it has done so pursuant to the exemptions in FOIA and in the National Construction Safety Team Act. *See* 15 U.S.C. § 7306(b)(1), (d) (providing that NIST need not disclose information exempt from disclosure under FOIA and that it "shall not publicly release any information . . . if the Director finds that the disclosure of that information might jeopardize public safety"); *see also, e.g.*, *Cole v. Copan*, No. 19-cv-1182,

29

2020 WL 7042814 (D.D.C. Nov. 30, 2020) (upholding application of FOIA exemptions to "input data and original analyses conducted by NIST regarding the role played by the seated connection at Column 79 . . . in the collapse of WTC 7," *id.* at *1); *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards and Tech.*, 775 F. Supp. 2d 174 (D.D.C. 2011) (upholding application of FOIA exemptions to "disclosure of the raw data that NIST used in its architectural and engineering modeling of the collapse of [WTC 7]," *id.* at 177). And, as plaintiffs acknowledge, "[s]everal of [their own] FOIA requests resulted in the release of original design and construction drawings of WTC 7." Compl. ¶¶ 58-60, A45-A46; *see also* Compl. ¶ 311, A100 (noting that NIST "has declined to disclose" modeling files "on the grounds that releasing this data 'might jeopardize public safety'").

## B. Architects & Engineers for 9/11 truth has suffered no organizational injury sufficient to confer standing.

1. To assert standing on its own behalf as an organization, Architects & Engineers for 9/11 Truth must make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *American Anti-Vivisection Soc'y v. U.S. Dep't of*

30

*Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (quoting *American Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011)).

To satisfy the first element—injury in fact—an organization must show that it has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 339 (quoting *Lujan,* 504 U.S. at 560). Standing is "not measured by the intensity of the litigant's interest" in the subject matter, even when that interest can be demonstrated by outlays of time or money. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982). Instead, as the Supreme Court later explained in *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982), an organization must show a "concrete and demonstrable injury to [its] *activities*[,] with [a] consequent drain on the organization's resources." *Id.* at 379 (emphasis added). A mere "setback to the organization's abstract social interests" does not suffice. *Id.*; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("[F]rustration of an organization's objectives is the type of abstract concern that does not impart standing." (quotation marks omitted)).

31

This Court's decisions accordingly "distinguish[] between organizations that allege that their activities have been impeded [and] those that merely allege that their mission has been compromised." *Food & Water Watch*, 808 F.3d at 919 (quoting *Abigail All. for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 133 (D.C. Cir. 2006)). "[T]he organization must allege that discrete programmatic concerns are being directly and adversely affected by the challenged action." *National Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1433 (D.C. Cir. 1995); *see also, e.g., Food & Water Watch,* 808 F.3d at 919 (asking whether "the defendant's conduct cause[d] an 'inhibition of [the organization's] daily operations'") (second alteration in original); *Turlock Irrigation Dist. v. Federal Energy Regulatory Comm'n,* 786 F.3d 18, 24 (D.C. Cir. 2015) (requiring "alleg[ation] that the defendant's conduct 'perceptibly impaired' the organization's ability to provide services in order to establish injury in fact").

The Court has also made clear that injuries arising from an organization's desire to engage in advocacy cannot establish standing. "[T]o hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would

eviscerate standing doctrine's actual injury requirement . . . ." *Center for Law & Educ. v. Department of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005). Accordingly, this Court has "recognized that the expenditure of resources on advocacy is not a cognizable Article III injury." *Turlock Irrigation Dist.*, 786 F.3d at 24; *see also, e.g.*, *Food & Water Watch,* 808 F.3d at 919 ("Our precedent makes clear that an organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury.").

Even with respect to educational and counseling activities that are not "pure issue-advocacy," *Center for Law & Educ.*, 396 F.3d at 1162, an organization's expenditure of resources may qualify as an Article III injury only if the expenditure is caused by the challenged action. Thus, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 920 (alteration in original) (quoting *National Taxpayers Union*, 68 F.3d at 1434).

2. Plaintiff alleges organizational standing under two theories. First, it asserts that it has organizational standing because NIST's refusal to alter its WTC 7 report in response to the Request for Correction violates the

33

Information Quality Act, its implementing guidelines, and the National

Construction Safety Team Act.  Opening Br. 36–37.  The district court

correctly concluded that this theory of organizational standing is "part and

parcel of the alleged informational injury and thus fail[s] with it."  Op. 11,

A25 (quoting *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x at

431).  As the court explained, these alleged harms "stem[] from NIST's

failure to disclose [what plaintiffs assert to be] the correct information" and

they thus depend on the existence of an informational injury.  *Id.* (citing

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 34 (D.D.C.

2020)); *see also Electronic Privacy Info. Ctr.*, 878 F.3d at 377-79 (holding that a

plaintiff who had suffered no informational injury had no organizational

standing because it "identifie[d] no organizational harm unrelated to its

alleged informational injury," and a plaintiff "cannot ground

organizational injury on a non-existent interest").  None of the plaintiffs

have plausibly alleged that they were denied information that they had a

legal entitlement to, and they thus have not suffered an informational

injury sufficient to confer standing.  *Supra* pp. 23-30.

Second, the organization argues (Opening Br. 47-51) that it has

suffered an injury distinct from the informational injuries described above

34

because it has expended substantial resources to "rebut a false agency report going to the heart of its mission," Opening Br. 39.  As the district court concluded, even if such expenditures could be distinguished from the asserted informational injury, these "classic . . . advocacy activities" would not create Article III standing.  Op. 12, A26.  Plaintiffs' attempted reliance on *Havens* underscores the error of their analysis.  In *Havens*, the Supreme Court held that an organization dedicated to promoting equal access to housing had standing to challenge the defendants' practice of deterring prospective tenants because that practice "perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income home[-]seekers."  455 U.S. at 379.  Here, by contrast, the only activity assertedly affected by NIST's actions is the organization's attempt to persuade the public of its version of events on 9/11.  This is the type of social-interest advocacy distinguished in *Havens*.

Plaintiff puts particular reliance on the claim that "[it] was put to substantial expense (more than three hundred thousand dollars) to fund an engineering study of the collapse of WTC Building 7."  Opening Br. 49-50; *id.* at 50 ("This extraordinary expenditure by [Architects & Engineers for 9/11 Truth] for this expensive independent engineering study was a drain

35

on the organization's resources, not simply a setback to the organization's abstract social interests, sufficient to establish injury for purposes of the standing analysis." (quotation marks omitted)).  But this Court has already held that the resources expended on this very study are "a self-inflicted budgetary choice that cannot qualify as an injury in fact."  *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x at 431 (quoting *Electronic Privacy Info. Ctr.*, 878 F.3d at 379); *see also National Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (stating that "self-inflicted harm doesn't satisfy the basic requirements for standing").  This "[u]se of resources for 'advocacy is not sufficient to give rise to an Article III injury,'" the district court explained, and advocacy is "[t]he point of the study here."  Op. 12, A26 (quoting *Food & Water Watch*, 808 F.3d at 919).

Moreover, even on plaintiffs' theory of standing, this injury would not be traceable to NIST's denial of plaintiffs' Request for Correction.  This study was "initiated in May 2015[,] and the final version was released on March 25, 2020."  Opening Br. 50.  Plaintiffs provided the study report along with their Request for Correction, submitted on April 15, 2020.  Opening Br. 15.  The study expenditures therefore predate the denial and thus "cannot plausibly be said to flow from [this] claimed unlawful

conduct," *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x at 431.

*Cf. Lawyers' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276, 283 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 573 (2023) (noting that, because plaintiffs had "likely . . . completed [the] investigation at the time they requested that the evidence be turned over to the grand jury, they have not identified how defendants imposed additional costs on that activity" by denying their request). They accordingly cannot confer standing for the nine claims that challenge the denial of the Request for Correction (Claims I-VIII, X). *See Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," because "standing is not dispensed in gross." (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008))).

Plaintiffs' remaining claim challenges not the denial of the Request for Correction but the 2008 NIST report itself. Compl. ¶¶ 345-361, A108-A112. But the organization cannot plausibly argue that its decision to commission a study from 2015 to 2020 is an injury attributable to a report published almost seven years prior. The organization was founded in 2006; it alleges that the hypothesis that thermite and thermate incendiaries caused WTC 7 to collapse was published in 2007, Compl. ¶¶ 191-192, A71;

and it alleges that the 2008 NIST report "was simply incompatible with the *then-available* scientific and witness evidence," Compl. ¶ 112, A55 (emphasis added).  The funding of this study is not an expenditure of resources traceable to NIST's actions; instead, it is one of the many expenditures this plaintiff makes in its ongoing efforts to persuade others to believe its theory of WTC 7's collapse.

**C.    Plaintiffs' claimed injuries are not redressable.**

For many of the reasons already discussed, plaintiffs are also unable to satisfy the redressability element of standing.  Indeed, their arguments regarding redressability highlight that this is not a case about informational standing, as NIST has long since discharged its statutory responsibility to issue a report.  Plaintiffs do not seek issuance of a report; they demand issuance of a report that comports with their view of events on 9/11.

Thus, plaintiffs seek a "mandatory injunction requiring NIST to . . . modify its WTC 7 Probable Collapse Sequence [to] . . . account[] for the occurrence of a subaerial explosion at the onset of the east penthouse collapse and a subaerial explosion at the onset of global collapse."  Compl ¶ 304, A98; *see also* Compl. ¶ 305, A98-A99 ("NIST should be required to revise the [report] to reflect that subaerial explosions[,] as opposed to the

NIST alleged cascade of floor failures and the initiation of global collapse, were the actual source of the seismic signals generated during the collapse of WTC 7.")  In a similar vein, plaintiffs ask for an injunction "requir[ing] NIST to revise the [report] to reflect that . . . the north face roofline of WTC 7 underwent a sudden transition to free fall," Compl. ¶ 289, A95, as well as for a "mandatory injunction requiring NIST to correct its WTC 7 report to include valid and transparent computer modelling . . . that does not involve walk-off of Girder A2001 at its Column 79 support," Compl. ¶ 287, A94. *See also, e.g.*, Compl. ¶ 213, A76 (requesting an injunction that "require[s] NIST to discard its Probable Collapse Sequence and develop a new Probable Collapse Sequence for WTC 7 that . . . reflects the intentional use of . . . incendiary and/or explosive material to cause WTC 7 to collapse," "pending the results of [NIST's] new analysis"); Compl. ¶ 240, A83 (requesting an injunction that "require[s] NIST, pending the results of NIST's new analysis, to discard its Probable Collapse Sequence and develop a new Probable Collapse Sequence that is consistent with the occurrence of an explosion at the onset of the east penthouse collapse as well as explosions later in the collapse sequence and explosions earlier in the day").

39

Plaintiffs' asserted injuries would accordingly be redressed only if a court had authority to issue injunctions of this kind—an authority not provided by any statute.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

MICHAEL BOGOMOLNY
  *Senior Counsel for Privacy and
    Information
  Office of the General Counsel
  Department of Commerce*

BRIAN M. BOYNTON
  *Principal Deputy Assistant
    Attorney General*

MATTHEW M. GRAVES
  *United States Attorney*

MARK B. STERN

 */s/ Catherine Padhi*
CATHERINE PADHI
  *Attorneys, Appellate Staff
  Civil Division, Room 7712
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-5091
  catherine.m.padhi@usdoj.gov*

March 2023

40

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of
Appellate Procedure 32(a)(7)(B) because it contains 8181 words.  This brief
also complies with the typeface and type-style requirements of Federal
Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using
Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally
spaced typeface.


*/s/ Catherine Padhi*
CATHERINE PADHI

**ADDENDUM**

## TABLE OF CONTENTS

44 U.S.C. § 3516 note ............................................................................ A1

15 U.S.C. § 7306 .................................................................................... A2

15 U.S.C. § 7307 .................................................................................... A3

**44 U.S.C. § 3516 note**

**§ 3516 note. Information quality act**

(a) In general.—The Director of the Office of Management and Budget shall, by not later than September 30, 2001, and with public and Federal agency involvement, issue guidelines under sections 3504(d)(1) and 3516 of title 44, United States Code, that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code [this chapter], commonly referred to as the Paperwork Reduction Act.

(b) Content of guidelines.—The guidelines under subsection (a) shall—

(1) apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies; and

(2) require that each Federal agency to which the guidelines apply—

(A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

(B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and

(C) report periodically to the Director—

(i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency; and

(ii) how such complaints were handled by the agency.

A1

**15 U.S.C. § 7306**

**§ 7306. Disclosure of information**

(a) General rule

Except as otherwise provided in this section, a copy of a record, information, or investigation submitted or received by a Team shall be made available to the public on request and at reasonable cost.

(b) Exceptions

Subsection (a) does not require the release of—

    (1) information described by section 552(b) of Title 5 or protected from disclosure by any other law of the United States; or

    (2) information described in subsection (a) by the National Institute of Standards and Technology or by a Team until the report required by section 7307 of this title is issued.

(c) Protection of voluntary submission of information

Notwithstanding any other provision of law, a Team, the National Institute of Standards and Technology, and any agency receiving information from a Team or the National Institute of Standards and Technology, shall not disclose voluntarily provided safety-related information if that information is not directly related to the building failure being investigated and the Director finds that the disclosure of the information would inhibit the voluntary provision of that type of information.

(d) Public safety information

A Team and the National Institute of Standards and Technology shall not publicly release any information it receives in the course of an investigation under this chapter if the Director finds that the disclosure of that information might jeopardize public safety.

**15 U.S.C. § 7307**

**§ 7307. National Construction Safety Team report**

Not later than 90 days after completing an investigation, a Team shall issue a public report which includes

(1) an analysis of the likely technical cause or causes of the building failure investigated;

(2) any technical recommendations for changes to or the establishment of evacuation and emergency response procedures;

(3) any recommended specific improvements to building standards, codes, and practices; and

(4) recommendations for research and other appropriate actions needed to help prevent future building failures.