RECORD NO. 22-5267
_____

**[ORAL ARGUMENT SCHEDULED ON SEPTEMBER 8, 2020]**

**In The**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**ARCHITECTS & ENGINEERS FOR 9/11 TRUTH**, *et al.*,

*Plaintiffs-Appellants*

*v.*

**GINA M. RAIMONDO, in her official capacity**
**as Secretary of Commerce**, *et al.*

*Defendants-Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

————————————

**BRIEF OF APPELLANT**

————————————

**Mick G. Harrison, Attorney at Law, #55038**
**520 S. Walnut Street, #1147**
**Bloomington, IN 47402**
**Tel.: 812-361-6220; Fax: 812-233-3135**
**Eml. mickharrisonesq@gmail.com**
**Counsel for Plaintiffs-Appellants**

In The

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ARCHITECTS & ENGINEERS FOR 9/11 TRUTH, )
*et al.,*                                 )
                                          )
     *Plaintiffs-Appellants,*         )
                                          )
v.                                        ) Case No.: 22-5267
                                          )
                                          )
GINA RAIMONDO, in her official capacity   )
as Secretary of Commerce, *et al.*,       )
                                          )
     *Defendants-Appellees.*          )

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

   (A)  **Parties and Amici.**

The parties in this appeal are:

   (1)    The Appellants: Architects & Engineers for 9/11 Truth, Robert

McILvaine, Helen McILvaine, Matt Campbell, Diana Hetzel, Kacee Papa, Drew

DePalma, Francine Scocozzo, Justin Myers, Bill Brinnier, Ron Brookman, Seth

McVey, Mike Henry, Dave Parker, Peter Kosmoski, Kamal Obeid, and Lynn

Affleck; and

   (2)    The Appellees: Gina M. Raimondo, in her official capacity as

Secretary of Commerce, Dr. James Olthoff,[1] in his official capacity as Director of

---

[1] Dr. Olthoff, an originally named defendant, has been replaced as Director of NIST by Dr. Laurie E. Locascio.

the National Institute for Standards and Technology, and The National Institute of

Standards and Technology (NIST);

To date, there have been no intervenors or amici that have participated in

this case.

(B)    **Rulings Under Review.**

The rulings under review are the District Court's Memorandum Opinion and

the District Court's accompanying Order (ECF Doc.. Nos. 22, 23) dismissing

Plaintiffs-Appellants' claims for lack of standing, both of which the District Court

(McFadden, J.) entered on August 2, 2022. See Appendix at A15 and A14

respectively.

On October 17, 2022, the rulings under review were filed electronically with

this Court by Appellants.

(C)    **Related Cases.**

This case has not previously been before this Court. Counsel is not aware of

any related cases.

Respectfully submitted,

s/ Mick G. Harrison
Mick G. Harrison, Attorney at Law (#55038)
520 S. Walnut Street, #1147
Bloomington, IN 47402
Tel. 812-361-6220
Fax 812-233-3135
Eml. mickharrisonesq@gmail.com

In The
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ARCHITECTS & ENGINEERS FOR 9/11 TRUTH, *et al.,* | ) ) ) |
| *Plaintiffs-Appellants*, | ) ) |
| v. | ) Case No.: 22-5267 |
| | ) ) |
| GINA RAIMONDO, in her official capacity as Secretary of Commerce, *et al.*, | ) ) ) |
| *Defendants-Appellees.* | ) ) |

## APPELLANTS' CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Certificate required by Circuit Rule 26.1:

I, the undersigned, counsel of record for all Appellants, certify that to the best of my knowledge and belief, there are no Appellants which are companies that issue stock or that have parent companies, subsidiaries, affiliates, or companies which own at least 10% of any stock issued by any Appellant, and none of the Appellants have any outstanding securities in the hands of the public.

All of the Appellants except one are individuals. Appellant Architects & Engineers for 9/11 Truth is a nonprofit corporation that does not issue stock.

Architects & Engineers for 9/11 Truth, Inc. (AE911Truth) is a 501(c)(3) non-profit organization of architects, engineers, and affiliates dedicated to establishing the truth about the events of September 11, 2001. It pursues its

mission by conducting research and educating the public about the scientific evidence related to the destruction of three World Trade Center towers on 9/11 and by working with 9/11 victims' families and other concerned citizens and groups to advocate for a new investigation. AE911Truth represents more than 3,000 architects and engineers who have signed its petition calling upon the U.S. Congress to open a new investigation.

These representations are made in order that judges of this Court may determine the need for recusal.

Respectfully submitted,

s/ Mick G. Harrison
Mick G. Harrison, Attorney at Law (#55038)
520 S. Walnut Street, #1147
Bloomington, IN 47402
Tel. 812-361-6220
Fax 812-233-3135
Eml. mickharrisonesq@gmail.com

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES      2

RULE 26.1 DISCLOSURE STATEMENT   .      .      .      .      .      4

TABLE OF AUTHORITIES      .      .      .      .      .      .      .      7

GLOSSARY      .      .      .      .      .      .      .      .      .      10

JURISDICTIONAL STATEMENT      .      .      .      .      .      .      11

STATEMENT OF ISSUES PRESENTED FOR REVIEW      .      .      12

RELEVANT STATUTORY PROVISIONS .      .      .      .      .      13

STATEMENT OF THE CASE .      .      .      .      .      .      .      13

SUMMARY OF ARGUMENT .      .      .      .      .      .      .      19

ARGUMENT      .      .      .      .      .      .      .      .      .      21

I.      The District Court Erred in Concluding that Each of the Plaintiffs-
Appellants Lacked Informational Standing      .      .      .      .      21

    A.      The Information Quality Act      .      .      .      .      .      21

    B.      The National Construction Safety Team Act .      .      .      26

    C.      Plaintiffs Have Informational Standing      .      .      .      27

II.      The District Court Erred in Concluding that Organizational Plaintiff-
Appellant Architects & Engineers For 9/11 Truth Lacked
Organizational Standing .      .      .      .      .      .      .      .      37

CONCLUSION AND RELIEF REQUESTED      .      .      .      .      52

RULE 32(g)(1) CERTIFICATE OF COMPLIANCE      .      .      .      53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Soc. for Prevention of Cruelty to Animals v.
Feld Entertainment, Inc.*, 659 F.3d 13 (D.C. Cir. 2011)        29-30, 31, 41, 45-47

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) .      .      .      .      48

*Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008).      .      45

*District of Columbia v. Trump*, 291 F.Supp.3d 725 (D. Md. 2018)      .      48

*Electronic Privacy Information Center v. Presidential Advisory Commission
on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017)        .      .  28-29, 32, 47

*FEC v. Akins*, 524 U.S. 11 (1998)      .      .      .      .      .      .      27-28

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .      .      .      .      .      .      27, 44, 49-50

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016)      .      .      28, 32

*Friends of Animals v. Salazar*, 626 F.Supp.2d 102 (D.D.C. 2009)      .      33

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)  .      .      .      52

*Huron v. Cobert*, 809 F.3d 1274 (D.C. Cir. 2016)  .      .      .      .      21, 37

*Information Handling Servs., Inc. v. Defense Automated Printing Servs.*,
338 F.3d 1024 (D.C. Cir. 2003) .      .      .      .      .      .      21, 37

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26
(D.D.C. 2020), affd, 848 F. App'x 428 (D.C. Cir. 2021), cert. denied,
No. 21-93, 2021 WL 4508610 (U.S. Oct. 4, 2021)  .      .      .      .      34, 39

*Nat'l Ass'n for Advancement of Colored People v. U.S. Postal Serv.*,

496 F. Supp. 3d 1, 12 (D.D.C. 2020), *enforcement granted,*
No. 20-CV-2295 (EGS), 2020 WL 6441317 (D.D.C. Oct. 27, 2020),
and *appeal dismissed,* No. 20-5375, 2021 WL 672392
(D.C. Cir. Feb. 10, 2021) .     .     .     .     .     .     .     .     50-51

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011)   .     51

*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995)  51

*\*People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*,
797 F.3d 1087 (2015)     .     .     .     .     .     .     .     .     44-45

*Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989)     .     27, 28, 32

*\*Warth v. Seldin*, 422 U.S. 490 (1975).     .     .     .     .     .     21, 48

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1, 19 (D.D.C. 2020), appeal dismissed sub nom.
*Whitman-Walker Clinic, Inc. v. United States Dep't of Health & Hum. Servs.*,
No. 20-5331, 2021 WL 5537747 (D.C. Cir. Nov. 19, 2021)     .     .     43-44

*Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193 (4th Cir. 2017)   .     48

**Statutes and Rules**

*Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706     .     .     19-20

*Informational Quality Act (IQA) (aka Data Quality Act),
Section 515 of Public Law 106-554, 44 U.S.C. § 3516, note     .     17-22, 42

*National Construction Safety Team Act (NCST Act), Pub. Law 107-231,
15 U.S.C. § 7301 et seq.     .     .     .     13-14, 19, 26-27, 31, 35, 37, 41-42

28 U.S.C. § 1291   .     .     .     .     .     .     .     .     .     11

28 U.S.C. § 1331   .     .     .     .     .     .     .     .     .     11

**Federal Register**

OMB IQA Proposed Guidelines, 66 Fed.Reg. 34489     .     .     22-23, 26

OMB IQA Final Guidelines, February 22, 2002, 67 Fed.Reg. 8452        22-23, 26

*Authorities upon which we chiefly rely are marked with asterisks.

## GLOSSARY

| | |
|---|---|
| 9/11 | September 11, 2001 |
| AE or AE911Truth | Architects & Engineers for 9/11 Truth |
| APA | Administrative Procedures Act |
| ASCE | American Society of Civil Engineers |
| FAC | First Amended Complaint |
| FAQ | Frequently Asked Question |
| IQA | Informational Quality Act |
| IQS | Information Quality Standards |
| NCST Act | National Construction Safety Team Act |
| NCSTAR | National Construction Safety Team Act Report |
| NIST | National Institute of Standards and Technology |
| OMB | Office of Management and Budget |
| PETA | People for the Ethical Treatment of Animals |
| RFC | Request for Correction |
| UAF | University of Alaska Fairbanks |
| WTC | World Trade Center |
| WTC 1 | World Trade Center North Tower |
| WTC 2 | World Trade Center South Tower |
| WTC 7 | World Trade Center 7 |

**JURISDICTIONAL STATEMENT**

**(A) Basis for the District Court's Subject-Matter Jurisdiction**

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs brought this action under the Administrative Procedures Act, 5 U.S.C. §§ 702, 706, and the Information Quality Act (IQA), Section 515 of Public Law 106-554 (aka Data Quality Act), against the government defendants including the National Institute for Standards and Technology (NIST) for arbitrary and capricious agency action and action contrary to the requirements of the IQA, OMB regulations and NIST Guidelines promulgated and issued to implement the IQA. *See* First Amended Complaint, Appendix at A29-A115.

**(B) Basis for the Court of Appeals' Jurisdiction**

On August 2, 2022, the District Court dismissed all the Plaintiffs' claims. *See* District Court's Memorandum Opinion of August 2, 2022, Appendix at A15, and District Court's Order of August 2, 2022, Appendix at A14. A Notice of Appeal was timely filed on October 3, 2022, Appendix at A12. This Court has jurisdiction to hear appeals of the final decisions of the District Court. 28 U.S.C. § 1291.

**(C) Filing Dates Establishing the Timeliness of the Appeal**

On August 2, 2022, the District Court dismissed all the Plaintiffs' claims. *See* District Court's Memorandum Opinion of August 2, 2022, Appendix at A15,

and District Court's Order of August 2, 2022, Appendix at A14. Because the government is a party, the notice of appeal was due to be filed within 60 days. Fed. R. App. P. 4(a)(1)(B). Plaintiffs' Notice of Appeal was timely filed on October 3, 2022 (the 60th day falling on October 1, 2022, a Saturday). Appendix at A12.

**(D) Appeal from a Final Order**

This appeal (see Notice of Appeal, Appendix at A12) is from a final order or judgment that disposes of all the Plaintiffs' claims, specifically the District Court's Memorandum Opinion of August 2, 2022, Appendix at A15, and the District Court's Order of August 2, 2022, Appendix at A14, which dismissed all of Plaintiffs' claims in their First Amended Complaint based on the conclusion that Plaintiffs lacked standing.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

I.     Whether the District Court erred in concluding that each of the Plaintiffs-Appellants lacked informational standing where Plaintiffs challenged via the Administrative Procedures Act (APA) and the IQA a blatantly incorrect and arbitrary agency (NIST) report on a matter of great public importance, a report required by statute to be issued publicly, that clearly violated the IQA, OMB's IQA regulations, and NIST's own IQA information quality standards.

II.     Whether the District Court erred in concluding that organizational Plaintiff-Appellant Architects & Engineers for 9/11 Truth (AE) lacked organizational standing where Plaintiff AE challenged via the Administrative Procedures Act (APA) and the IQA a blatantly incorrect and arbitrary agency (NIST) report, on a matter of great public importance, that clearly violated the IQA, OMB's IQA regulations, and NIST's own IQA information quality standards in a manner that substantially interfered with AE's performance of its nonprofit public interest mission.

**RELEVANT STATUTORY PROVISIONS**

National Construction Safety Team Report

Not later than 90 days after completing an investigation, a Team shall issue a public report which includes—

(1) an analysis of the likely technical cause or causes of the building failure investigated; …

15 U.S.C. § 7307.

**STATEMENT OF THE CASE**

The horrendous attacks of September 11, 2001 (9/11) were the worst attacks on American soil since Pearl Harbor, and perhaps the worst such attacks in the history of the United States. It is well known that on 9/11, on the morning of the terrorist attacks in New York City, the two World Trade Center (WTC) towers (WTC 1 and WTC 2) completely and rapidly collapsed, resulting in the tragic

deaths of over two thousand people, including first responders and citizens working in and visiting the WTC. This rapid collapse of WTC 1 and WTC 2 exacerbated the already tragic loss of the passengers and crews on the hijacked aircraft. What is less well known is that also on 9/11 a third WTC high-rise building, WTC 7, 47 stories high, completely collapsed, much later in the day, without having been struck by an aircraft.

WTC 7's collapse was rapid, symmetrical, and in every respect appeared to be a controlled demolition. Appendix at A29, FAC ¶¶ 112-113, 191, 218-233, 269, 271-273, 279, 300. The National Institute of Standards and Technology (NIST) was charged with investigating and reporting the cause of WTC 7's collapse. NIST was required by law to generate the NIST WTC 7 Report under the National Construction Safety Team (NCST) Act (Pub. Law 107-231, 15 U.S.C. § 7301 et seq.). The NCST Act, 15 U.S.C. § 7307, mandates the issuance of a final public report following a NIST investigation of a building collapse subject to the Act.

NIST in November 2008 issued its findings and conclusions regarding the collapse of WTC 7 in its WTC 7 Report. Appendix at A29, FAC ¶ 89. NIST, through the NIST WTC 7 Report and the NIST WTC 7 FAQs, disseminated inaccurate, unreliable, and biased information about the collapse of the WTC 7, ignoring the abundant evidence of the use of explosives (in a controlled demolition), and misrepresenting to the public that WTC 7's collapse was due

entirely to fires in the building. Appendix at A29, FAC ¶ 99.  NIST's WTC 7

Report was based on purported computer modelling of WTC 7's collapse but NIST

refused to release its computer modelling to the public or independent scientists for

attempts at verification and replication. Appendix at A29, FAC ¶¶ 24, 275, 283.

     NIST's conclusion -- that fires initiated by debris damage from the collapse

of one of the WTC towers, the North Tower, WTC 1, caused the collapse of WTC

7 -- was simply incompatible with the then-available, and now-available, scientific

and witness evidence. Plaintiffs submitted to NIST, via their Request for

Correction (RFC) under the IQA, a scientifically and logically irrefutable case

based on careful documentation of dispositive evidence clearly showing that the

NIST WTC 7 Report's conclusion and rationale -- that the collapse of WTC 7 on

9/11 was due to fires and not the use of explosives and incendiaries -- was more

than just wrong, it was factually inaccurate, methodologically unreliable,

scientifically unsound, illogical, and biased. Appendix at A29, FAC ¶ 113.

     Some of the Plaintiffs are family members of those who died in the 9/11

attacks at the WTC, Appendix at A29, FAC ¶¶ 27-50, 52, and some are

professional architects and engineers, Appendix at A29, FAC ¶¶ 54-67. Plaintiff

Architects & Engineers for 9/11 Truth (AE) is a non-profit organization,

incorporated in California. Since its founding in 2006, AE has conducted an

independent, multi-year scientific investigation into the causes of the destruction of

World Trade Center Building 7 (WTC 7) as well as the destruction of the World Trade Center Twin Towers (WTC 1 and 2). Appendix at A29, FAC ¶¶ 9-26; Appendix at A116, FAC Exhibit 1, Declaration of Roland Angle, President and Chief Executive Officer of AE.

Plaintiffs submitted their RFC of NIST's WTC 7 Report[2] under the IQA to NIST on April 15, 2020, asserting inter alia that NIST violated NIST's IQS requirements of objectivity, utility, transparency, and reproducibility.

The Initial Decision by NIST denying Plaintiffs' RFC was issued on August 28, 2020. Plaintiffs' administrative Appeal of the Initial Decision Regarding the Request for Correction to NIST's Final Report on the Collapse of World Trade Center Building 7 (Information Quality #20-01) was submitted to NIST on September 28, 2020.

Plaintiffs submitted to NIST on June 1, 2021, a Request for Issuance of Final Decision, and Alternative Notice of Intent to Sue due to NIST's eight-month delay in deciding Plaintiffs' Appeal. On June 30, 2021, NIST issued its decision denying Plaintiffs' administrative Appeal of NIST's denial of Plaintiffs' RFC.

---

[2] Plaintiffs-Appellants use herein the term NIST's WTC 7 Report to include collectively  NIST's Final Report on the Collapse of the World Trade Center Building 7 (NIST report NCSTAR 1A) and NIST's Fire Response and Probable Collapse Sequence of World Trade Center Building 7 (NIST report NCSTAR 1-9), together with NIST's publicly posted FAQs regarding these reports.

All the Plaintiffs were Requestors in the RFC submitted to NIST under the IQA and were parties to the subsequent administrative appeal of NIST's denial of that RFC.

NIST's violations of the IQA, the OMB Guidelines, and NIST's Information Quality Standards (IQS) significantly and adversely affect Plaintiffs. Appendix at A116, FAC Exhibit 1, Declaration of Roland Angle; Appendix at A121, FAC Exhibit 2, Declaration of Robert McILvaine; and Appendix at A123, FAC Exhibit 3, Declaration of Ronald Brookman. And see, e.g., FAC ¶¶ 9-26; FAC ¶¶ 41-49; FAC ¶¶ 55-67.

Plaintiffs, who include several family members victims of the September 11, 2001 terrorist attacks at the World Trade Center, and the nonprofit organization Architects and Engineers for 9/11 Truth filed this action for declaratory and injunctive relief on September 7, 2021, and filed their First Amended Complaint (FAC) on January 31, 2022. In Plaintiffs First Amended Complaint, Plaintiffs present ten claims for declaratory and injunctive relief under the Administrative Procedures Act, 5 U.S.C. §§ 702, 706, the Informational Quality Act (aka Data Quality Act), Section 515 of Public Law 106-554, and the National Construction Safety Team Act (NCST Act).

The FAC was filed by eight family members of people killed on September 11, 2001, by ten architects and structural engineers, and by the nonprofit

organization Architects & Engineers for 9/11 Truth, Inc. The FAC alleged that NIST, a federal agency, took actions that were arbitrary and not in accordance with law, including failures to comply with the IQA, OMB's IQA regulations, and NIST's own IQA information quality standards. Appendix at A29 (First Amended Complaint).

After Plaintiffs filed their FAC, Defendants filed a Motion to Dismiss on March 11, 2022, ECF Doc. 17, Appendix at A3 (Docket Entries, p. 9). On April 11, 2022, Plaintiffs filed their Memorandum in Opposition to Defendants' Motion to Dismiss. ECF Doc 19. Appendix at 3 (Docket Entries, p. 9). On May 2, 2022, Defendants filed their reply on motion to dismiss. ECF Doc. 21. Appendix at 3 (Docket Entries, p. 9).

As noted, on August 2, 2022, the District Court entered its Memorandum Opinion and its Order dismissing Plaintiffs' First Amended Complaint in its entirety. Appendix at A15 and A14 respectively. On October 3, 2022, Plaintiffs timely filed their Notice of Appeal to this Court of Appeals. Appendix at A12.

The rulings presented for review are the District Court's (McFadden, J.) Memorandum Opinion of August 2, 2022 and the District Court's Order of the same date (ECF Doc. Nos. 22, 23) dismissing Plaintiffs-Appellants' claims for lack of standing. Appendix at A15 and A14, respectively.

**SUMMARY OF ARGUMENT**

Plaintiffs have a substantive right to information under the NCST Act which requires issuance of a public report by Defendant NIST regarding the likely technical cause of the collapse of WTC 7, and under the IQA which requires agencies to comply with certain informational quality standards. The IQA allows affected persons to seek correction of disseminated information directly from an agency, and Plaintiffs exercised that statutory right before the agency.

Plaintiffs-Appellants AE et al. have, contrary to the District Court's conclusion, informational standing to challenge NIST's WTC 7 Report, and NIST's refusal to correct that Report, under the IQA and APA because NIST produced a sham report. NIST's WTC 7 Report reflects a knowing failure of NIST to honor its statutory mandate under the NCST Act to report the likely technical cause of WTC 7's collapse on 9/11. Plaintiffs thus were denied the information to which an Act of Congress entitled them, and the public, and had standing to challenge that denial of statutorily mandated information via the IQA and APA. NIST's knowingly incorrect report blatantly violated the IQA, OMB's IQA regulations, and NIST's own IQA information quality standards.

Organizational Plaintiff-Appellant AE has, contrary to the District Court's conclusion, organizational standing to pursue its IQA and APA challenge to NIST's refusal to correct its WTC 7 Report to reflect the actual likely technical

cause of WTC 7's collapse because NIST's arbitrary and illegal actions create

substantial obstacles to AE performing its nonprofit organizational public interest

mission, and have caused AE to expend more than $200,000 in efforts to publicly

rebut NIST's factually and scientifically fundamentally flawed WTC 7 Report.

The District Court's conclusion below that the NCST Act did not require

issuance of an honest report or scientifically valid report or factually correct report,

but only required that the public be given some kind of document that was labelled

as a report on WTC's collapse, sets a disturbing precedent, if allowed to stand.

Under the rule the District Court adopted, the rule the government would have this

Circuit Court of Appeals adopt, even if a government "report" was an outright

fraud and knowingly failed to report to the public what Congress had mandated,

here a disclosure of the likely technical cause of WTC 7's collapse, citizens and

organizations would still not have informational standing to sue under the IQA or

APA because members of public would have gotten all the information they were

entitled to –whatever a corrupt or incompetent agency chose to given them no

matter how far removed from what Congress had mandated.

**ARGUMENT**

## I.   THE DISTRICT COURT ERRED IN CONCLUDING THAT EACH OF THE PLAINTIFFS-APPELLANTS LACKED INFORMATIONAL STANDING

The standard of review for this issue is *de novo*. The Court of Appeals reviews the district court's dismissal of a case for lack of standing *de novo*. *Huron v. Cobert*, 809 F.3d 1274, 1278 (D.C. Cir. 2016), citing *Information Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003). In evaluating standing at this early stage of the litigation, the Court of Appeals assumes that the complaint states a valid legal claim. *Id.*

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *E.g., Jenkins v. McKeithen*, 395 U.S. 411, 421—422, 89 S.Ct. 1843, 1848—1849, 23 L.Ed.2d 404 (1969).

*Warth v. Seldin*, 422 U.S. 490, 501–02 (1975).

### A.   The Information Quality Act

Section 515 of Public Law 106-554 is commonly known as the Data Quality Act or Information Quality Act. The IQA, enacted in 2000, provides that the Director of the OMB shall, with public and federal agency involvement, issue guidelines under sections 3504(d)(1) and 3516 of title 44, United States Code, that provide policy and procedural guidance to federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information

disseminated by federal agencies in fulfillment of the purposes and provisions of the Paperwork Reduction Act. 44 U.S.C. § 3516, note.

The IQA required OMB's Guidelines to direct each Federal agency to which the guidelines apply to issue agency specific guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by such agency.

The IQA also required OMB's Guidelines to direct each Federal agency to establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the OMB and agency information quality guidelines.

The OMB, pursuant to the IQA, issued government-wide Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies ("OMB Guidelines"). On June 28, 2001, the OMB issued its proposed guidelines implementing the IQA and requesting public comment. 66 Fed. Reg. 34489. OMB issued its updated final guidelines on February 22, 2002. 67 Fed. Reg. 8452.

The OMB guidelines require agencies to "adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal," including "specific standards of quality that are appropriate for the various categories of information they disseminate." 67 Fed. Reg. 8458–59. "Quality is to be ensured

and established at levels appropriate to the nature and timeliness of the information to be disseminated." *Id*. at 8458.

The OMB Guidelines state that "'Objectivity' includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner." *Id.* at 8460.

The OMB Guidelines also require that agencies provide "administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines." *Id*. at 8459.

The OMB commentary provided when the OMB Guidelines were published states, in regard to an agency's administrative mechanism allowing affected persons to seek and obtain timely correction of information, that "an objective process will ensure that the office that originally disseminates the information does not have responsibility for both the initial response and resolution of a disagreement." *Id*. at 8458.

NIST in turn, pursuant to the IQA and the OMB Guidelines, issued its own "Guidelines, Information Quality Standards, and Administrative Mechanism" ("NIST IQS").

The NIST IQS define "information" as follows:

Information means any communication or representation of knowledge such as facts or data, in any medium or form, including

textual, numerical, graphic, cartographic, narrative, or audiovisual forms. This definition includes information that an agency disseminates from a Web page but does not include the provision of hyperlinks to information that others disseminate. This definition does not include opinions, where the agency's presentation makes it clear that what is being offered is someone's opinion rather than fact or the agency's views.

The NIST IQS defines "dissemination" as follows:

Dissemination means agency initiated or sponsored distribution of information to the public. Dissemination does not include distribution limited to government employees or agency contractors or grantees; intra- or inter-agency use or sharing of government information; and responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act or other similar law. This definition also does not include distribution limited to correspondence with individuals or persons, press releases, archival records, public filings, subpoenas or adjudicative processes.

Under the OMB Guidelines and the NIST IQS, information quality comprises three elements: utility, integrity, and objectivity.

"Utility" under the NIST IQS means that the information is "useful to its intended users." The term "useful," in turn, means that the information is "helpful, beneficial, or serviceable to its intended users." The NIST IQS further provides that "Where the usefulness of information will be enhanced by greater transparency, care is taken that sufficient background and detail are available, either with the disseminated information or through other means, to maximize the usefulness of the information. The level of such background and detail is commensurate with the importance of the particular information, balanced against

24

the resources required, and is appropriate to the nature and timeliness of the information to be disseminated."

"Integrity" under the NIST IQS means that before information is disseminated by NIST, it is "safeguarded from improper access, modification, or destruction." Furthermore, the integrity of information is protected "to a degree commensurate with the risk and magnitude of harm that could result from the loss, misuse, or unauthorized access to or modification of such information."

"Objectivity" under the NIST IQS means that the information is "accurate, reliable, and unbiased." Moreover, "objective" information is "presented in an accurate, clear, complete, and unbiased manner." In the case of scientific information, "the original and supporting data are generated, and the analytic results are developed, using sound statistical and research methods."

The OMB Guidelines and the NIST IQS apply stricter quality standards to the dissemination of information that is considered "influential." The OMB Guidelines define as "influential" information that "will have or does have a clear and substantial impact on important public policies or important private sector decisions." The NIST IQS defines "influential" similarly.

Regarding influential scientific information and analytic results related thereto, the OMB Guidelines dictate that "agency guidelines shall generally require sufficient transparency about data and methods that an independent reanalysis

could be undertaken by a qualified member of the public." See 67 F.R. 8460. Citing OMB Guidelines, the NIST IQS states that "agency guidelines shall include a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties."

"Reproducibility" under the NIST IQS means that the information is "capable of being substantially reproduced, subject to an acceptable degree of imprecision. For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased)." The NIST IQS states that "With respect to analytic results, 'capable of being substantially reproduced' means that independent analysis of the original or supporting data using identical methods would generate similar analytic results, subject to an acceptable degree of imprecision or error." Id. In other words, if independent analysis of the original or supporting data using identical methods does not generate similar analytic results, the disseminated information does not meet the reproducibility standard imposed on "influential" information.

### B. The National Construction Safety Team Act

NIST was required by law to generate the NIST WTC 7 Report under the NCST Act (Pub. Law 107-231, 15 U.S.C. § 7301 et seq.). The NCST Act, 15 U.S.C. § 7307, mandates the issuance of a final public report following a NIST investigation of a building collapse subject to the Act.

The NCST Act, as Defendants note, authorizes NIST to establish and deploy a National Construction Safety Team, after a building collapse "that has resulted in substantial loss of life or that posed significant potential for substantial loss of life," in order to investigate the likely cause or causes of the collapse. 15 U.S.C. § 7301(a)-(b). Following such an investigation, a Team must issue a public report that includes "an analysis of the likely technical cause or causes of the building failure investigated." *Id*. § 7307.

## C.     Plaintiffs Have Informational Standing

Contrary to the District Court's conclusions below, all of the Plaintiffs here satisfy the requirements for informational standing. The D.C. Circuit has explained the nature of the burden on plaintiffs to establish standing, generally.

> To establish standing, Plaintiffs "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C.Cir.2015). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Bennett*, 520 U.S. at 168, 117 S.Ct. 1154 (internal quotation marks omitted).

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

The Supreme Court has explained that a plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); see also *Public*

27

*Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (finding that failure to

obtain information subject to disclosure under Federal Advisory Committee Act

"constitutes a sufficiently distinct injury to provide standing to sue").

The D.C. Circuit has explained that informational standing may arise from

circumstances where a denial of access to information works an injury to the

plaintiff.

> Following *FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10
> (1998), "we have recognized that a denial of access to information
> can," in certain circumstances, "work an 'injury in fact' for standing
> purposes," *Am. Soc'y for Prevention of Cruelty to Animals v. Feld
> Entm't, Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011) (Feld) (internal
> quotation omitted). To carry its burden of demonstrating a
> "sufficiently concrete and particularized informational injury," **the
> plaintiff must show that "(1) it has been deprived of information
> that, on its interpretation, a statute requires the government or a
> third party to disclose to it,** and (2) it suffers, by being denied access
> to that information, the type of harm Congress sought to prevent by
> requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992
> (D.C. Cir. 2016); see *Spokeo, Inc. v. Robins*, ―― U.S. ――, 136 S.Ct.
> 1540, 1549, 194 L.Ed.2d 635 (2016) ("judgment of Congress" is
> "important" to "whether an intangible harm," including informational
> harm, "constitutes injury in fact").

*Electronic Privacy Information Center v. Presidential Advisory Commission on

Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (emphasis added). *Also See,

Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998); *Public Citizen v. Dep't of

Justice*, 491 U.S. 440 (1989); *Friends of Animals v. Jewell*, 828 F.3d 989 (D.C.

Cir. 2016).

It is important to note for purposes of a standing decision to be made at the

motion to dismiss stage, as Defendants seek here, that the legal standard adopted

by the D.C. Circuit, as reflected in the emphasized portion of the quote from

*Electronic Privacy Information Center* immediately above, requires the deciding

court to adopt the *Plaintiffs'* interpretation regarding information the statute in

question requires the government to disclose to them. *Id.*

> **Injury in fact is the denial of information he believes the law entitles him to**."). **To establish such an injury, a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain.** In *Akins*, for example, the plaintiffs challenged the Federal Election Commission's determination that the American Israel Public Affairs Committee (AIPAC) was not a "political committee" as defined by the Federal Election Campaign Act (FECA) and therefore not subject to FECA's disclosure requirements. *Akins*, 524 U.S. at 13, 118 S.Ct. 1777. **Under plaintiffs' contrary view of the law**—that AIPAC's activities rendered it a "political committee"—AIPAC would be required to disclose information about its donors and contributions, information that plaintiffs would have a right to obtain. *See id.* at 21, 118 S.Ct. 1777 ("**The 'injury in fact' that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors ... and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public.**"). **Because of this, the Supreme Court held, plaintiffs had informational standing to challenge the agency's decision**. Were plaintiffs to prevail, AIPAC would have to disclose the information they sought. Similarly, in *Judicial Watch, Inc. v. U.S. Department of Commerce*, the plaintiff alleged that the Department violated the Federal Advisory Committee Act (FACA) reporting requirements by failing to disclose information about its meetings with the North American Competitiveness Council. 583 F.3d 871, 872–73 (D.C.Cir.2009). Much as in *Akins*, under the plaintiff's view of the law—that the North American Competitiveness Council and its subgroups qualified as "advisory committees" under FACA—the Department would be "subject to an array of FACA obligations" to

disclose information about its meetings. *Id.* at 873. Because plaintiff would have a right to this information, we held that it had standing to sue the Department for reporting violations.

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 22-23 (D.C. Cir. 2011) (emphasis added).

The District Court here erred as a matter of law in concluding that each of the Plaintiffs-Appellants, lacked Informational Standing. District Court's Memorandum Opinion of August 2, 2020, Appendix at A15, A19-A24. The primary errs of the District Court in regard to the informational standing issue are:

1) The District Court fails to distinguish the prior cases upon which it relies, including primarily a prior decision of this Court, in which the statute at issue had no explicit language requiring an agency to publish a report to the public, from the instant case where the NCST Act does explicitly require NIST to issue a public report. *See* District Court Opinion, Appendix at A15, 19-22.

2) The District Court's mischaracterization of the NCST Act's public report requirement imposed on NIST, which the District Court acknowledges exists (Appendix at A22), as having no teeth – i.e. that NIST can issue a sham or fraudulent report even knowingly to mislead the public and still be deemed to be perfectly in compliance with the Act. *See* District Court Opinion, Appendix at A23 (not enough for an agency report to be a sham), A24 (acknowledging this Circuit's precedent that it is plaintiff's view of the statute's information requirement that

controls at this stage, but holding that Plaintiff's view that the NCST Act report requirement is not satisfied by a sham or fraudulent report is not "plausible"). For the reasons discussed below, the District Court erred as a matter of law in both respects.

Under this Court of Appeals' precedent, Plaintiffs do have Informational Standing because the Defendants actions deprived Plaintiffs of access to information to which they and the public would have had access had Defendants complied with the mandate from Congress at issue, the NCST Act, *as Plaintiffs read that law.*

> In *FEC v. Akins*, the Supreme Court explained that a plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); see also *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (finding that failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"). Following *Akins*, we have recognized that "a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (**on the claimants' reading**) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.' " *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C.Cir.2002) (quoting *Akins*, 524 U.S. at 21, 118 S.Ct. 1777).

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 22 (D.C.Cir.2011) (emphasis added).

Defendants want this Court to adopt the rule that they persuaded the District

Court to adopt, a rule that would deem, for purposes of the standing analysis here,

that Defendants complied with the NCST Act and IQA in regard to information

required to be made public because in *Defendants' view* the NCST Act required

only that a report be issued by NIST (even if scientifically and factually vacuous or

even intentionally fraudulent). In *Defendants' view* the IQA is so discretionary that

NIST could blatantly violate its own and OMB's information quality standards

(and, again, issue a report that was scientifically and factually vacuous or even

intentionally fraudulent) and there would be no informational injury to the 9/11

family member plaintiffs or the architects and engineers plaintiffs because they

were entitled to no information, and not even entitled to have information issued

from a government agency not be designed to intentionally mislead them.

But it is not *Defendants' view* of what information a statute requires an

agency to publicly report that matters under the rule established in this Circuit for

deciding informational standing, it is the *Plaintiff's view*. *Electronic Privacy*

*Information Center v. Presidential Advisory Commission on Election Integrity*, 878

F.3d 371, 378 (D.C. Cir. 2017). This Circuit rule is consistent with the rules

regarding Informational Standing articulated in *Fed. Election Comm'n v. Akins*,

524 U.S. 11 (1998); *Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989);

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016); *Elec. Privacy Info.*

*Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C.

Cir. 2017); and *Friends of Animals v. Salazar*, 626 F.Supp.2d 102, 111 (D.D.C. 2009). Plaintiffs, absent Defendants' arbitrary and capricious actions and actions not in accordance with law and absent Defendants' failure to comply with their non-discretionary duty under the mandate from Congress at issue, would have had access to the congressionally mandated NCST Act report that actually provided an analysis of the real likely technical cause of WTC 7's collapse.

The District Court, while acknowledging this Court of Appeal's precedent holding that Informational Standing is to be determined based on the *plaintiffs' reading* of the requirements of the law at issue, nonetheless departed from that controlling Circuit precedent and decided the Informational Standing issue based on *the District Court's own contrary reading* of the NCST Act (adopting the Defendants' reading).

The erroneous result of this unwarranted departure by the District Court from this Circuit's precedent regarding Informational Standing is particularly disturbing in regard to the District Court's determination in the prior case of the *Lawyers' Committee* that *had there been* a reporting requirement in the mandate from Congress at issue, that then Plaintiff Robert McILvaine, father of Bobby McILvaine who perished at the World Trade Center on 9/11, may have had Informational Standing, a conclusion with which this Court agreed in its prior decision.

This Court, in *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26 (D.D.C. 2020), affd, 848 F. App'x 428 (D.C. Cir. 2021), cert. denied, No. 21-93, 2021 WL 4508610 (U.S. Oct. 4, 2021), a decision on which the District Court and Defendants significantly relied, noted the significance, for informational standing, of whether the statute at issue actually imposes a duty on the agency to issue a public report. This Court held that if there had been a reporting requirement in the Act of Congress at issue there (an appropriations bill), then Plaintiff Robert McILvaine, father of Bobby McILvaine who perished at the World Trade Center on 9/11, may have had informational standing.

> For example, if Congress had required the FBI to report on new evidence, perhaps the goal would have been to mitigate the suffering of survivors like McIlvaine. But Congress did not require the disclosure of any information, so Plaintiffs cannot show informational injury.

*Id*. at 32. Here, however, even the Defendants acknowledge that the NCST Act requires NIST to issue a public report on the likely technical cause of the collapse of WTC 7.

Plaintiff and 9/11 family member Robert McILvaine stated in his declaration that obtaining an accurate explanation from NIST, via the IQA RFC in which he joined, of the cause of WTC 7's collapse will lead to a better understanding of the collapses of WTC 1 and WTC 2 on 9/11, which in turn would result in a better understanding of the cause of his son Bobby's death at the WTC on 9/11. Exhibit

2, ¶ 7. *Also see*, FAC ¶¶ 105, 123. This would assist Mr. McILvaine and his family in getting closure regarding the death of his son and ending his longstanding ongoing quest to find answers. FAC ¶¶ 41-49; Exhibit 2, ¶¶ 6-7.

The NCST Act imposes a mandatory duty on NIST to issue a public report on the likely technical cause of WTC 7's collapse which, in addition to providing a basis for informational standing for 9/11 family members like Mr. McILvaine, also gives the architects and engineers plaintiffs here an informational interest that supplies the basis for these Plaintiffs' standing as well. These plaintiffs have standing to challenge NIST's IQA related actions not only as violations of the IQA but as arbitrary and capricious actions under the APA (even if Plaintiffs turn out to be in error on their asserted claims).

The individual plaintiffs such as Ronald Brookman who are licensed engineers or architects have suffered a special information injury as a result of NIST's IQA and NCST Act violations. *See* Exhibit 3, Declaration of Ronald Brookman. As engineer Brookman notes in his declaration, he has studied the World Trade Center (WTC) tragedy extensively since 2007, with a primary focus on the structural aspects of WTC 7 since the final NIST reports NCSTAR lA, 1-9 and 1-9A were released in 2008. NIST was responsible for establishing the likely cause of the building failure. *Id.*

Licensed professional engineers are charged with safeguarding life, health,

property and public welfare. *Id*. Mr. Brookman takes this obligation seriously and has thus dedicated countless hours to understanding the failure of WTC 7. *Id*.

Mr. Brookman's review has caused him to conclude that the NIST WTC 7 Report authors cannot justify the assumption that collapse initiation resulted from the flange bending and lateral walk-off failure of girder A2001 at column 79 as NIST reported. *Id*. NIST has provided incomplete and misleading responses -- or no responses -- to serious technical inquiries regarding this failure mechanism. *Id.*

Detailed independent analyses conducted and reported by researchers at the University of Alaska Fairbanks (UAF) under the direction of Professor Leroy Hulsey ("UAF Report" or "UAF Study") clarified many questions that NIST has refused to address. *Id*. These comprehensive studies by Professor Hulsey and his UAF team arrived at different conclusions from the NIST studies regarding the collapse initiation and the global collapse, including that the stiffeners would indeed prevent flange bending and lateral walk-off failure of girder A2001 at column 79. *Id.* Engineer Brookman's trust in the research and publishing institutions involved (NIST and ASCE) has significantly eroded as a result of what he considers unethical conduct surrounding obvious errors and omissions in the NIST reports in question. *Id.*

The informational injuries suffered by all the Plaintiffs here would be redressed if NIST were ordered to comply with the IQA. Issuance by NIST of a

36

corrected WTC 7 Report which actually did provide a scientifically valid analysis of the likely technical cause of WTC 7's collapse would, for the reasons discussed *supra*, resolve or substantially resolve the problems created for the plaintiffs who are 9/11 Family Members, for AE, and for the architect and engineer plaintiffs by NIST's arbitrary and illegal issuance of the sham WTC 7 Report.

Because the District Court clearly erred by misapplying, or perhaps more accurately disregarding, this Circuit's precedent on Informational Standing, and achieved an unjust result in the process, the District Court's August 2, 2022 Order and Memorandum Opinion dismissing Plaintiffs' First Amended Complaint should be reversed.

## II.   THE DISTRICT COURT ERRED IN CONCLUDING THAT ORGANIZATIONAL PLAINTIFF-APPELLANT ARCHITECTS & ENGINEERS FOR 9/11 TRUTH LACKED ORGANIZATIONAL STANDING

The standard of review for this issue is likewise *de novo*. As noted, the Court of Appeals reviews the district court's dismissal of a case for lack of standing *de novo*. *Huron v. Cobert*, 809 F.3d 1274, 1278 (D.C.Cir.2016), citing *Information Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C.Cir.2003).

The District Court erred as a matter of law in concluding that the organizational Plaintiff-Appellant AE, a nonprofit organizations whose mission is focused on 9/11 transparency and government accountability, lacked

Organizational Standing to challenge NIST's refusal to correct its WTC 7 Report when AE et al. filed their Request for Correction under the IQA. *See* District Court's Memorandum Opinion of August 2, 2022, Appendix at A25-A27. Again, the District Court did not properly follow this Circuit's precedent, in this case regarding organizational Standing.

The District Court's first error(s) in regard to AE's organizational standing overlaps with one of its primary errors noted *supra* regarding informational standing. In analyzing AE's organizational standing the District Court again treats the NCST Act as if it imposes no requirement on NIST for release of information to the public (and AE), at least no meaningful requirement – i.e. the District Court treats the NCST Act as either imposing no requirement for NIST to issue a public report or reads the Act's requirement as having no teeth, allowing even a knowing sham or fraudulent agency report. *See* District Court Opinion, Appendix at A25 (organizational standing dependent on existence of a statutory right to information), A27 (unlike in the PETA case, here no information was withheld by NIST). The District Court's reasoning in this regard was erroneous for the reasons explained *supra* in regard to informational standing.

But the District Court below made additional errors specific to organizational standing. The District Court treated AE's substantial expenditure of $200,000-300,000 for the University of Alaska study by Professor Hulsey as pure

advocacy and not as an effort to protect and promote its mission which had been substantially interfered with by NIST's issuance of the sham WTC 7 Report. *See* District Court Opinion, Appendix at A26. In addition, the District Court mistakenly relies on a prior AE case that came before this Court for the conclusion that AE's need to make expenditures for the Alaska Hulsey study did not flow from the illegal agency conduct alleged. *See* District Court Opinion, Appendix at A26. But the illegal conduct alleged in the prior *Lawyers' Committee*[3] case was quite different and involved a different agency and a different law. In the prior case the FBI was alleged to have failed to perform a study of 9/11 evidence required by Congress in good faith. Although that evidence included evidence regarding the demolition of WTC buildings on 9/11, it also included numerous other categories of evidence. Here, there is a direct and non-tenuous tie between NIST issuing a sham report about the cause of WTC 7's collapse and the Alaska Hulsey study which addresses specifically that question, and only that question.

The District Court further erred in concluding that because AE's substantial expenditure for the Alaska Hulsey study in some measure furthered AE's nonprofit organizational mission, that NIST's issuance of the flawed WTC 7 Report did not cause such expenditure or otherwise interfere with AE's mission. *See* District

---

[3] *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26 (D.D.C. 2020), affd, 848 F. App'x 428 (D.C. Cir. 2021), cert. denied, No. 21-93, 2021 WL 4508610 (U.S. Oct. 4, 2021).

Court Opinion, Appendix at A27. This logic misses the point of all the prior precedent regarding organizations having standing if agency action causes the organization to expend resources to rebut or otherwise respond to agency action that obstructs its mission. NIST's issuance of the sham WTC 7 Report caused AE, a nonprofit with limited resources, to expend approximately a quarter of a million dollars to rebut a false agency report going to the heart of its mission, an expenditure that would not have needed at all had NIST complied with the NCST Act and issued a good faith analysis of the likely technical cause of WTC 7's collapse.

The key for organizational standing is whether the challenged actions of Defendants are in direct conflict with the organizational plaintiff's mission and harms the organization's interests in some concrete manner other than impacting abstract social interests.

> In *Havens Realty Corp. v. Coleman*, however, the Supreme Court held that an organization may establish Article III standing if it can show that the defendant's actions cause a "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests." 455 U.S. at 379, 102 S.Ct. 1114. … Taking these allegations as true, the Supreme Court held that if the organization could show that the steering practices "perceptibly impaired [its] ability to provide counseling and referral services for low- and moderate-income homeseekers," such impairment would constitute an injury in fact sufficient to support standing. *Id.* Because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests," *id.*, the Court

distinguished the case from *Sierra Club*, where the organizational
plaintiff had alleged nothing more than a "mere interest in a
problem," *Sierra Club*, 405 U.S. at 739, 92 S.Ct. 1361 (internal
quotation marks omitted).

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,

659 F.3d 13, 25 (D.C.Cir.2011).

> For our part, we "ha[ve] applied *Havens Realty* to justify
> organizational standing in a wide range of circumstances." *Abigail
> Alliance for Better Access to Developmental Drugs v.
> Eschenbach*, 469 F.3d 129, 133 (D.C.Cir.2006). Our case law,
> however, establishes two important limitations on the scope
> of standing under *Havens*. See *id*. First, an organization seeking to
> establish *Havens* standing must show a "direct conflict between the
> defendant's conduct and the organization's mission." *Nat'l Treasury
> Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C.Cir.1996). If
> the challenged conduct affects an organization's activities, but is
> neutral with respect to its substantive mission, we have found it
> "entirely speculative" whether the challenged practice will actually
> impair the organization's activities. *Id.* Second, an organization may
> not "manufacture the injury necessary to maintain a suit from its
> expenditure of resources on that very suit." *Spann*, 899 F.2d at 27.
> Under our case law, an organization's diversion of resources to
> litigation or to investigation in anticipation of litigation is considered a
> "self-inflicted" budgetary choice that cannot qualify as an injury in
> fact for purposes of standing. *Equal Rights Ctr.*, 633 F.3d at 1139–40.

*Id*.

The NCST Act requires NIST to issue a public report on the likely technical

cause of WTC 7's collapse. FAC ¶¶ 347-348. Plaintiffs assert that that WTC 7

Report issued by NIST in 2008 was at best an unscientific sham, and likely

fraudulent, FAC ¶¶ 355-358, and that NIST's misconduct in issuing such a report

denied AE and the other plaintiffs critically important information affecting their individual and organizational interests.

NIST's violations of the IQA and NCST Act in issuing the scientifically unfounded and misleading public WTC 7 Report based on secret computer modelling and refusing to correct the Report or disclose the modelling denied AE access to the real fact and scientific evidence in NIST's possession and denied AE access to the evidence of NIST's (at best) blatant errors regarding the cause of WTC 7's collapse (including the errors that are now known to necessarily exist in NIST's still secret computer modelling based on the recent UAF Report).

Absent NIST's IQA and NCST Act statutory violations, AE would have been able to obtain and share with the public and with 9/11 family members the government's withheld evidence of the real cause of WTC 7's collapse and/or the evidence of NIST's fraud or incompetence in issuing the WTC 7 Report which has misled the 9/11 family members for so long as to such cause. AE was clearly harmed by NIST's statutory violations in AE's efforts to assist the 9/11 family members in not only knowing the truth but in being able to prove it in a manner that might provide additional legal relief or remedies for the 9/11 family members. That harm resulted in AE's efforts to combat NIST's violations including by incurring the extraordinary expense of contracting for an independent engineering

study of WTC 7's collapse, the UAF Report, which required AE to expend more than $300,000 of its limited non-profit organizational resources.

Such circumstances support a finding that the requirements for organizational and informational standing here are met, as the District Court for D.C. has recently held.

> Regarding the first prong: to qualify as an injury to the organization's interest, the challenged activity must "perceptibly impair[ ] the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919 (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)). Put otherwise, it must "inhibit[ ]" the organization's "daily operations" in a concrete way, *PETA II*, 797 F.3d at 1094 (citation omitted), such as by "undermin[ing] the organization's ability to perform its fundamental programmatic services." *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, No. 14-1915, 2016 WL 4435175, at *6 (D.D.C. Aug. 19, 2016). A necessary aspect of this requirement is that there be a "direct conflict between the defendant's conduct and the organization's mission." *Abigail All. v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).
>
> Once this first prong is met, the Court moves on to the second and asks whether the organization will "use[ ] its resources to counteract that harm." *Food & Water Watch*, 808 F.3d at 919 (quoting PETA II, 797 F.3d at 1094). While "self-inflicted" injuries do not count, *Abigail All.*, 469 F.3d at 133, an injury is not a "self-inflicted ... budgetary choice[ ]" merely by having been made willfully or voluntarily. *Equal Rights Ctr.*, 633 F.3d at 1139 (quoting *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). Rather, as long as the organization will expend resources "to counteract[ ] the effects of the defendant['s]" challenged conduct, that diversion can suffice for Article III purposes. *Id*. at 1140.

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp.

3d 1, 19 (D.D.C. 2020), appeal dismissed sub nom. *Whitman-Walker Clinic, Inc. v.*

*United States Dep't of Health & Hum. Servs.*, No. 20-5331, 2021 WL 5537747

(D.C. Cir. Nov. 19, 2021).

An agency's action or inaction including via withholding information vital

to a non-profit organization's mission can provide a basis for organizational

standing, including informational standing.

> In *PETA*, an animal-welfare organization challenged the USDA's failure to apply statutory general animal welfare requirements to birds. 797 F.3d at 1089–91. Ordinarily, when the USDA applied the animal welfare requirements, an outside organization like PETA could seek redress for mistreatment by filing a complaint with the USDA. Because the USDA refused to apply those requirements to birds, PETA could not seek redress for mistreatment of birds through the USDA's complaint procedures. *Id.* at 1091. Additionally, because the USDA was not applying the requirements to birds, the USDA was not generating inspection reports that the organization used to educate its members. *Id.* **The agency inaction injured the organization because the organization suffered a "denial of access to bird-related ... information including, in particular, investigatory information, and a means by which to seek redress for bird abuse"** *Id.* at 1095. We found these injuries to be "concrete and specific to the work" in which the organization was engaged. *Id.* (quoting *Action All.,* 789 F.2d at 938). The denial of access to an avenue for redress and denial of information "perceptibly impaired [the organization's] ability to both bring [statutory] violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public." *Id.* (internal quotation marks omitted).

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920–21 (D.C. Cir. 2015).

The work of the PETA organization described above in the DC Circuit's

decision in *Food & Water Watch, Inc. v. Vilsack* (discussing the prior D.C. Circuit

decision in *People for the Ethical Treatment of Animals v. U.S. Dept. of*

*Agriculture*, 797 F.3d 1087 (2015)) is analogous to Plaintiff AE's work to bring to

9/11 family members the truth regarding the cause of WTC 7's collapse on 9/11.

FAC ¶¶ 9-26. AE's work to bring the truth to 9/11 family members about the cause

of the WTC 1 and WTC 2 collapses on 9/11 (where tragically so many of the 9/11

family members lost loved ones) is inextricably intertwined (contrary to

Defendants' illogical contrary assertion) with AE's similar work regarding WTC 7.

In reviewing a district court's standing determination, "the court must be

careful not to decide the questions on the merits for or against the plaintiff."

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,

659 F.3d 13, 19–20 (D.C.Cir.2011) quoting *Defenders of Wildlife v. Gutierrez*, 532

F.3d 913, 924 (D.C. Cir. 2008).

> As explained in *Equal Rights Center*, we begin an inquiry
> into Havens standing by asking whether the defendant's allegedly
> unlawful activities injured the plaintiff's interest in promoting its
> mission. *Id*. at 1140. If the answer is yes, we then ask whether the
> plaintiff used its resources to counteract that injury.

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,

659 F.3d 13, 19–20 (D.C.Cir.2011).

Had NIST honored its mandate from Congress and assessed and reported to

Congress the readily apparent evidence of controlled demolition at the WTC on

9/11, organizational plaintiff AE would not have had to have expended thousands

of hours and tens of thousands of dollars publicly rebutting NIST's findings,

including expending over two hundred thousand dollars for the special engineering study contracted for by AE with civil engineering Professor Leroy Hulsey of the University of Alaska. Organizational plaintiff AE here engaged in these extraordinary expenditures of resources in an effort to counteract the harm to its nonprofit organizational interests caused by Defendants' failures to comply with the NCST Act mandate from Congress to provide the public an analysis of the likely technical cause of WTC 7's collapse. The fact that some might describe some of AE's expenditures to combat the misinformation put out by NIST in its WTC 7 Report as advocacy related does not undercut AE's organizational standing argument here.

Moreover, many of our cases finding *Havens* standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are. In *Equal Rights Center*, for instance, we spoke of an injury to the organizational plaintiff's "interest in promoting fair housing." 633 F.3d at 1140. And in *Abigail Alliance*, although recognizing a distinction "between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised," we found that the Alliance had "met this threshold by alleging that it actively engages in counseling, referral, **advocacy**, and educational services." 469 F.3d at 133 (emphasis added) (internal quotation marks omitted). Indeed, API's claims closely mirror those we found sufficient to support standing in *Spann*. There, we concluded that a fair housing organization had standing to sue a condominium owner over discriminatory advertisements, reasoning that the organization might have to expend additional resources on public education to "rebut any public impression the advertisements might generate that racial discrimination in housing is permissible." *Spann*, 899 F.2d at 29. Here, similarly, API claims that it must expend additional resources

on public education to rebut the misimpression, allegedly caused by
Feld's practices, that the use of bullhooks and chains is permissible.

*American Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,

659 F.3d 13, 26–27 (D.C. Cir. 2011).

In Plaintiffs' view, the view that matters under this Circuit's standard set in

*Electronic Privacy Information Center v. Presidential Advisory Commission on*

*Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017), NIST's statutory obligation

to issue a public report on the likely technical cause of WTC 7's collapse cannot be

considered to have been complied with just because NIST issued a sham report that

ignored the abundant evidence of the use of controlled demolition at WTC 7 on

9/11 and relied on a still secret black box computer modelling to mislead the public

into thinking there was some fact and science supporting NIST's conclusion. *See*

FAC ¶¶ 99, 135-137, 140-141, 244-264, 274-276, 280, 283-286, 355-358. NIST's

WTC 7 Report could not reasonably be considered, as a matter of fact, science,

logic, or law, to have complied with this NCST Act requirement to determine the

likely technical cause of WTC 7's failure on 9/11 for all the reasons spelled out in

painstaking technical detail in Plaintiffs' RFC and RFC Appeal, and for the reasons

detailed in the (expensive) UAF study that AE contracted for that demonstrated

that NIST's WTC 7 Report's conclusions as to the likely technical cause of WTC

7's collapse could not have been correct (and neither could have NIST's secret

computer modelling).

It is important to note that the burden on Plaintiffs to establish standing is less demanding at this motion to dismiss stage. "[P]laintiffs are required only to state a plausible claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (emphasis in original). "[W]hat may perhaps be speculative at summary judgment can be plausible on a motion to dismiss," and courts should not "recast[ ] 'plausibility' into 'probability' " by demanding predictive certainty. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208–12 (4th Cir. 2017); *see also District of Columbia v. Trump*, 291 F.Supp.3d 725, 738 (D. Md. 2018) (alleging injury-in-fact at the pleading stage is not akin to climbing "Mount Everest").

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *E.g., Jenkins v. McKeithen,* 395 U.S. 411, 421—422, 89 S.Ct. 1843, 1848—1849, 23 L.Ed.2d 404 (1969).

*Warth v. Seldin*, 422 U.S. 490, 501–02 (1975).

It should be noted that although there is some overlap in AE's asserted bases for informational standing and organizational standing, there are also differences between the two. Whether or not AE was harmed by NIST's failure to provide information to AE or the public in response to AE's RFC, AE would still have been harmed organizationally as a result of NIST's issuance of a fraudulent WTC 7 Report and NIST's efforts to conceal its misrepresentations about the cause of

WTC 7's collapse on 9/11 by keeping secret its purported computer modelling on which the purported validity of NIST's WTC 7 Report superficially stands.

Organizational standing requires an organization, just as in the case of an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action of the defendant and that is likely to be redressed by a favorable court decision. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919–20 (D.C. Cir. 2015).

> An organization must allege more than a frustration of its purpose because frustration of an organization's objectives "is the type of abstract concern that does not impart standing." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). "The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). Accordingly, for FWW to establish standing in its own right, it must have "suffered a concrete and demonstrable injury to [its] activities." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotation marks omitted). Making this determination is a two-part inquiry—"we ask, first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Id.* at 1094 (internal quotation marks omitted). … .

> ... Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury. *Id*. at 1093–94; *Turlock Irrigation Dist*., 786 F.3d at 24. Furthermore, **an organization does not suffer an injury in fact where it "expend[s] resources to educate its members and others"** *unless* **doing so subjects the organization to "operational costs beyond those normally expended."** *Nat'l Taxpayers Union, Inc*., **68 F.3d at 1434;** *see also Nat'l Ass'n of Home Builders v. EPA*, **667 F.3d 6, 12**

> **(D.C.Cir.2011) (organization's expenditures must be for "
> 'operational costs beyond those normally expended' to carry out
> its advocacy mission"** (quoting *Nat'l Taxpayers Union*, 68 F.3d at
> 1434)).

*Id.* (emphasis added).

> An organization is harmed if the "actions taken by [the defendant]
> have 'perceptibly impaired' the [organization's] programs." *Fair
> Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d
> 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v.
> Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214
> (1982)); *see also Nat'l Treasury Emps. Union v. United States*, 101
> F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that the initial question
> is whether "a defendant's conduct has made the organization's
> *activities* more difficult"). If so, the organization must then also show
> that the defendant's actions "directly conflict with the organization's
> mission." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

> The second step is required to ensure that organizations cannot engage
> in activities simply to create an injury. *Id. League of Women Voters*,
> 838 F.3d at 8. "Irreparable harm" is a higher burden than that
> necessary to establish Article III standing. *Nat. Res. Def. Council, Inc.
> v. EPA*, 383 F. Supp. 3d 1, 11 (D.D.C. 2019) ("**an identifiable trifle
> is enough for standing**'").

*Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.*, 496

F. Supp. 3d 1, 12 (D.D.C. 2020), *enforcement granted,* No. 20-CV-2295 (EGS),

2020 WL 6441317 (D.D.C. Oct. 27, 2020), and *appeal dismissed,* No. 20-5375,

2021 WL 672392 (D.C. Cir. Feb. 10, 2021).

Organizational plaintiff AE meets the above articulated standard for

organizational standing because, as a result of NIST's IQA and NCST Act

violations in regard to NIST's WTC 7 Report, AE was put to substantial expense

(more than three hundred thousand dollars) to fund an engineering study of the collapse of WTC Building 7, a study performed for AE by Professor Leroy Hulsey of the University of Alaska (the aforementioned UAF Report).

Such an extraordinary diversion of organization resources, for a non-profit organization is clearly more than a "trifle." This study was initiated in May 2015 and the final version was released on March 25, 2020. The UAF Report is an engineering analysis of the collapse of WTC Building 7 (which was not hit by any aircraft) which concluded in short that fire did not cause the collapse and that whatever did cause the collapse involved the near simultaneous failure of nearly all of the buildings steel support columns.

This extraordinary expenditure by AE for this expensive independent engineering study was a drain on the organization's resources, not simply a "setback to the organization's abstract social interests," sufficient to establish injury for purposes of the standing analysis. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). *And see*, *Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.*, 496 F. Supp. 3d 1, 11–12 (D.D.C. 2020), *enforcement granted,* No. 20-CV-2295 (EGS), 2020 WL 6441317 (D.D.C. Oct. 27, 2020), and *appeal dismissed,* No. 20-5375, 2021 WL 672392 (D.C. Cir. Feb. 10, 2021) ("Accordingly, Plaintiff has provided evidence demonstrating that

[the] Defendants' actions "directly conflict with [its] mission" because it has needed to divert resources ...").

In *Havens Realty Corp. v. Coleman*, the Court held that an organization may establish Article III standing if it can show that the defendant's actions cause a "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests." 455 U.S. 363, 379 (1982). In making the organizational standing decision in *Havens*, the Supreme Court accepted the allegations in the plaintiff's complaint as true, as this Court should in deciding Defendants' Motion to Dismiss here. The Court in *Havens* held that "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Because the District Court clearly erred by misapplying this Circuit's precedent on Organizational Standing, the District Court's August 2, 2022 Order and Memorandum Opinion dismissing Plaintiffs' First Amended Complaint should be reversed.

**CONCLUSION AND RELIEF REQUESTED**

For all of the foregoing reasons, because the District Court clearly erred by misapplying this Circuit's precedent regarding Informational Standing and regarding Organizational Standing, the District Court's August 2, 2022 Order and

Memorandum Opinion dismissing Plaintiffs' First Amended Complaint should be reversed.

/s/ Mick G. Harrison
Mick G. Harrison, Attorney at Law #55038
520 S. Walnut Street, #1147
Bloomington, IN 47402
Phone: 812-361-6220
Fax: 812-233-3135
E-mail: mickharrisonesq@gmail.com

Attorney of Record for all Plaintiffs

## RULE 32(g)(1) CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(g)(1) because the brief contains 12,396 words, *including* exempted parts as counted by Microsoft Word 2010 software. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

/s/ Mick G. Harrison
MICK G. HARRISON

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2023, I electronically filed the foregoing corrected Appellants' Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system. I also emailed copies of Appellant's corrected Brief to Defendants' counsel on this same date. Paper copies will be mailed to the Court and to Defendants' counsel in compliance with the Court's rules asap and within two business days.

The Defendants-Appellees' counsel to whom the above described service was made and is being made are:

Catherine M. Padhi
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: 202-514-2000
Email: catherine.m.padhi@usdoj.gov

Mark B. Stern, Attorney
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: 202-514-2000
Email: mark.stern@usdoj.gov

/s/ Mick G. Harrison
Mick G. Harrison, Attorney at Law
Counsel for Appellants